# UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF VERMONT

ESTATE OF WAYNE BRUNETTE by )
BARBARA BRUNETTE, as Personal )
Representative and Administratrix of the )
ESTATE OF WAYNE BRUNETTE, and )
BARBARA BRUNETTE, Individually, )
          )
          Plaintiffs, )
          )
     v. )
          )       Case No. 2:15-cv-61-cr
CITY OF BURLINGTON, VERMONT; CITY )
OF BURLINGTON POLICE DEPARTMENT, )
CHIEF MICHAEL SCHIRLING, in his )
Individual and Official Capacities; CPL. )
ETHAN THIBEAULT; in his Individual and )
Official Capacities; CPL. BRENT NAVARI, in )
his Individual and Official Capacities. )
          )
          Defendants. )

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56, Defendants City of Burlington (the "City"), Vermont; Chief Michael Schirling, Cpl. Ethan Thibeault, and Cpl. Brent Navari (collectively "Defendants"), hereby move for Summary Judgment on all remaining claims by Plaintiffs Estate of Wayne Brunette and Barbara Brunette  (collectively "Plaintiffs").[1]  In support of this Motion, Defendants submit the following Memorandum of Law.

## MEMORANDUM OF LAW

### I.     FACTUAL BACKGROUND[2]

---

[1] Plaintiffs' claims against the City of Burlington Police Department ("BPD") and against Chief Schirling, Cpl. Thibeault and Cpl. Navari in their official capacities were dismissed by Court Order dated September 4, 2015.  (Doc. 27).

[2] The Court has "great flexibility with regard to the evidence that may be used in Rule 56 proceedings."  10A Wright & Miller § 2721 (3d ed. 1998).  In conformity with Rule 56, Defendants' Motion is supported by (1) deposition

Downs
Rachlin
Martin PLLC

1

A.  <u>THE SUBJECT INCIDENT</u>

On November 6, 2013, at approximately 3:30 p.m., Lawrence Brunette, age 78, and his

wife Ruthine "Dolly" Brunette, age 76, heard a noise in the front yard of their home at 85 Randy

Lane, Burlington, Vermont.  Statement of Undisputed Material Facts ("SUMF") ¶1.  The

Brunettes' son, Wayne Brunette, age 49, was cutting down a portion of an apple tree in their

front yard with a reciprocating saw.[3]  *Id*.  Mr. Brunette described Wayne's state of mind at this

time as follows:

> **A:**     The tree, he was doing that.  But he was, I don't know if I
> can say it, he was out of his mind at the time.  And I didn't know
> whether he would go and hurt someone.
>
> **Q:**     Okay.
>
> **A:**     Namely, us [Larry and Dolly Brunette].  But he didn't like
> me very well at all, at that time.  But he didn't like anyone at that
> time.

Deposition of Lawrence Brunette, 6/3/16 (hereinafter "L. Brunette Dep.") at 21:23-24:6, attached

as Exhibit D to SUMF; SUMF ¶3.  The Brunettes tried to talk to Wayne, but he was "ranting and

raving," "out of control," and "foul mouth, swearing and cursing and calling us names and

calling his wife names."  SUMF ¶4.  Mrs. Brunette telephoned Wayne's wife, Barbara Brunette,[4]

at work who advised her mother-in-law to call the police.  *Id*. ¶5.

At 4:18 p.m., Mrs. Brunette called the Burlington Police non-emergency number.  The

recorded call is as follows:

---

transcripts; (2) affidavits; and (3) sworn witness statements.  Fed. R. Civ. P. 56(c)(1)(A); 11-56 Moore's Federal
Practice - Civil § 56.94.
[3] Wayne Brunette had a history of mental illness including paranoid schizophrenia, marijuana dependency/abuse,
narcissistic personality traits, delusional disorder, grandiose type; and caffeine and other stimulant abuse.  At the
time of this incident, Wayne had not sought or received medical treatment for any of these various illnesses in
almost ten (10) years.  SUMF ¶2.
[4] To avoid confusion, "Mrs. Brunette" will be used throughout this motion to refer to Wayne's mother, Dolly
Brunette.  Barbara Brunette, Wayne's wife, will be referred to as "Barbara Brunette."

Downs
Rachlin
Martin PLLC

2

> **Mrs. Brunette:**  [T]his is Mrs. Brunette on 85 Randy Lane.  I've
> got a problem here with my son that's upstairs.  He's gone berserk,
> I think, and I mean I've got to do something.  He's cut my apple
> tree down out front just now.  He's violent and he's just mean.  We
> live downstairs.  Him and his wife live upstairs over us.  And now
> he says he owns this whole house and this whole property and
> everything, which he doesn't.  And he's really bad.
>
> **Dispatcher:**  Ok, what is he doing right now m'am?
>
> **Mrs. Brunette:**  Right now I chased him upstairs.  He's upstairs in
> the apartment right now….
>
> **Dispatcher:**  Does he have mental health issues?
>
> **Mrs. Brunette:**  Yes he does….
>
> **Dispatcher:**  Keep your door locked and I'll send somebody over
> there.

SUMF ¶6.

At this time, BPD officers Brent Navari and Ethan Thibault were parked in a parking lot

at Ethan Allen Homestead Park.  *Id*. ¶7.  At 4:19:23 p.m., they received the following radio call

over dispatch:

> **Dispatcher:** Respond to 85 Randy Lane for a mental health issue.
> The caller who lives downstairs owns the property, advises her son
> who lives in the upstairs apartment has been threatening, out-of-
> control, destroying property.  He's now in the apartment upstairs.
> She's downstairs and was advised to stay inside with the door
> locked.

*Id*. ¶8.

Cpl. Thibault estimates that over the years, he has responded to many similar calls with

Cpl. Navari.  *Id*. ¶10.  On this occasion, Cpl. Thibault was the primary officer on the call.  *Id*. ¶9.

He arrived at 85 Randy Lane first and approached the front door.  *Id*. ¶13. Cpl. Navari arrived

moments later and approached the house by way of the Brunettes' driveway.  *Id*. ¶15.  Neither

Cpl. Navari nor Cpl. Thibault turned on their police car lights or sirens in responding to 85 Randy Lane.[5]  *Id*. ¶16.

Mr. and Mrs. Brunette came out to speak with Cpl. Thibault near the front steps of the house.  *Id*. ¶14.  Cpl. Thibault asked Mr. Brunette if Wayne was under the care of a particular doctor; if he was on any medications; if he was seeing anyone from the Howard Center for Human Services[6] (the "Howard Center"); and if Wayne had any weapons or firearms on him.  *Id*. ¶17.  Mr. Brunette responded that Wayne was not on any medications and was not receiving any medical care.  *Id*. ¶18.

When Cpl. Navari arrived on the scene, he observed someone, who he later learned was Wayne Brunette, standing just inside the open garage off the driveway.  *Id*. ¶19.  A moment later, Wayne disappeared from view into the garage and reappeared on the landing above the garage on the upper floor of the house.  *Id*. ¶20.  At this time, Cpl. Navari was standing on the driveway approximately two to three feet from the sidewalk running parallel to Randy Lane.  *Id*.

Using a soft-toned voice, Cpl. Navari requested that Wayne come down from the landing to talk with him.  *Id*. ¶21.  Wayne responded "no," slammed the metal screen door on the landing, but did not appear to go inside.  *Id*. ¶22.

Wayne momentarily disappeared from Cpl. Navari's view and then reappeared stepping out of the garage at the driveway level holding a shovel.  *Id*. ¶23.  The shovel was a garden spade; slightly less than five (5) feet (four feet, ten inches) long, with a wooden handle and pointed metal head.[7]  *Id*. ¶24.

---

[5] At the time of the incident, no BPD cruisers were equipped with cameras.  SUMF ¶74.

[6] The Howard Center is the designated center for mental health services in Chittenden County.

[7] It is undisputed that the subject shovel could be used as a dangerous weapon to inflict serious bodily injury or death.  Plaintiffs' own expert witness, W. Ken Katsaris, is in complete agreement with this conclusion.  *Id*. ¶25.

Cpl. Navari immediately felt threatened by the aggressive manner in which Wayne was holding the shovel. *Id.* ¶26. Cpl. Navari testified that "the hair on the back of my neck stood up." Deposition of Brent Navari, 9/7/16 (hereinafter "B. Navari Dep.") at 117:17-22, attached as Exhibit J to SUMF. Cpl. Navari asked Wayne to put the shovel down. SUMF ¶27. Wayne did not respond, but stood holding the shovel "up, in an aggressive manner towards [Cpl. Navari]." *Id.* Cpl. Navari once again asked Wayne in a friendly-tone to put the shovel down so they could talk. *Id.* ¶28. At that point, Wayne responded in a loud, more aggressive tone, "No, you're going to have to shoot me" and, still holding the shovel in an upright threatening manner, began to advance on Cpl. Navari in a very fast manner. *Id.* ¶¶28-29.

Cpl. Navari immediately started backing up as Wayne continued to quickly advance. *Id.* ¶30. Cpl. Navari drew his weapon and yelled, "drop it, drop it" repeatedly as he was continuing to back up. *Id.* ¶31. Mr. Brunette, who witnessed this interaction from the front walkway of the house, stated in the immediate aftermath that Cpl. Navari tried his best to get Wayne to drop the shovel and asked him to do so at least 6-7 times. *Id.* ¶32.

Cpl. Thibault testified:

> Brent is yelling, 'Drop the shovel." I see Wayne Brunette… barreling out of the…garage, charging towards Brent, swinging a shovel or like jabbing it like a spear kind of way. I saw Brent move back; I saw Brent's gun come out. Again, this is…all happening now seconds, just a few seconds…. I remember Wayne Brunette yelling out, 'No,' in a forceful, kind of growl….

Deposition of Ethan Thibault, 9/8/16 (hereinafter "E. Thibault Dep.") at 208:4-14, attached as Exhibit H to SUMF.

Other eye-witnesses described Wayne pointing the shovel at Cpl. Navari like a spear: handle horizontal to the ground, bladed-end pointed at Navari's face and upper body, with the

Downs
Rachlin
Martin PLLC

upside of the blade face-up.  *Id*. ¶34.  According to Mr. Brunette, "[Wayne] was jousting…he was close enough, I would be scared."  L. Brunette Dep. at 27:5-6, SUMF ¶34.  Mrs. Brunette, who witnessed the incident from the front steps of her house, said "[Wayne] raised the shovel and then he started swinging, you know.  I don't know if he would have hit him.  He [Wayne] probably would have…you know because he's angry, very angry, very angry."  Ruthine "Dolly" Brunette Sworn Statement Lines 103-105, attached as Exhibit M to SUMF; Deposition of Ruthine "Dolly" Brunette, 6/3/16 (hereinafter "R. Brunette Dep.") at 29, 30:20-24, attached as Exhibit A to SUMF.  Mrs. Brunette testified at deposition that Wayne's manner and approach indicated that he was going to hit Cpl. Navari with the shovel.  R. Brunette Dep. at 36:4-14. Mrs. Little told the police in the immediate aftermath that "he tried to attack the cop with the shovel…."  Initial On-Scene Recording (M. Little Statement) Line 175, attached as Exhibit N to SUMF.

Mary Little, the Brunettes' neighbor across the street, watched the incident from the front bay window of her house.  In the immediate aftermath, Mrs. Little described that Wayne

> took the shovel and he lunged right, he kept going toward the cop
> with the shovel in his hand and he lunged right at the cop with it
> and then I saw him swing the shovel at the cop….

*Id*. Lines 152-155. Mrs. Little reiterated this point at her deposition.  He "lunged towards [Cpl. Navari] with the pointed shovel [and] started chasing him."  Deposition of Mary Little, 4/5/16 (hereinafter "M. Little Dep.") at 18:19-25, attached as Exhibit O to SUMF.

Wayne was closing in on Cpl. Navari faster than Cpl. Navari could back up.  *Id*. ¶35. Wayne moved so quickly and was so close to Cpl. Navari that Mr. Brunette couldn't tell whether or not Cpl. Navari had actually been hit by the shovel—it was so close to Cpl. Navari's chest.

Downs
Rachlin
Martin PLLC

6

*Id*. ¶42.  Cpl. Navari tried to create distance between himself and Wayne.  *Id*. ¶ 35.  Wayne continued to lunge and poke the shovel at Cpl. Navari.  *Id*. ¶36.  Cpl. Navari placed his finger on the trigger of his gun.  *Id*. ¶38.  He recalls thinking that if Wayne continues advancing, "I'm going to have to—I'm going to be the one shooting."  *Id*.  Cpl. Navari was extremely fearful of being seriously injured or killed by Wayne.  *Id*. ¶37.  It appeared to Cpl. Thibault that Cpl. Navari was so scared, he froze up.

Almost as soon as Wayne started advancing on Cpl. Navari, Cpl. Thibault moved forward, drawing his firearm, to provide assistance.  *Id*. ¶39.  Cpl. Thibault told Wayne multiple times to drop the shovel.  *Id*. ¶40.  At this point, Cpl. Thibault observed that the blade of Wayne's shovel was in close proximity to Cpl. Navari's face.  *Id*. ¶41.  Then, when Wayne was in striking distance of Cpl. Navari, Wayne suddenly redirected his attention and momentum to charge at Cpl. Thibault.  *Id*. ¶43.  Fearful Wayne would strike him or Cpl. Navari with the shovel causing serious injury or death, Cpl. Thibault fired two shots.  *Id*. ¶¶44, 47.  After the first two consecutive shots, Wayne continued to advance and Cpl. Thibault fired two more shots in quick succession after the first two shots.  *Id*. ¶¶49-52.

At 4:26:39 p.m., Cpl. Thibault radioed that shots had been fired, and requested an ambulance.  *Id*. ¶60.  Wayne was still moving, and Cpl. Thibault tried to calm him until the ambulance arrived.  *Id*. ¶59.  The period of time from when Wayne first charged out of the garage to the time of the fourth shot, was a matter of mere seconds.  *Id*. ¶61.  The entire incident, from the radio dispatch call to the officers at Ethan Allen Park to the time Cpl. Thibault radioed that shots had been fired, was just over seven (7) minutes.  This was the first officer-involved shooting in Burlington since 1997.  *Id*. ¶63.

Downs
Rachlin
Martin PLLC

First responders arrived at the scene.  They treated Wayne and transported him to the University of Vermont Medical Center emergency room.  A Burlington police officer accompanied Wayne en route to the hospital.  Wayne was declared deceased at 5:06 p.m. by trauma surgeon Ken Sartorelli, M.D.

BPD and the Vermont State Police investigated the shooting.  *Id*. ¶65.  They obtained tape-recorded statements from ten persons who witnessed the shooting at close proximity including Cpl. Thibault and Cpl. Navari.  *Id*. ¶66.  In addition to the officers, Mr. and Mrs. Brunette and Mr. and Mrs. Little were deposed in this case.  All witnesses state that Wayne aggressively confronted the officers with the shovel. *Id*. ¶¶34, 36, 42. Many of the witnesses also thought it was reasonable for the officers to feel threatened and concerned with their physical safety and none thought Cpl. Thibault acted unreasonably in shooting Wayne.  *Id*. ¶¶45-46.  In the immediate aftermath, Mr. Brunette exclaimed, "I seen [sic] how [Wayne] was.  I don't blame the police.  I don't."  Lawrence Brunette Sworn Statement Line 265, attached as Exhibit B to SUMF.

All witnesses describe that Wayne advanced to within striking distance of the officers.[8] *Id*. ¶42.

> **Officer:**   How close did [Wayne] get to the cop?
>
> **Mrs. Little:**  I'm surprised he didn't hit the cop.   It was that close.
>
> **….**
>
> **Mrs. Little:**  The cop was just trying to protect himself as all this happened….  Because you know he was, in my mind…I think he would have hit the cop.  If he had gotten close enough he would have definitely hit the cop.

---

[8] K. Katsaris Dep. at 57:5-8.

Downs
Rachlin
Martin PLLC

Initial On-Scene Interview (M. Little) Lines 222-223, Mary Little Sworn Statement Lines 177-80, attached as Exhibit K to SUMF.

> **Q:**     [T]he end of the shovel is within a foot and a half of one of the officers, is that correct?
> **Mr. Brunette:**     Yes…. But like I say, he was obviously close enough that he could have done harm, I suppose.
>
> ….
>
> **Q:**     [Y]ou thought it was reasonable for [the officers] to defend themselves?
>
> **A:**     <u>Well, Yes…</u>.  He was a big man, with a spade like that, coming at you, or poking at you…. One swipe, it could have been bad news.

L. Brunette Dep. at 31, 33.

> **Q:**     Then the detective asks [you], 'If I was coming towards you in that manner…would you have thought I was going to hit with something like that?' Answer, 'oh yeah, I think so.'
>
> Is that what you thought…. That is what you recall happening?
>
> **Mrs. Brunette:**     Yes.

R. Brunette Dep. at 36:4-14.

> **Q:**     So I just want to be really clear on this point.  [Wayne] was close enough that he could have [hit Cpl. Navari], but he actually didn't?
>
> **Mr. Little:**     Absolutely.  The shovel was five feet long, [Wayne] could have reached him easily.

Deposition of Raymond Little, Jr., 4/5/16 (hereinafter "R. Little Dep.") at 24:10-14, attached as Exhibit P to SUMF.

> **Mr. Little:**     [Wayne] tried to hit the cop with the shovel.

Raymond Little, Jr. Sworn Statement Lines 30-31, attached as Exhibit Q to SUMF.

Downs
Rachlin
Martin PLLC

>**Officer:**      Okay…how close do you think Wayne got to the police officer with the shovel?
>
>**J2:**   I feel like if [Wayne] had gotten a couple inches more of a reach then it could have hit [the officer] in the face.

J2 Sworn Statement Lines 60-62, attached as Exhibit R to SUMF.

>**Officer:**      How close was the end of the shovel to the policeman do you think?
>
>**J1:**   Probably like half a foot, 12 inches.

J1 Sworn Statement Lines102-104, attached as Exhibit S to SUMF.

>**Marcus Medlar:**      [Wayne] was definitely coming after the officer….   He damn near got him.
>
>**Officer:**      How close do you think Wayne got to [the officer]?
>
>**Mr. Medlar:**  Oh, I would say in the vicinity of about 3 feet.

Marcus Medlar Sworn Statement Lines 38-39, attached as Exhibit X to SUMF.

>**Kelley Medlar:**      I actually turned and I said to my dad…holy sh-t, he's going after the cop with the shovel….
>
>I actually thought [Wayne] had connected with him at first.
>
>**Detective:**     So you thought he did hit the officer?
>
>**Ms. Medlar:**  Yeah.

Kelley Medlar Statement Lines 78-80,127-129, attached as Exhibit T to SUMF;

K. Medlar Affidavit ¶9, attached as Exhibit U to SUMF.

Cpl. Navari and Cpl. Thibault, consistent with witness testimony, also describe Wayne as

being in dangerously close proximity to them at the time of the shooting. *Id*. ¶52.  When Cpl.

Downs
Rachlin
Martin PLLC

Thibault fired shots, Wayne was within four (4) feet of Cpl. Navari and within 15 feet of Cpl. Thibault—well within the 21-foot range.[9] *Id.* ¶¶53-54. According to Mr. Little:

> **A:** Navari was backing up; Wayne was coming at him with a shovel, and I saw Thibault start walking down the sidewalk towards him. [Cpl. Thibault] was probably 20, 25 feet away <u>when he started walking down the sidewalk</u>. And I assumed…that he was trying to protect his partner.
>
> **Q:** But tell me what you saw.
>
> **A:** Thibault walked down the sidewalk <u>to within 15 feet of the pair of Wayne and Navari</u>. And Wayne was still advancing with the shovel…. And Thibault shot.

R. Little Dep. at 25:21-26:1. Cpl. Navari also testified that Wayne was within 12-15 feet of Cpl. Thibault (not deducting the length of the shovel) at the time shots were fired. *Id.* ¶53. Finally, Plaintiffs own expert, in his review of the witness testimony, reiterated that the tip of the shovel was three (3), at most six (6) feet away from Cpl. Navari. Deposition of W. Ken Katsaris, 3/1/17 (hereinafter "K. Katsaris Dep.") at 72:12-16, attached as Exhibit L to SUMF. Thus, Wayne could have struck either officer virtually instantaneously in less than a second—well before either officer could react.[10] SUMF ¶58; K. Katsaris Dep. at 6, 36, 38-39, 41.

Shell casings for three of the four bullets fired were recovered from the crime scene. SUMF ¶73. The Vermont State Police measured the distance from the shell casings to the shovel lying on the ground, rather than the distance to where Wayne fell on the ground when he was shot. The distances of these shell casings to the shovel as measured by the Vermont State Police were 18'7", 22'6" and 28'2". *Id.* ¶76. According to Plaintiffs' expert witness, shell casings

---

[9] <u>See</u> note 10, below. According to Plaintiffs' own expert, an average assailant can cover 21 feet in "two seconds, give or take." K. Katsaris Dep. at 36:13-15.

[10] According to Mr. Katsaris, an assailant can cover 21 feet in "two seconds, give or take." K, Katsaris Dep. at 36:13-15.

typically eject backwards by 40-48 inches.  *Id*. ¶78.  In other words, the distance from the shovel to where Cpl. Thibault was standing when he fired the shots was significantly closer than the distance of the shell casings to the shovel as measured by the Vermont State Police.  *Id*.

   B.   <u>THE CITY OF BURLINGTON/BURLINGTON POLICE DEPARTMENT'S POLICIES AND OFFICER TRAINING.</u>

      1.  *Use of Force and De-escalation Training.*

Cpl. Navari graduated from the Vermont Police Academy in 2003.  *Id*. ¶80.  He has been employed by BPD on a continuous, full-time basis since that time.  *Id*. ¶81.  In 2009, he was promoted to the rank of Corporal.  *Id*. ¶80.

Cpl. Thibault graduated from the Vermont Police Academy in 1998.  *Id*. ¶82.  In 1997, Cpl. Thibault joined the Vermont Army National Guard.  He was assigned to active duty on September 11, 2001.  *See id*. ¶83.  In January 2002, he was deployed to Pakistan for approximately 90 days.  *See id*.  In September 2007, Cpl. Thibault was again called to active duty and deployed to Kyrgyzstan through March 2008.  *See id*.  Aside from his two deployments, active duty in 2001, and a one-year military contract in Central Asia from 2008-2008, Cpl. Thibault was employed by BPD on a full-time basis from 2001 to 2016.  *Id*.

All BPD officers, including Cpl. Thibault and Cpl. Navari, receive annual Use of Force training beginning at the Vermont Police Academy.  *Id*. ¶84.  Officers are trained in various "Use of Force" scenarios with artificial decision points for (a) applying force; (b) not applying force; and (c) changing the manner of force.  *Id*. ¶85.  Cpl. Thibault was also a certified Use Of Force instructor for BPD.  *Id*. ¶86.  At the time of the incident, BPD also had in place a Department Directive Policy for use of force entitled "DD05 Response to Resistance/Use of Force."  *Id*. ¶87.  This policy provides in part as follows:

Downs
Rachlin
Martin PLLC

> Officers are agents of the state authorized to use various degrees of
> force to effect arrests or ensure the public safety.  Officers employ
> objectively reasonable force necessary to accomplish a legal
> purpose.  Officers should use only the force that is necessary and
> appropriate for compliance to control of [sic] a suspect and only
> until compliance or control has been achieved.

*Id*.

In addition to instructing on use of force, Cpl. Thibault was certified as an instructor in (a) "Rape Aggression Defense"/Self-Defense; (b) firearms; (c) control and restraint; and (d) Monadnock Defensive Tactic Systems ("MDTS").  *Id.* ¶88.  MDTS training includes instruction on policy, case law, and de-escalation techniques.  *Id.* ¶88.  As of the date of this incident, November 6, 2013, both Cpl. Thibault and Cpl. Navari had received extensive training in de-escalation techniques.  *Id.* ¶90.

> ### 2. *Training and Efforts to Deal with Mental Disabilities*.

BPD is a "progressive agenc[y]" in terms of developing training and protocols for dealing with persons with mental disabilities.  *Id.* ¶91.  For example, approximately fifteen years ago, BPD was one of the co-founders, along with the Howard Center and other partners, of the Street Outreach Program.  *Id.* ¶93.  This program sought to have a mental health worker from the Howard Center available to interface with law enforcement officers working the Church Street marketplace to help deal with persons who presented with mental health issues.  *Id.*  BPD has also been active in partnering with other social service agencies aimed at addressing the impact of mental illness on community welfare and public safety.  *Id.*  Chief Schirling has been involved with the Vermont Chapter of NAMI, the National Alliance on Mental Illness, participating in its fundraising walks, chairing its fundraising efforts and speaking at its annual convention in 2014.  *Id.*

Downs
Rachlin
Martin PLLC

In 2009, as mental health issues began to effect law enforcement operations more frequently, BPD, at the direction of Chief Schirling, worked to expand the Street Outreach Program from the Church Street Marketplace to the entire city using federal grant funds, which Chief Schirling was personally involved in obtaining. *Id.* The aim of the program was to have an additional mental health case worker to work with identified high-frequency callers who presented with mental health problems that were not best addressed through a wholly law enforcement response. *Id.* This was the most substantial mental health challenge confronting BPD.

Cpl. Thibault and Cpl. Navari, along with all BPD officers, were specifically trained in mental health issues that relate to law enforcement. *Id.* ¶92. In 2010, in order to better address mental health issues, BPD partnered with the Howard Center to develop and conduct a training for all sworn officers over four (4), hour and a half long sessions. *Id.* ¶93. This training was led by the Medical Director of the Howard Center and incorporated three other Howard Center mental health professionals into the teaching. *Id.* In 2007, all sworn BPD officers received mental health training mandated by the State of Vermont Act 80. *Id.*

BPD also has a written policy, entitled Interacting with Persons with Disabilities, effective March 15, 2013; directing its patrol officers to comply with the ADA and "provide police services in an equal and impartial manner. This policy includes providing police services to those who have disabilities that officers either observe or become aware of based upon the circumstances presented or information obtained." *Id.* ¶94.

## II.    STANDARD OF REVIEW

To prevail on a motion for summary judgment, the moving party must show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." F.R.C.P. 56(a).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by…citing to particular parts of materials in the record…or…showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  *Id*. at 56(c)(1).

"By its terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *U.S. v. Sullivan*, 2013 U.S. Dist. LEXIS 26858 (D. Vt. Feb. 27, 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).  An issue of fact is material if "it might affect the outcome of the suit under the governing law.  An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Konikoff v. Prudential Ins. Co. of America*, 234 F.3d 92, 97 (2d Cir. 2000).

"Summary Judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (internal quotations omitted).  The central purpose of summary judgment is "to avoid a useless trial" by isolating and disposing of factually unsupported claims or defenses, and the Rule should be interpreted to allow it to accomplish this purpose.  *See id*. 323-24.

Downs
Rachlin
Martin PLLC

### III.     RELEVANT PROCEDURAL HISTORY

Plaintiffs' First Amended Complaint asserted nine causes of action.  In Counts I and II, Plaintiffs allege that Officer Thibeault violated Chapter 1, Article 11 of the Vermont Constitution, and the Fourth and Fourteenth Amendments through use of excessive force in the shooting of Wayne Brunette.  In Count III, Plaintiffs allege the City and Chief Schirling are liable under section 1983 for allegedly failing to train, supervise, and/or institute policies regarding individuals with mental health issues pursuant to *Monell v. Dept. of Social Services of City of New York*, 436 U.S. 658 (1978).  In Count IV, Plaintiffs allege that all Defendants violated Brunette's rights under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132.  Plaintiffs also assert state law claims for assault and battery (Count V); negligence (Count VI) against all defendants; loss of consortium (Count VII); intentional infliction of emotional distress (Count VIII) against Officer Thibeault and Officer Navari; and a statutory wrongful death and survival action against all Defendants (Count IX).

On June 8, 2015, Defendants filed a Motion to Dismiss or, in the alternative, Motion for Summary Judgment (Doc. 15).  The Court, in its discretion, limited itself to the pleadings and reviewed the filing as a Motion to Dismiss.  Opinion and Order at 7 (Doc. 27).[11]  Thus, the Court declined to opine on the primary issue of qualified immunity, determining instead that this issue was "best decided on a motion for summary judgment when the facts are more fully developed…."  *Id*. at 9.

The Court did, however, grant the Motion to Dismiss as to (1) all claims against the individual defendants in their official capacity; (2) all claims against BPD; (3) claims against the

---

[11] Plaintiffs sought to bar Defendants from filing a subsequent Motion for Summary Judgment.  This request was denied.  Opinion and Order at 8 (Doc. 27).

Downs
Rachlin
Martin PLLC

individual defendants, in their individual and official capacities, under the ADA; and (4)

Plaintiffs' loss of consortium claim set forth in Count VII.  *Id.*

## IV.  ARGUMENT

### A.  CPL. THIBAULT IS ENTITLED TO QUALIFIED IMMUNITY ON PLAINTIFFS' CLAIMS UNDER 42 U.S.C. § 1983 (COUNTS I AND II).

It is well established that "[p]ublic officials are immune from suit under 42 U.S.C. § 1983

unless they have violated a statutory or constitutional right that was clearly established at the

time of the challenged conduct."  *City and County of San Francisco v. Sheehan*, 192 L. Ed. 2d

856, 861, 135 S. Ct. 1765 (2015) (internal quotation marks omitted); *Brown v. City of New York*,

862 F.3d 182, 190 (2d Cir. 2017).  The purpose of qualified immunity is to "give[] government

officials breathing room to make reasonable but mistaken judgments by protect[ing] all but the

plainly incompetent or those who knowingly violate the law."  *Sheehan*, 192 L. Ed. 2d at 861.

To effectuate this purpose, qualified immunity should be decided by the Court as a matter of law

where the factual record is not in serious dispute.  *Lennon v. Miller*, 66 F.3d 416, 421 (2d Cir.

1995).  The purpose of this principle is to "provide immunity from suit, as well as a defense to

liability."  *Id.*

The United States Supreme Court recently re-emphasized the "importance of qualified

immunity to society as a whole" when liability of *individual officers* is at issue.  *Sheehan*, 192 L.

Ed. 2d at 866 n.3 (internal quotation marks omitted); *see also City of Los Angeles, Calif. v.

Mendez*, 137 S. Ct. 1539, 1542, 198 L. Ed. 2d 52 (2017) (rejecting the Ninth Circuit's

"provocation rule.").  Most recently, in *White v. Pauly*, 137 S. Ct. 548, 551, 196 L. Ed. 2d 463

(2017) (*per curiam*), the Court stated:

Downs
Rachlin
Martin PLLC

> In the last five years, the Court has issued a number of opinions
> reversing federal courts in [denial] of qualified immunity cases.
> *See, e.g.,* [*Sheehan*] (collecting cases).  The Court has found this
> necessary both because qualified immunity is important to 'society
> as a whole,' *ibid.,* and because as 'an immunity from suit,'
> qualified immunity 'is effectively lost if a case is erroneously
> permitted to go to trial.'
>
> Today, it is again necessary to reiterate the longstanding principle
> that 'clearly established' law should not be defined at a 'high level
> of generality.'  As this Court explained decades ago, the clearly
> established law must not be 'particularized' to the facts of the case.
> Otherwise, '[p]laintiffs would be able to convert the rule of
> qualified immunity…unto a rule of virtually unqualified liability
> simply by alleging violation of extremely abstract rights.'

137 S.Ct. at 551-52.

Courts conduct a two-part analysis to determine whether a police officer is entitled to qualified immunity from a claim of excessive force under section 1983.  A qualified immunity defense is established if either (1) the defendant's actions did not violate a statutory or constitutional right; or (2) the right was not "clearly established" at the time of the challenged conduct.  *Brayshaw v. City of Burlington*, 2015 U.S. Dist. LEXIS 44034, *14 (D. Vt. Apr. 3, 2015) (*citing Ashcroft v. al-Kidd*, 131 S. Ct. 23074, 2080, 179 L. Ed. 2d 1149 (2011)).  Courts have discretion within this analysis to determine the order in which to decide these two prongs.  *Id.* (*citing Tolan v. Cotton*, 134 S. Ct. 1861, 1866, 188 L. Ed. 2d 895 (2014)).  "Answering either prong in the negative will bar suit against the official."  *O'Brien v. Barrows*, 2013 U.S. Dist. LEXIS 16474, *16 (D. Vt. Feb. 7, 2013) (affirmed by 556 Fed. Appx. 2, 4 (2d Cir. 2014)).

"With regard to the first prong, the Fourth Amendment protects individuals from the government's use of excessive force when detaining or arresting individuals."  *Id.* (internal

quotation marks omitted) (*citing Jones v. Parmley*, 465 F.3d 46, 61 (2d Cir. 2006)).[12]  Police

officers, however, are permitted under the Fourth Amendment to use such force as is objectively

reasonable under the circumstances.  *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 123

(2d Cir. 2004).  Thus, a police officer may reasonably use deadly force if "the officer has

probable cause to believe that the suspect poses a significant threat of death or serious physical

injury to the officer or others."  *Tennessee v. Garner*, 471 U.S. 1, 11, 105 S.Ct. 1694, 1696

(1985); *O'Brien v. Barrows*, 556 Fed. Appx. 2, 3 (2d Cir. 2014).  The reasonableness analysis

"must be judged from the perspective of a reasonable officer on the scene, <u>rather than with the

20/20 vision of hindsight</u>."  *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 1872 (1989)

(emphasis added) (overruled on other grounds).

　　　　With regard to the "clearly established" prong, "the right in question must be

"sufficiently definite that any reasonable official in [his or her] shoes would have understood that

he was violating it….meaning that existing precedent…placed the statutory or constitutional

question beyond debate."  *Sheehan*, 92 L. Ed. 2d at 867 <u>("We have repeatedly told courts…not to

define clearly established law at a high level of generality.")</u>.  "Only Supreme Court and Second

Circuit precedent existing at the time of the alleged violation is relevant in deciding whether a

right is clearly established." *Brayshaw*, 2015 U.S. Dist. LEXIS 44034 at *17 (citing *Moore v.

Vega*, 371 F.3d 110, 114 (2d Cir. 2004)).

---

[12] In addition to the Fourth Amendment, Plaintiffs claim Cpl. Thibault's conduct violated Chapter 1, Article 11 of
the Vermont Constitution and the Fourteenth Amendment.  Neither the Fourteenth Amendment nor Chapter 1,
Article 11 of the Vermont Constitution govern or apply to Plaintiffs' claims under 42 U.S.C. § 1983.  Instead, "[a]ll
claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest,
investigatory stop, or other 'seizure' of a free citizen should be analyzed under the *Fourth Amendment* and its
'reasonableness' standard rather than under the [Fourteenth Amendment's] substantive due process approach."
*Graham*, 490 U.S. at 395 (emphasis added).

Downs
Rachlin
Martin PLLC

1.  *Cpl. Thibault's Use Of Force Was Objectively Reasonable And Does Not Give Rise To A Constitutional Violation*.

The "touchstone inquiry" in a claim of excessive force under the Fourth Amendment is "reasonableness, and in measuring it, [the courts] consider the facts and circumstances of each particular case, including the crime committed [and the government interest at stake], its severity, the threat of danger to the officer and society, and whether the suspect is resisting or attempting to evade arrest." *Brayshaw*, 2015 U.S. Dist. LEXIS 44034 at *18-19 (citing *Jones*, 465 F.3d at 61).  The most important inquiry, however, is whether the individual posed an immediate threat to the safety of the officers or others.  *Graham*, 490 U.S. at 396.  This inquiry is based on the "circumstances immediately prior to and at the moment [the officers] made the split-second decision to employ deadly force."  *Salim v. Proulx*, 93 F.3d 86, 92 (2d Cir. 1996); *see Mendez*, 137 S. Ct. at 1542 ("A different Fourth Amendment violation cannot transform a later, reasonable use of force into an unreasonable seizure.").

### a.  Wayne Brunette posed an immediate threat to the safety of Cpl. Thibault and Cpl. Navari.

Supported by the witness statements and depositions, the undisputed fact is that Cpl. Thibault had significant reason to believe that Wayne posed an immediate threat to Cpl. Thibault and Cpl. Navari at the moment Cpl. Thibault fired shots.  *See* SUMF ¶¶24-54  At the time Cpl. Thibault fired the first two successive shots, Wayne (1) was wielding an almost five-foot long bladed shovel as a weapon; (2) was holding the shovel like a rifle and lunging, jabbing, poking, and swinging the shovel at the officers; (3) was quickly advancing; (4) had repeatedly refused to

relinquish the shovel; (5) had suddenly turned towards Cpl. Thibault; and (6) was within striking distance of the officers.[13]  *Id.*

Cpl. Thibault clearly had probable cause to believe that Brunette intended to attack the officers with the bladed shovel.  *See O'Brien v*, 556 Fed. Appx. at 3.  The reasonableness of this belief is independently supported by on-the-scene, contemporaneous, recorded statements from all eight (8) bystander witnesses and the depositions of Mr. and Mrs. Brunette and Mr. and Mrs. Little.  These witnesses *all* observed Wayne aggressively advancing to within inches or merely a few feet of both officers.  SUMF ¶¶52-55.  Each of the witnesses further believed Wayne would or could have struck the officers with the bladed shovel.  *Id*. ¶42.  For example, at the time of the shooting, multiple witnesses observed that Wayne was within four (4) feet of Cpl. Navari (at the most) and within fifteen (15) feet of  Cpl. Thibault.  *Id.* ¶¶52-55.  Plaintiffs' own expert, Mr. Katsaris, acknowledged that the tip of Wayne's shovel was three (3), but no more than six (6) feet from Cpl. Navari.  K. Katsaris Dep. 72:12-16.  Many of these witnesses, including Mr. Brunette, who was closer to the officers and Wayne than any other eye-witness, agreed that Cpl. Thibault's use of force was reasonable:

> **Q:**    [Y]ou thought it was reasonable for [the officers] to defend themselves?

---

[13] BPD officers are trained in the so-called "21-foot doctrine."  Affidavit of Deputy Chief Jannine Wright ¶7; SUMF ¶56.  Thus, Cpl. Thibeault and Cpl. Navari had been trained that a subject armed with a bladed weapon, and within 21 feet, can be a deadly threat to the officers.  The "21-foot doctrine" is widely accepted as a standard training policy for law enforcement officers throughout the country.  SUMF ¶¶56-57.  It is also relevant to the determination of whether the officers acted reasonably under the circumstances.  *Woodward v. Town of Brattleboro*, 2006 U.S. Dist. LEXIS 1059, * 18 (D. Vt. Jan. 5, 2006) (hereafter *Woodward III*) (citing the application of the 21-foot rule by the responding officers and stating that "implicit in the 21-foot rule is the recognition that, had [the subject] unexpectedly lunged at someone, this Court could have been considering a different set of plaintiffs who could claim police failed to control [the subject] in a timely manner.").

Downs
Rachlin
Martin PLLC

**A:**   <u>Well, Yes….</u>   He was a big man, with a spade like that, coming at you, or poking at you…. One swipe, it could have been bad news.

L. Brunette Dep. at 31, 33 (emphasis added).

Cpl. Navari also believed that he and Cpl. Thibault were in imminent danger, and that Wayne was only one step away from swinging and hitting either of them with the shovel at the time shots were fired.  SUMF ¶¶47-48; Affidavit of Ethan Thibault, attached as Exhibit G to SUMF; Affidavit of Brent Navari, attached as Exhibit F to SUMF.  As did Cpl. Thibault, who believed that he was in danger of being beaten with the shovel by Wayne.  *Id.*  Based on these circumstances, Cpl. Thibault was forced to make a split-second decision to protect himself and Cpl. Navari.  *See Sheehan*, 192 L. Ed. 2d at 868 ("The Constitution is not blind to 'the fact that police officers are often forced to make split-second judgments.'") (citing *Plumhoff v. Rickard*, 572 U.S. __, 134 S. Ct. 2012 (2014)).

Accordingly, Cpl. Thibault had probable cause to believe that if he did not employ the force he did, Wayne would have caused serious injury or death to either Cpl. Thibault or Cpl. Navari.[14]  Because Cpl. Thibault's use of force was objectively reasonable under the circumstances, there is no constitutional violation and he is immune for liability and suit on grounds of qualified immunity.

Throughout this litigation, Plaintiffs have ignored the multiple sworn eye-witness statements that Wayne aggressively went after both officers with an almost five-foot bladed shovel; continuously refused to drop the shovel and stop advancing; was swinging, poking, and jabbing at the officers; and was within striking distance—mere feet—of hitting both officers with

---

[14] Cpl. Thibault's reasonable belief is bolstered by Cpl. Navari's belief that Wayne posed an immediate threat, and Cpl. Navari, himself, was prepared to use deadly force if Wayne took another step in his direction.  *See* SUMF ¶38.

Downs
Rachlin
Martin PLLC

the bladed metal shovel.  Plaintiffs' own expert, Mr. Katsaris, opined that Wayne (a) was

wielding a deadly weapon and (b) could have struck either one of the officers in .75-1.5

seconds—well before either officer could react.  SUMF ¶58.

It is important to note that Barbara Brunette—whose claims were raised individually and

as the administrator of Wayne's estate—did not witness any aspect of the incident.  *Id*. ¶71.  Her

claim that Wayne ultimately would not have struck the officers, is mere speculation and does not

create a material dispute requiring trial.  Moreover, even if Mrs. Brunette's speculation would

have been correct, neither officer nor the witnesses to the incident had any reason to know that

and thus their actions remain reasonable.

In other words, even if the officers were mistaken in their fear of imminent harm, there is

still no constitutional violation.  *Saucier v. Katz*, 533 U.S. 194, 205, 121 S. Ct. 2151, 2158, 150

L. Ed. 2d 272 (2001).  For example in *Woodward III*, 2006 U.S. Dist. LEXIS 1059 at *11, this

Court held as a matter of law that the use of deadly force was reasonable, even absent a

"threatening movement" when the suspect was "(1)…armed and reported to be agitated or

psychotic; (2) he disobeyed orders to drop his weapon; and (3) he was in a position to, suddenly

and without warning, injure another person in proximity."  *Id*. at *18 ("select witness statements

which suggest no threatening movement…do not raise a material factual dispute as to the

reasonableness of the officers' actions when those statements are viewed in light of the

remaining, undisputed factual circumstances the officers confronted.").  Unlike *Woodward III*,

however, the witnesses in this case all describe Brunette as making highly threatening actions.[15]

---

[15] Plaintiffs' expert witness, W. Ken Katsaris, argues that the decision to use deadly force should have been made by Cpl. Navari, not Cpl. Thibault.  K. Katsaris Dep. at 81:16-19.  Not only does this opinion ignore the witness statements about the distance between Cpl. Thibault and Wayne, as well as Cpl. Thibault's own testimony, but it is entirely inconsistent with the law of qualified immunity.

Downs
Rachlin
Martin PLLC

**b. The second two successive shots do not give rise to an independent constitutional violation.**

Plaintiffs allege in Count II that the second two successive shots constitute an independent constitutional violation, irrespective of the reasonableness of the first two shots.  *See* Am. Compl. ¶¶ 86-89.  This is an impossible distinction, completely unsupported by the testimony and evidence, and does not and cannot give rise to either an independent cause of action or a material dispute.  It is also inconsistent with the United States Supreme Court's 2014 decision in *Plumhoff*, 134 S. Ct. at 2022.  ("It stands to reason that, if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended.").

First, the fact that Cpl. Thibault fired more than one round does not, in and of itself, give rise to a violation of the Fourth Amendment.  *See Sheehan*, 192 L. Ed. 2d at 868 ("Nothing in the Fourth Amendment barred [the officers] from protecting themselves, even though it meant firing multiple rounds.").  Second, the period of time from when Wayne first charged out of the garage to the time of the fourth shot, was a matter of mere seconds.  SUMF ¶¶51, 61.  Cpl. Thibault had, at most, a split-second to evaluate the continued risk.  *Id*.  Given the circumstances, Cpl. Thibault made the reasonable determination that Wayne continued to pose a threat to the officers and possibly others.  *See Plumhoff*, 134 S. Ct. at 2022 ("[I]f officers are justified in firing at a suspect in order to end a severe threat to public safety, they need not stop shooting until the threat has ended.").

Moreover, the incident occurred so quickly, that Mrs. Brunette (who was standing close by) did not perceive any interruption in the sequence of the shots fired.  R. Brunette Dep. at 38:24-39:9.

Third, other witnesses, in addition to Cpl. Thibault and Cpl. Navari, testified that Wayne continued to advance following the first two shots:

> **Mr. Little:**    And when Wayne didn't stop with the first bullet, Thibault fired again.  And I don't remember him stopping with the second one, either.  Then he fired another time, and then there was a slight pause, and he fired the fourth time.
>
> **Q:**    So after the first bullet, Wayne took a half a step, maybe a foot.  Did he stay standing; did he fall down?  What happened to his body?
>
> **A:**    He was standing.

R. Little Dep. at 40:5-15 (emphasis added); M. Little. Dep. at 29:25-30:3 ("[Wayne] was still in movement…when Thibault ended up shooting the last three shots.").  Mrs. Little shared her husband's observation on this point: "they shot 3 or 4 times *because he just kept coming*."  M. Little Statement Line 14.  In short, Plaintiff's theory, that Wayne no longer posed a serious threat following the first two shots, derives no support from either the witness statements or witness depositions.

### 2. *Cpl. Thibault Did Not Violate A "Clearly Established" Right.*

Even if Plaintiffs were able to show a violation under the Fourth Amendment, their section 1983 claim must still fail.  Cpl. Thibault is entitled to qualified immunity under the second prong of the qualified immunity analysis, because any constitutional violation that occurred was not clearly established at the time of the incident (Nov. 6, 2013).  Thus, Cpl. Thibault would have no reason to understand that his conduct was clearly unlawful under the undisputed factual circumstances in this case.  *See Sheehan*, 192 L. Ed. 2d at 866-67 ("Public officials are immune from suit under 42 U. S. C. §1983 unless they have violated a statutory

Downs
Rachlin
Martin PLLC

or constitutional right that was clearly established at the time of the challenged conduct.")

(internal quotation marks omitted).

The issue of whether a right is "clearly established" is analyzed against relevant case law

existing at the time of the alleged violation.  *Burgess v. Town of Wallingford*, 569 Fed. Appx. 21,

23 (2d Cir. 2014); *Brayshaw*, 2015 U.S. Dist. LEXIS 44034 at *17.  The standard applicable to

the Defendant Officers' actions on November 6, 2013, as stated by the Second Circuit in *Salim*,

is as follows:

> [I]t was objectively reasonable for the officer to view the use of
> deadly force as not excessive in the circumstances presented to
> him.  The objective reasonableness test is met if officers of
> reasonable competence could disagree on the legality of the
> defendant's actions…. [A]n officer's actions are not to be assessed
> with 20/20 hindsight.  Rather, qualified immunity serves to protect
> police from liability and suit when they are required to make on-
> the-spot judgments in tense circumstances.
>
> In determining whether the force used to effect a particular seizure
> is reasonable, a court must examine the facts and circumstances of
> each particular case, including…whether the suspect poses an
> immediate threat to the safety of the officers or others….

93 F.3d at 91.

Furthermore, it would not have been clear to Cpl. Thibault that his conduct violated the

Fourth Amendment given this Court's decisions in *Woodward v. Town of Brattleboro*, 2004 U.S.

Dist. LEXIS 32414 (D. Vt. July 1, 2004) (reversed for reconsideration of additional affidavits

and subsequently reaffirmed in *Woodward III*) (hereinafter *Woodward I*) and *Woodward III*.[16]  In

---

[16] In *Woodward II*, the Second Circuit vacated and remanded *Woodward I* for consideration of conflicting witness
statements.  In *Woodward III*, this Court clarified that it had fully considered these conflicting statements, which did
not give rise to a material dispute of fact for qualified immunity purposes.  In affirming qualified immunity for use
of deadline force, the Second Circuit more recently noted that "small differences in testimony simply do not rise to
the level at which a reasonable jury could find the officers' credibility damaged."  *Fortunati v. Vermont*, 503 Fed.
Appx. 78, 81 (2d Cir. 2012).

Downs
Rachlin
Martin PLLC

those cases, this Court concluded, based on circumstances less clear than this, that deadly force by two Brattleboro police officers was reasonable and was not a violation of a clearly established right. *See e.g. Woodward III*, 2006 U.S. Dist. LEXIS 1059 at *13.

In *Woodward*, the subject entered a church in an "agitated" and "psychotic" state and began to address the congregation. *Woodward I*, 2004 U.S. Dist. LEXIS 32414 at *11. Upon arrival at the scene, the police officers learned that the subject was armed with a 3.5-inch knife, threatening congregants, and refusing to come out of a confined area in the front of the church. *Id*. at *11-12. After instructing the congregants to leave, one officer approached the subject and several times instructed him to put down the knife. *Id*. at *12. The subject ignored this instruction, grunted, and with the knife pointed in the officers' direction made a movement that the officers—although not all witnesses—perceived as threatening.[17] *Id*. at *13; *Woodward III*, 2006 U.S. Dist. LEXIS 1059 at *5. Two officers subsequently fired seven shots in rapid succession. *Woodward I*, 2004 U.S. Dist. LEXIS 32414 at *16. At the time of the first shot, the subject was within six feet of the officers. *Id*.

On those facts, this Court concluded that the officers reasonably determined "in the heat of the moment," that the subject had made a "potentially threatening movement which caused [the officer] to fear for his own safety and the safety of others in the vicinity." *Id*. at *22. The officers were entitled to qualified immunity under both prongs of the qualified immunity analysis. *Id*. at *24-25, 26.

---

[17] Whether there was in fact a threatening movement did not give rise to a material dispute given that "Woodward's agitated demeanor and unpredictable behavior, could leave a reasonable officer to conclude that someone could be hurt if Woodward was not immediately subdued. In the heat of the moment, the officers determined that Woodward made a potentially threatening movement which caused [the officer] to fear for his own safety and the safety of others in the vicinity." *Woodward III*, 2006 U.S. Dist. LEXIS 1059 at *5.

Downs
Rachlin
Martin PLLC

In *Woodward III*, this Court incorporated its prior ruling in *Woodward I* and reemphasized that even though there were conflicting witness statements as to whether the subject advanced towards the officers, there was no constitutional violation, because the subject was (1) armed with a 3.5 inch knife; (2) was acting irrationally; (3) was in close proximity to several individuals; and (4) applying the 21-foot rule, was within 21 feet of the officers at the time of the shooting.  *Woodward III*, 2006 U.S. Dist. LEXIS 1059 at *13.

The facts supporting qualified immunity in this case are stronger than those in *Woodward*.  Here, there is no dispute that Brunette was armed with a weapon, acting irrationally, in close proximity to the officers, *and* quickly advancing towards the officers "swinging", "lunging", and "poking" the almost-five-foot-long spade in a threatening and aggressive manner appearing to all ten witnesses to be aimed at hitting the officers.  Accordingly, it was far from clearly established that Cpl. Thibault was violating the Constitution when he fired to defend himself and Cpl. Navari.  The *Woodward* cases, as well as other authority, [18]  would lead Cpl. Thibault to believe his actions were constitutionally permissible.  Accordingly, Cpl. Thibault is entitled to qualified immunity because he reasonably believed that Wayne posed a significant threat and no legal precedent clearly established that his actions were not reasonable.

    B.   <u>PLAINTIFFS HAVE FAILED TO STATE A *MONELL* CLAIM AGAINST THE CITY UNDER 42 U.S.C. § 1983 (COUNT IV)</u>

---

[18] Under similar circumstances, courts from around the Country have found that officers acted reasonably in employing deadly force.  *See Blanford v. Sacramento Cnty.*, 406 F.3d 1110, 1112 (9th Cir. 2005) (deputies entitled to qualified immunity for shooting where suspect raised a two-and-a-half foot sword, growled, and refused to drop the sword); *Roy v. City of Lewiston*, 42 F.3d 691, 693 (1st Cir. 1994) (officers entitled to qualified immunity for shooting where suspect came out of the house with two steak knives, ignored instructions to drop the knives, and advanced towards officer making a "lunging" motion); *Rhodes v. McDannel*, 945 F.2d 117 (6th Cir. 1991) (officer acted reasonably in shooting suspect where it was undisputed that suspect had threatened a victim with a machete, advanced toward the officers and the victim with the machete raised, and ignored the officers warnings to drop it); *Biggs v. City of New York*, 2010 U.S. Dist. LEXIS 121332, *5 (S.D.N.Y. Nov. 15, 2010) (officers entitled to qualified immunity for shooting where suspect held a knife over his head, refused to drop the knife, and the officers feared for their safety).

Downs
Rachlin
Martin PLLC

Plaintiffs claim the City is liable under section 1983 for allegedly failing to train its officers on use of force or institute policies for interacting with individuals experiencing a mental health crisis.  As a threshold matter, Plaintiffs' own expert witness, Mr. Katsaris, testified that Burlington's training was sufficient to overcome liability under the *Monell* standard:

> **Q:**     So you agree that it is not like Burlington Police Department's been <u>deliberately indifferent</u> to training these officers in mental health?
>
> **A:**     <u>Correct</u>.  I never rendered that opinion.

K. Katsaris Dep. at 68:11-15, 70:18 (emphasis added).  This unequivocal testimony, alone, supports full dismissal of Plaintiffs' *Monell* claim.

A municipal defendant's liability under § 1983 is premised on a government policy or custom that evidences a deliberate indifference to a plaintiff's rights.  *Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. 2012) (*citing Monell*, 436 U.S. at 690-91).  Thus, regardless of how Plaintiffs characterize their *Monell* claims, i.e., failure to train, discipline, retrain, etc., the required legal showing is the same—"deliberate indifference to the rights of persons with whom the [untrained employees] come in contact."  *Connick v. Thompson*, 131 S. Ct. 1350, 1354 (2011) (emphasis added).  The same standard applies to claims based on "inaction, including the absence of an official policy."  *O'Brien*, 2013 U.S. Dist. LEXIS 16474 at *33.

"[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."  *Id*. at 1360.  The plaintiff must show that "through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged."  *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 117 S. Ct. 1382, 1385 (1997) (emphasis in original).

Downs
Rachlin
Martin PLLC

"It is not enough to show that an officer was negligently trained or that a well-trained officer would have avoided a constitutional violation." *Ryan v. Town of Berlin*, 2014 U.S. Dist. LEXIS 69594, *8 (D. Vt. May 21, 2014) (citing *Okin v. Vill. of Cornwall-on-Hudson Police Dep't*, 577 F.3d 415, 440 (2d Cir. 2009)) (internal quotations omitted).  Instead, Plaintiffs must show that a "municipal policymaker…had actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights." *Id.* Significantly, "[a] pattern of similar constitutional violations by untrained employees is ordinarily necessary" to demonstrate deliberate indifference…." *Id.*

Plaintiffs' *Monell* claim against the City fails as a matter of law for numerous reasons. First, a town cannot be held liable under section 1983 where there is no constitutional violation by the officers at the scene.  *Curley v. Vill. of Suffern*, 268 F.3d 65, 71 (2d Cir. 2001); *MacLeod v. Town of Brattleboro*, 2012 WL 1928656, at *8 (D. Vt. May 25, 2012).  As discussed above, Cpl. Thibault and Cpl. Navari acted reasonably under the circumstances and neither violated Mr. Brunette's constitutional rights.

Second, there is absolutely no pattern of deadly force by BPD officers.  It is undisputed that at the time of the incident, no BPD officer had fired a gun (much less initiated lethal force) in the line of duty since 1997—sixteen (16) years prior.  SUMF ¶63.  Thus, "[t]o hold the [City] liable for inadequate training, without any notice of a deficiency in its police department's training regime, risks converting *Monell* liability into respondeat superior liability."  *O'Brien*, 013 U.S. Dist. LEXIS 16474 at *31 (citing *Connick*, 131 S. Ct. at 1359) (dismissing *Monell* claim against the Town of Shelburne where there was "no pattern of deadly force") (affirmed by 556 Fed. Appx. 2, 4 (2d Cir. 2014)).

Third, this case does not fall within the extremely rare and "narrow range of circumstances," in which a "pattern of similar violations" is not necessary for a finding of deliberate indifference. *Connick*, 131 S. Ct. at 428.  In *City of Canton v. Harris*, 489 U.S. 378 (1989), the Supreme Court theorized that an isolated incident could give rise to a *Monell* claim where a city "deploys armed officers into the public to capture fleeing felons without training the officers in the constitutional limitation on the use of deadly force."  *Connick* (citing *Canton*, 489 U.S. at 390, n. 10).  Here, there is no such situation that could possibly give rise to liability based on this one, isolated incident and based on the undisputed facts of BPD's comprehensive mental health and use of force training programs

Fourth, the City/BPD absolutely has a policy of restricting the use of deadly force to those circumstances in which an officer reasonably believes that the use of force is necessary to protect the officer or others from an imminent threat of death or serious bodily injury.  SUMF ¶87.  BPD also regularly trains its officers on use of force and BPD's Use of Force Policy.  *Id.* ¶¶84-85.  Cpl. Thibault and Cpl. Navari had both received extensive, and in fact recent, training on use of force and the City's policy prior to the incident.  *Id*. ¶90.  Cpl. Thibault was himself a certified Use of Force instructor.  *Id*. ¶86.

Fifth, Plaintiffs' claim that the City failed to institute policies to ensure compliance with the ADA is merely duplicative of Plaintiffs' claim under Title II of the ADA (Count IV). Moreover, the City had a policy effective March 15, 2013 directing its patrol officers to fairly treat persons who present with disabilities, including mental illness.  *Id*. ¶94.  This policy, entitled "Interacting with Persons with Disabilities," was adopted to "ensure that disabilities do not exclude persons from receiving services from [BPD] or prohibit personnel from performing

Downs
Rachlin
Martin PLLC

their jobs effectively, while maintaining compliance with Federal law [including] the Americans with Disabilities Act of 1990…."  Plaintiffs also have not alleged any pattern of similar incidents, which could have put the City on notice of a deficiency in its training regime with respect to ADA compliance.[19]  *See O'Brien v. Barrows*, 2013 U.S. Dist. LEXIS 16474 at *33 (plaintiff failed to make sufficient showing of *Monell* violation arising from absence of policy requiring officers to report changes in mental health condition where there was no such past incident).

Finally, it is also undisputed that at the time of the incident, the City provided training to its officers on responding to individuals experiencing a mental health episode.  SUMF ¶¶92-93. For example, BPD collaborated with the Howard Center to provide comprehensive training in law enforcement-related mental health issues to its entire patrol force in 2010.  Scenarios based on mental health issues that police may encounter are, and were at the time of the incident, a regular part of BPD's annual patrol procedures block training for the entire patrol force. Additionally, BPD's entire force of sworn officers received mental health training as mandated by Act 80 during 2007.  This training, entitled Interacting with People Experiencing a Mental Health Crisis, was a four-and-a-half hour program mandated by state legislation.  It is the only training on mental health for law enforcement that is mandated by state law.  SUMF ¶¶92-93.

Given the extensive policies, training, and procedures in use at the time of the incident, and the absence of any prior violations, Plaintiffs cannot sustain their burden of proving

---

[19] Plaintiffs' allegation that the City has experienced a "four hundred percent increase in the number of calls involving persons with mental health issues between the years 2008 and 2013[,]" Am. Compl. at 1, does not amount to a "pattern of similar incidents."  There is no allegation of a pattern of excessive force *as a result of* the 400% increase in mental health calls.  Moreover, the absence of similar issues, despite this increase, is a significant indicator that the BPD and the City have effectively managed the increase in mental health response calls through its training and policies.

Downs
Rachlin
Martin PLLC

deliberate indifference.  Accordingly, Plaintiffs' *Monell* claims against the City fail as a matter of law.

C.  PLAINTIFFS HAVE FAILED TO STATE A CLAIM FOR SUPERVISORY LIABILITY UNDER SECTION 1983 AGAINST CHIEF SCHIRLING

"To establish the liability of a supervisory official under [section 1983], a plaintiff must show the defendant's personal involvement in the alleged constitutional violations."  *Elek v. Inc. Vill. of Monroe*, 815 F. Supp. 2d 801, 806 (S.D.N.Y. 2011) (quoting *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003).  Personal involvement means:

> (1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring.

*Id*.

No facts in this case support a section 1983 claim against Chief Schirling.  First, it is undisputed that Chief Schirling was not present during the incident and had no knowledge of the dispatch call or incident until after Cpl. Thibault radioed that shots had been fired.  SUMF ¶72. Second,  neither Cpl. Thibault nor Cpl. Navari had ever fired his gun in the line of duty.  *Id*. ¶64. Moreover, both officers consistently participated in required department trainings and seminars. *Id*. ¶90.  In fact, at the time of the incident, Cpl. Thibault was himself certified to provide training and instruction to other officers on (a) use-of-force; (b) "Rape Aggression Defense"/Self-Defense; (c) firearms; (d) control and restraint; and (e) Monadnock Defensive Tactic Systems ("MDTS"), which includes de-escalation techniques.  *Id*. ¶88.  There also is no evidence that either Cpl. Thibault's or Cpl. Navari's performance was unsatisfactory.  Thus, as a

Downs
Rachlin
Martin PLLC

matter of law, Plaintiffs cannot establish "grossly negligent" supervision."

Significantly, Chief Schirling's extensive involvement in improving BPD's interactions with individuals experiencing mental health issues is far from deliberate indifference.  *See id.*

¶93.  Plaintiffs' expert, Mr. Katsaris, testified as follows:

> **Q:**     And so as this mental health set of challenges emerged in Vermont and nationally, you saw Chief Schirling describe some of the things they were trying to do with the problems that were in front of them and growing; fair enough?
>
> **A:**     which is good…
>
> **Q:**     And you don't fault him for that and indeed you compliment him for that?
>
> **A:**     <u>Yes.</u>

K. Katsaris Dep. at 157:13-23 (emphasis added).  Mr. Katsaris also applauded BPD for being a "progressive agenc[y]" under Chief Schirling's leadership in terms of developing training and protocols for dealing with persons with mental disabilities.  *Id.* at 152:21-22, 156:3-157:23.

For example, in 2007, all BPD officers received mental health training as mandated by State of Vermont Act 80.  SUMF ¶93.  In 2009, Chief Schirling personally worked to expand the Street Outreach Program in order to direct individuals dealing with mental illness to mental health professionals and reduce the criminal processing of these individuals.  *Id.*  And in 2010, under Chief Schirling's leadership, BPD officers participated in four (4), hour and a half long trainings led by the Medical Director of the Howard Center.  *Id.*

Accordingly, the claim against Chief Schirling under Section 1983 must also be dismissed.

Downs
Rachlin
Martin PLLC

### D.  PLAINTIFFS' ADA CLAIM (COUNT IV) FAILS AS A MATTER OF LAW

1.  *Title II Of The ADA Does Not Apply To Defendant Officers' Response to the Brunette Residence Under The Exigent Circumstances Of This Case.*

Plaintiffs claim the City violated Brunette's rights under Title II of the ADA by failing to provide Brunette with reasonable accommodations during the police encounter on the day of the incident.[20]

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  The purpose of the ADA is to "eliminate discrimination on the basis of disability and ensure evenhanded treatment between the disabled and the able-bodied."  *Ryan v. Vermont State Police*, 667 F. Supp. 2d 378, 385 (D. Vt. 2009) (quoting *Doe v. Pfrommer*, 148 F.3d 73, 82 (2d Cir. 1998)).

To prove a claim under Title II of the ADA, a plaintiff must demonstrate "(1) that he is a 'qualified individual' with a disability; (2) that he was excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by a public entity; and (3) that such exclusion or discrimination was due to his disability."  *Id*.

In the context of arrests, courts have recognized two types of ADA claims: (1) where the subject is wrongfully arrested based on disability, and (2) "where police properly arrest a suspect but fail to reasonably accommodate his disability during the investigation or arrest, causing him to suffer greater injury or indignity than other arrestees."  *Id*. at 387.

---

[20] Plaintiffs' claims against the individual officers and Chief Schirling under the ADA were dismissed by Court Order.  (Doc. 27).

Downs
Rachlin
Martin PLLC

Notably, there is disagreement among the Circuits as to whether and when the ADA applies, if at all, during police encounters.[21]   *See id.* at 386 (citing cases); *see also Taylor v. Schaffer*, 2015 U.S. Dist. LEXIS 16119, *16-17 (D. Vt. Feb. 10, 2015) ("[I]t is not readily clear a police encounter qualifies as a 'program, service or activity.'").  In 2014, the United States Supreme Court granted certiorari to determine this issue, but declined to decide this question when the parties failed to address it in their briefs.  *Sheehan*, 135 S. Ct. at 1170.  The Second Circuit has never addressed the issue.

This Court recently applied the ADA to a Complaint alleging wrongful use of force in the arrest of a mentally-ill man.  *Sage v. City of Winooski*, 2017 WL 110082 (D. Vt. March 22, 2017).[22]  Not inconsistently, however, this Court has recognized the Fifth Circuit's exception in *Hainze v. Richards*, 207 F.3d 795 (5th Cir. 2000).  *See Taylor v. Schaffer*, 2015 WL 541058, *7 (D. Vt. Feb. 10, 2015) (recognizing the *Hainze* exception but considering application of the ADA under different circumstances where subject was unarmed).  Thus, even if police arrests or other encounters with law enforcement qualify as a "program, service or activity" within the meaning of section 12132, the ADA does not apply in the presence of exigent circumstances.

In *Hainze*, the Fifth Circuit considered a similar encounter between a police officer and a mentally disturbed man who was approaching the officer with a knife.  Declining to apply the ADA to that situation, the Fifth Circuit held that "Title II does not apply to an officer's on-the-street responses to reported disturbances or other similar incidents, whether or not those calls

---

[21] In *Sheehan*, the United States Supreme Court recently stated that although Title II applies only to public entities, the Court has never determined whether a public entity can actually be held liable under the ADA for the conduct of its officers.  *Sheehan*, 192 L. Ed. 2d at 866.  Thus, this too is an open question.
[22] *Sage* is a decision on a Motion to Dismiss.

involve subjects with mental disabilities, prior to the officer's securing the scene and ensuring that there is no threat to human life."  *Id.* at 801.  This is because:

> Law enforcement personnel conducting in-the-field investigations already face the onerous task of frequently having to instantaneously identify, assess, and react to potentially life-threatening situations.  To require the officers to factor in whether their actions are going to comply with the ADA, in the presence of **exigent circumstances** and prior to securing the safety of themselves, other officers, and any nearby civilians, would pose an unnecessary risk to innocents.

*Id.* (emphasis added).  Thus, under the *Hainze* exception, Title II of the ADA does not apply where (1) the scene is not secure and (2) there is a threat to human life.  *See id.*; *Taylor*, 2015 U.S. Dist. LEXIS 16119 at *18-19 (recognizing the *Hainze* exception but considering application of the ADA under different circumstances where subject was unarmed).

At the time of the incident in this case, the scene was not secure, nor had there been time or opportunity to do so.  SUMF ¶ 61.  Moreover, as discussed in detail above, the Defendant Officers reasonably believed that Wayne posed a significant threat to their lives.  *Id.* ¶¶ 26, 45-54.  Armed with a weapon, Wayne had quickly advanced to within striking distance of the officers.  *Id.* ¶ 42.  All witnesses believed that Wayne either intended to or could have hit the officers with the spade.  *Id.* ¶ 33, 45-46.  Accordingly, under *Hainze*, Title II of the ADA is not applicable to the encounter in this case.

Even Courts that deviate from *Hainze* have, nonetheless, found that "exigency…bears materially on the inquiry into reasonableness under the ADA."  *Waller v. City of Danville*, 556 F.3d 171, 175 (4th Cir. 2009); *see Sheehan v. City of San Francisco*, 743 F.3d 1211, 1232 (9th Cir. 2014) (following the Fourth Circuit's approach in *Waller*).  Thus, even assuming Title II did apply to the encounter in this case, the Defendant Officers would not have been required to

Downs
Rachlin
Martin PLLC

provide any further accommodations given the exigent, and subsequently life-threatening, circumstances.

Whether a reasonable accommodation could have been provided at all depends on the specific facts and circumstances of the case.  *Waller*, 556 F.3d at 175.  "[E]xigent circumstances inform the reasonableness analysis under the ADA, just as they inform the distinct reasonableness analysis under the Fourth Amendment."  *Sheehan*, 743 F.3d at 1232 (citing cases).  Under this analysis, Plaintiffs bear the burden of producing evidence that a reasonable accomodation could have been given under the circumstances.  *Sheehan*, 743 F.3d at 1233.

In *Waller*, the Fourth Circuit declined to find an ADA violation where officers responded to an unstable situation involving a mentally disturbed individual.  *Waller*, 556 F.3d at 175.  Although the officers reportedly had two hours to assess the situation, the Fourth Circuit recognized that in the police context "exigency is not confined to split-second circumstances." *Id*.  Instead, exigent circumstances exist where the situation is unstable, uncertain, and there is a risk that a situation will "take[] a dark turn quickly…."  *Id.*

Here, BPD dispatch received a call from Mrs. Brunette stating that Wayne was threatening, violent, out of control, had a history of mental illness, and was in the process of destroying property at the home he shared with his elderly parents.  SUMF ¶ 6.  Under these circumstances, the City was not required to provide any further accommodations beyond sending trained officers to respond, nor could it reasonably do so.  To the extent Plaintiffs' Complaint suggests that the City and the officers responded too quickly to the scene or should have left Brunette alone despite the 911 call from his mother, this claim should be rejected outright.  Had the City or the officers delayed their response to the Brunettes, "this Court could have been

Downs
Rachlin
Martin PLLC

considering a different set of plaintiffs who could claim police failed to control [the subject] in a timely manner." *Woodward III*, 2006 U.S. Dist. LEXIS 1059 at * 18; *see Waller*, 556 F.3d at 175-76.  Furthermore, despite the allegation in the Amended Complaint, the Defendant Officers did not arrive at the scene with their cruiser emergency lights or sirens turned on.

Plaintiffs' Amended Complaint also suggests that the City or the Defendant Officers could have accommodated Brunette by calling a crisis negotiation team or mental health professional prior to requesting permission to speak to Brunette.  Chief Schirling testified that a crisis negotiation team was not warranted at the scene, because (1) it did not involve a hostage situation; (2) it did not involve a barricaded subject; and (3) the situation evolved too rapidly when others went to assess the situation to deploy this resource.  SUMF ¶98.  Plaintiffs have not identified any expert witness to refute Chief Schirling's informed position, thus any argument to the contrary is mere speculation.  *See* K. Katsaris Dep. 83:1-17 (testifying that he will not render any opinion in connection with the ADA claim).

This same suggestion was also summarily rejected by the Fourth Circuit in *Waller*.  The Fourth Circuit recognized that:

> [T]he delay involved in getting the proper professionals or medications or determining which family member to call, for instances, might itself be considerable.  As to mental health professionals, it is unclear even now which or how many professionals should have been called or what sort of relationships existed within [the subject's] family, and if they had called to the scene a family member from whom [the subject] was alienated or estranged, they could have escalated the situation rather than defusing it.

*Id.*

Downs
Rachlin
Martin PLLC

Furthermore, to the extent the City had a duty to Wayne under the ADA, this duty was satisfied through the City's policies, procedures, and training concerning individuals with mental illness.  First, the City specifically had a policy in place at the time of the incident entitled "Interacting with Persons with Disabilities."  SUMF ¶94.  This policy directed the City's patrol officers to treat fairly persons who present with disabilities, including mental illness.  Second, it is undisputed that the City trains its officers in dealing with mental health calls as necessary first responders.  Furthermore, upon receiving a 911 call concerning an individual experiencing a mental health issue, the Defendant Officers are instructed and trained to assess the scene before calling a crisis negotiation team or mental health professional.  *Id.* ¶95.  In the majority of cases involving individuals with mental illness, officers are trained to talk with the individual to encourage him or her to seek mental health treatment.  *Id.*  It is simply not reasonable, practical, or in the interest of public safety for mental health professionals to replace police officers as the first line of response in all cases involving individuals suffering from mental illness.  *See id.* ¶96.  Accordingly, even if the ADA required the City to provide reasonable accommodations to Wayne, the City did so through its existing policies requiring ADA compliance and procedure for responding to mental health calls.

2. *Wayne Was Not A "Qualified Individual" Within The Meaning Of Section 12132.*

Furthermore, under the express terms of the ADA regulatory structure, Wayne was not a "qualified individual" at the time of the incident, and thus, was not entitled to the benefits of the ADA.  To state a claim under Title II of the ADA, a plaintiff must show that he or she is qualified to participate in or receive the benefits of services, programs, or activities of a public

entity.  Individuals who "pose a direct threat to the health or safety of others" are specifically excluded under 28 C.F.R. § 35.139(a) from receiving Title II benefits.

The term "direct threat," is defined as "a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices or procedures, or by the provision of auxiliary aids or services as provided in § 35.139."  28 C.F.R. § 35.104.  The determination of whether an individual poses a direct threat is an "individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence, to ascertain: the nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures or the provision of auxiliary aids or services will mitigate the risk."  28 C.F.R. § 35.139(b).

In cases involving police encounters, the determination of whether a significant risk exists necessarily involves "on-the-spot judgments in tense circumstances."  *See Salim*, 93 F.3d at 91 (discussing the objective reasonableness test for use of force).  Thus, the Defendant Officers were forced to make a quick decision as to "the nature, duration, and severity of the risk."  28 C.F.R. § 35.139(b).  Based on the objective information available to them at the time (discussed in detail above), the officers made the reasonable judgment that Wayne posed a significant risk, i.e., a direct threat, to the safety of others the moment he walked out of the garage wielding the shovel in a threatening manner.  At that point, Wayne was not a qualified individual under section 12132.

In sum, Plaintiffs' ADA claim seeks to impose an impossible ADA compliance standard on public entities and law enforcement as a whole.  In Plaintiffs' view, mental health

Downs
Rachlin
Martin PLLC

41

professionals would always be the first line of response any time a 911 call involved a person suffering from mental illness.  It bears noting that Barbara Brunette and Mrs. Brunette made the decision to call the police—as opposed to a social worker or other mental health professional.[23]  At that time, the Defendant Officers had limited information.  Neither officer had any prior interaction with Wayne.  SUMF ¶79; Thibault Affidavit ¶9; Navari Affidavit ¶3.  Nor was Wayne well known to BPD as an individual suffering from mental illness.  SUMF ¶79.  Instead, the Defendant Officers had to assess the situation based on the 911 call by Mrs. Brunette for *police* assistance with her adult son who was threatening and out of control.  It is completely unreasonable to expect the officers to delay their response to this call in order to determine which mental health professional to call instead.  It is entirely unreasonable for the police to send in a mental health professional as a first line of response to a situation that was unknown, unsecured, and unstable.  In practice, this would be an unworkable standard.  It would effectively require the radio dispatcher to determine whether and when it is safe or reasonable to send a mental health professional in addition to or instead of a trained police officer to respond to an unsecured and potentially violent situation.[24]  Moreover, it is also entirely speculative to assume that the tragic outcome on the day of the incident would have turned out any differently had a mental health professional, and not the police, responded to the scene first.  There is absolutely no indication the Brunette would have responded any differently.  Rather, any suggestion that the Defendant Officers could have taken other actions "is to lean far in the direction of impermissible

---

[23] Wayne Brunette had not had any mental health treatment for a decade even in the face of escalating mental disturbance over the months preceding the event of November 6, 2013.

[24] This suggestion also raises the issue of whether it is up to the legislature to require mental health professionals on staff with the police force to act as first responders in situations involving individuals suffering from a mental health crisis.

hindsight." *Waller*, 556 F.3d at 176.  The ADA does not impose such an unreasonable and unworkable duty.

        E.  <u>DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PLAINTIFFS' STATE LAW TORT CLAIMS.</u>

        1.  *Cpl. Thibault, Cpl. Navari, And Chief Schirling Are Entitled To Qualified Immunity On Plaintiffs' State Law Tort Claims For Assault And Battery And Negligence.*

A claim under Vermont law for assault and battery arising from allegations of excessive force is governed by the same standard as the Fourth Amendment claims.  *Brayshaw*, 2015 U.S. Dist. LEXIS 44034 at * 35.  First, there is no allegation in Plaintiffs' Amended Complaint that any Defendant, other than Cpl. Thibault, ever came in physical contact with Wayne.  Thus, Plaintiffs have failed to state any claim for assault and battery against Cpl. Navari or Chief Schirling, and this cause of action against them must be dismissed.  Second, as discussed above, Cpl. Thibault had probable cause to believe that if he did not employ the force he did when he did, Wayne would have caused serious injury or death to either himself or Cpl. Navari.

Much of Plaintiffs' facts and expert discovery seems aimed at making out a case for negligence despite the overwhelming evidence supporting qualified and municipal immunity for all defendants.  Plaintiffs' analysis of their claims is legally flawed.  As a threshold matter, neither Cpl. Thibault, Cpl. Navari, nor Chief Schirling owed Wayne any legal duty giving rise to a claim for negligence.  *Fortunati v. Campagne*, 681 F. Supp. 2d 528, 545 (D. Vt. 2009) (dismissing claim for gross negligence in case arising out of use of deadly force by Vermont State Troopers) (citing *Powers v. Office of Child Support*, 173 Vt. 390 (2002)) (*affirmed* by *Fortunati v. Vermont*, 503 Fed. Appx. 78 (2d Cir. 2012).  More fundamentally, however, the defense of qualified immunity is equally applicable to the state law tort claims as it is to the

Downs
Rachlin
Martin PLLC

federal 1983 claims.  *Id*.; *MacLeod v. Town of Brattleboro*, 2012 WL 5949787, at *8 (D. Vt.

Nov. 28, 2012), *aff'd,* 548 F. Appx. 6 (2d Cir. 2013) (dismissing state law claim for assault and

battery on qualified immunity grounds even where plaintiff had satisfied the elements of the

claim for the purpose of summary judgment).

　　　　Under Vermont law, public officials are entitled to qualified immunity when they are "(1)

acting during the course of their employment, or reasonably believing they are acting, within the

scope of their authority; (2) acting in good faith; and (3) performing discretionary, as opposed to

ministerial, acts…．  Good faith exists where an official's acts do not violate clearly established

rights of which the official reasonably should have known."  *Baptie v. Bruno*, 2013 VT 117, ¶

11.  The analysis of Vermont's application of qualified immunity in this case relies on the same

undisputed facts, evidence, and witness statements as the application of qualified immunity to

the federal law claims against the individual defendants.

　　　　It is undisputed that the individual defendants were acting within the scope of their

authority and performing discretionary acts at all times relevant to the Complaint.  *Amy's*

*Enterprises v. Sorrell*, 174 Vt. 623, 625 (2002) ("decisions made in the course of investigations

are discretionary"); *see MacLeod*, 2012 WL 5949787 *8 (officer's use of force decision was

within the scope of his employment and discretionary).  Furthermore, as discussed in detail

above, the officer defendants acted reasonably in light of the significant threat posed by Wayne.

There is also no allegation that Chief Schirling acted in violation of a clearly established

statutory or constitutional right.  Accordingly, the individual defendants acted in good faith in the

performance of their discretionary duties and are thus entitled to qualified immunity under

Vermont law.  *See Brayshaw*, 2015 U.S. Dist. LEXIS 44034 at * 37 (applying Vermont law on

qualified immunity to state law tort claims).

>    2. *Plaintiffs' Claim For Intentional Infliction Of Emotional Distress (Count VIII) fails As A Matter Of Law.*

A claim for intentional infliction of emotional distress ("IIED") requires proof of

"outrageous conduct, done intentionally or with reckless disregard of the probability of causing

outrageous conduct." *Baptie*, 2013 VT ¶ 24.  "This is a heavy burden that requires plaintiff to

show that [defendant's] conduct was so outrageous in character and so extreme in degree as to go

beyond all possible bounds of decent and tolerable conduct in a civilized community and be

regarded as atrocious and utterly intolerable." *Cate v. City of Burlington*, 2013 VT 64, ¶ 28

(quotation omitted).

This Court has held that where an officer's use of force is reasonable, a claim of IIED

fails as a matter of law. "It would be inconsistent to conclude that [the officer's] conduct was

both reasonable and 'outrageous in character and ... extreme in degree.'" *MacLeod*, 2012 WL

5949787 at *8.

It is undisputed that the officers responded to the scene with the knowledge that Wayne

had "been threatening, out of control, and destroying property."  SUMF ¶8.  Under no scenario

could their response, arriving at the residence, asking the parents a few questions, requesting that

Wayne come and explain what was going on, be considered "atrocious and utterly intolerable."

*Cate*, 2013 VT at ¶ 28.  The mere request by Cpl. Navari to speak to Brunette cannot satisfy the

stringent standard for IIED.  No one would willingly serve as a police officer if officers could be

sued for IIED merely for responding to a call for assistance and requesting to speak with a

person of interest upon arrival.  Furthermore, as discussed above, the officers acted reasonably in

light of the significant threat posed by Wayne when he advanced towards them lunging, jabbing, poking, and/or swinging the shovel.  Based on these undisputed facts, the officers' conduct cannot be considered "outrageous in the extreme," and this claim must be dismissed.

>   3.  *The City Is Entitled To Municipal Immunity For Plaintiffs' State Law Tort Claims.*

To the extent Plaintiffs' Complaint alleges state law tort claims against the City, the City is immune from these claims under the principle of municipal immunity.  In Vermont, as in most jurisdictions, municipalities can only be held liable for injuries arising from their proprietary, as opposed to governmental, duties.  *Decker v. Fish*, 126 F. Supp. 2d 342, 346 (D. Vt. 2000); *MacLeod v. Town of Brattleboro*, 2012 WL 5949787at *21 ("Most courts, including this one, have concluded that training police officers and evaluating their conduct both fall within the governmental function of police work."); *Sage*, 2017 WL 1100882 at *5 (dismissing claims against City of Winooski for "hiring, training, and supervision" of officer in case alleging wrongful use of force).  Here, "there can be little question that police work is a quintessential governmental function."  *Decker*, 126 F. Supp. 2d at 346.  Accordingly, the City is immune from Plaintiffs' state law claims.

>   4.  *Plaintiffs' Claim Under The Vermont Wrongful Death Act, 14 V.S.A. §§ 1451, 1491-92, Fails As An Independent Cause Of Action And Must Be Dismissed.*

Plaintiffs allege "wrongful death" against all Defendants.  However, the Vermont Wrongful Death Act and Survival Statutes do not create new, independent causes of action.  Rather, they simply provide a basis for recovery "not existing at common law, arising from the injury to the deceased which gave or would have given him a right of action if death had not ensued."  *Berry v. Rutland Ry. Co.*, 103 Vt. 388, 154 A. 671, 672 (1931).  Because Defendants

Downs
Rachlin
Martin PLLC

are entitled to qualified immunity, and all federal and state tort claims must be dismissed, Plaintiff's claim for recovery under the Vermont Wrongful Death Act and Survival Statutes must also be dismissed. *Fortunati*, 681 F. Supp. 2d at 546 (granting summary judgment on wrongful death claim where Defendant police officers entitled to qualified immunity in use of deadly force).

<u>CONCLUSION</u>

For the foregoing reasons, Defendants City of Burlington, Vermont; Chief Michael Schirling, Cpl. Ethan Thibault, and Cpl. Brent Navari respectfully request that the Court GRANT their Motion for Summary Judgment and dismiss all claims against them in Plaintiffs' Amended Complaint.

September 29, 2017                              DOWNS RACHLIN MARTIN PLLC


By   /s/ Tristram J. Coffin
          Tristram J. Coffin
          Jennifer E. McDonald
          199 Main Street
          P.O. Box 190
          Burlington, VT 05402-0190
          Telephone:  802-863-2375
          Fax:  802-862-7512

          ATTORNEYS FOR DEFENDANTS CITY OF BURLINGTON, VERMONT; CITY OF BURLINGTON POLICE DEPARTMENT; CHIEF MICHAEL SCHIRLING, IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES; CPL. ETHAN THIBEAULT; IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES; CPL. BRENT NAVARI, IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES.

Downs
Rachlin
Martin PLLC

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on Friday, September 29, 2017, I electronically filed a true copy of Defendants' Motion for Summary Judgment with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.  A copy of the CD attached to Exhibit E of Defendants' Statement of Undisputed Material Facts was sent via regular mail to all counsel of record.

By: _____/s/ Jennifer E. McDonald_____

17808206.1

Downs
Rachlin
Martin PLLC