UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| ESTATE OF WAYNE BRUNETTE by )<br>BARBARA BRUNETTE, as Personal )<br>Representative and Administratrix of the )<br>ESTATE OF WAYNE BRUNETTE, and )<br>BARBARA BRUNETTE, Individually, )<br> )<br>Plaintiffs, )<br> )<br>v. )<br> )<br>CITY OF BURLINGTON, VERMONT; CITY )<br>OF BURLINGTON POLICE DEPARTMENT, )<br>CHIEF MICHAEL SCHIRLING, in his )<br>Individual and Official Capacities; CPL. )<br>ETHAN THIBEAULT; in his Individual and )<br>Official Capacities; CPL. BRENT NAVARI, in )<br>his Individual and Official Capacities. )<br> )<br>Defendants. ) | Case No. 2:15-cv-61-cr |

**DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56(a), Defendants submit the following Undisputed Material Facts to which they contend there is no genuine issue to be tried. These Undisputed Facts reflect the sworn statements and deposition testimony of the ten (10) eye-witnesses to the incident on November 6, 2013.

1.  At approximately 3:30 p.m. on November 6, 2013, Lawrence Brunette and his wife Ruthine "Dolly" Brunette observed their adult son, Wayne Brunette, cutting down a portion of an apple tree with a reciprocating saw in the front yard of Lawrence and Dolly Brunette's home at 85 Randy Lane, Burlington, Vermont. Deposition of Ruthine "Dolly" Brunette, 6/3/16 (hereinafter "R. Brunette Dep.") at 14:18-21; 15:7 (copies of the relevant pages of R. Brunette's

deposition are attached hereto as Exhibit A). Sworn Statement of Lawrence Brunette at 20-22 (a copy of Mr. Brunette's Sworn Statement is attached as Exhibit B).

2.  Wayne had a history of mental illness, however, as of 2013 he had not sought any treatment for his various mental illnesses in almost ten (10) years. Deposition of Barbara (Brunette) Davison, 9/12/16 at 87:14-18 (copies of the relevant pages of Mrs. Davison's deposition are attached as Exhibit C).

3.  It was Mr. Brunette's[1] perception that Wayne was "out of his mind" when he was cutting down the apple tree. Deposition of Lawrence Brunette, 6/3/16 (hereinafter L. Brunette Dep.") at 21:23-24 (copies of the relevant pages of L. Brunette's deposition are attached as Exhibit D).

4.  Mr. and Mrs. Brunette tried to talk to Wayne, but according to Mr. and Mrs. Brunette, Wayne was "ranting and raving," "out of control," and "foul mouth, swearing and cursing and calling us names and calling his wife names." R. Brunette Dep. at 33-36; L. Brunette Dep. at 22:10, 23:4.

5.  Mrs. Brunette telephoned Wayne's wife, Barbara Brunette, at work. Barbara Brunette advised Mrs. Brunette to call the police. R. Brunette Dep. at 16:5.

6.  At 4:18 p.m., Mrs. Brunette called the Burlington Police Department ("BPD") non-emergency number. The call occured as follows:

> Mrs. Brunette:  [T]his is Mrs. Brunette on 85 Randy Lane. I've got a problem here with my son that's upstairs. He's gone berserk, I think, and I mean I've got to do something. He's cut my apple tree down out front just now. He's violent and he's just mean. We live downstairs. Him and his wife live upstairs over us. And now he

---

[1] To avoid confusion, "Mr. Brunette" will be used to refer to Lawrence Brunette. "Mrs. Brunette" will be used to refer to Wayne's mother, Dolly Brunette. Wayne's wife will be referred to as "Barbara Brunette."

Downs
Rachlin
Martin PLLC

2

> says he owns this whole house and this whole property and everything, which he doesn't. And he's really bad.
>
> Dispatcher: Ok, what is he doing right now m'am?
>
> Mrs. Brunette: Right now I chased him upstairs. He's upstairs in the apartment right now….
>
> Dispatcher: Does he have mental health issues?
>
> Mrs. Brunette: Yes he does….
>
> Dispatcher: Keep your door locked and I'll send somebody over there.

Exhibit 2 to Affidavit of Deputy Chief Jannine Wright (hereinafter "Wright Affidavit"), attached as Exhibit E.

7. At 4:19:23 p.m., BPD officers Brent Navari and Ethan Thibault received a radio call over dispatch. At the time of this dispatch call, Cpl. Navari and Cpl. Thibault were parked in a parking lot at Ethan Allen Homestead Park. Affidavit of Brent Navari ¶1 (hereinafter "Navari Affidavit"), attached as Exhibit F; Affidavit of Ethan Thibault ¶8 (hereinafter "Thibault Affidavit"), attached as Exhibit G.

8. The dispatch radio call directed the officers to respond to a mental health issue at 85 Randy Lane, Burlington. The dispatch call informed the officers that (a) the caller lives downstairs and owns the property; (b) the caller's son lives upstairs; (c) the caller's son has been threatening, out-of-control, and destroying property; (d) the caller's son is now in the apartment upstairs; and (e) the caller is downstairs and was advised to stay inside with the door locked. Exhibit 2 to Wright Affidavit.

9. Cpl. Thibault was the primary officer on this dispatch call. Deposition of Ethan Thibault, 9/8/16 (hereinafter "E. Thibault Dep.") at 138:9-10 (copies of the relevant pages of E. Thibault Dep. are attached as Exhibit H).

10. Cpl. Thibault and Cpl. Navari have responded to hundreds of similar calls and many together during their years as BPD officers. E. Thibault Dep. at 145:21-146:2; see Affidavit of Michael Schirling (hereinafter Schirling Affidavit) at ¶19, attached as Exhibit I.

11. Neither Cpl. Thibault nor Cpl. Navari had ever responded to a call or complaint at 85 Randy Lane. Thibault Affidavit ¶9; Navari Affidavit ¶3.

12. Neither Cpl. Thibault nor Cpl. Navari were familiar with Wayne Brunette prior to interacting with him on the day of the incident. Thibault Affidavit ¶9; Navari Affidavit ¶3.

13. Cpl. Thibault was the first officer to arrive at 85 Randy Lane. E. Thibault Dep. at 171:16-18, 174:23-175:3.

14. Mr. and Mrs. Brunette came out of the first floor of the house to speak with Cpl. Thibault near the front steps. E. Thibault Dep. at 173:2-9.

15. Cpl. Navari arrived at 85 Randy Lane moments after Cpl. Thibault and approached the house by way of the driveway. Navari Affidavit ¶4.

16. Neither Cpl. Thibault nor Cpl. Navari turned on their police car lights or sirens in responding to 85 Randy Lane. E. Thibault Dep. at 296:24-297:5; Deposition of Brent Navari, 9/7/16 (hereinafter B. Navari Dep. at 90-91 (copies of the relevant pages of B. Navari Dep. are attached hereto as Exhibit J); Sworn Statement of Mary Little at 38-40 (a copy of Mrs. Little's Sworn Statement is attached as Exhibit K).

17. Cpl. Thibault asked Mr. Brunette if Wayne was under the care of a particular doctor; if he was on any medications; if he was seeing anyone from the Howard Center for Human Services (the "Howard Center"); and if Wayne had any weapons or firearms on him. E. Thibault Dep. at 181:23-182:8.

18. Mr. Brunette responded that Wayne was not on any medications and was not receiving any medical care. E. Thibault Dep. at 182.

19. When Cpl. Navari arrived on the scene, he observed someone, who he later learned was Wayne Brunette, standing just inside the open garage off the driveway. B. Navari Dep. at 102:8-12.

20. A moment after observing Wayne standing just inside the open garage off the driveway, Cpl. Navari observed Wayne disappear from view into the garage and reappear on the landing above the garage on the upper floor of the house. B. Navari Dep. at 105:14-25.

21. Using a soft-toned voice, Cpl. Navari requested that Wayne come down from the landing to talk with him. B. Navari Dep. at 106:11-12; L. Brunette Statement at Lines 343-344; Deposition of W. Ken Katsaris, 3/1/17 (hereinafter "K. Katsaris Dep.") at 85:11-15 (copies of the relevant pages of K. Katsaris Dep. are attached as Exhibit L).

22. Wayne responded "no," to Cpl. Navari's request that Wayne come down from the landing. Wayne then slammed the metal screen door on the landing, but did not appear to go inside. B. Navari Dep. at 106:13-20.

23. After momentarily disappearing from view, Wayne reappeared stepping out of the garage at the driveway level holding a shovel. B. Navari Dep. at 116:12-17.

24. The subject shovel was a garden spade; slightly less than five (5) feet at four feet, ten inches long, with a wooden handle and pointed metal head. B. Navari Dep. at 117:11-15.

25. The subject shovel could be used as a dangerous weapon and was capable of inflicting serious bodily injury or death. K. Katsaris Dep. at 6-7; Navari Affidavit ¶13; Thibault Affidavit ¶11.

26. Cpl. Navari immediately felt threatened by the aggressive manner in which Wayne was holding the shovel.  B. Navari Dep. at 117:17-22; Navari Affidavit ¶11.

27. Cpl. Navari asked Wayne to put the shovel down.  Wayne did not respond the first time Cpl. Navari made this request and instead stood holding the shovel "up, in an aggressive manner towards [Cpl. Navari]."  B. Navari Dep. at 118:16.

28. Cpl. Navari asked Wayne to put the shovel down a second time.  In response to this second request, Wayne responded in a louder, more aggressive tone, "No, you're going to have to shoot me" and, still holding the shovel in an upright threatening manner, began to advance on Cpl. Navari in a very fast manner.  B. Navari Dep. at 118:22-25, 119:20-21.

29. Wayne began to quickly advance on Cpl. Navari.  B. Navari Dep. at 119:24-25.

30. Cpl. Navari started backing up as Wayne quickly advanced.  B. Navari Dep. at 119:24-25.

31. As he was backing up, Cpl. Navari drew his weapon and yelled, "drop it, drop it" over again and over again.  B. Navari Dep. at 120:8-11; L. Brunette Statement Lines 84, 175-77; Sworn Statement of Ruthine "Dolly" Brunette Lines 76-81, 119 (a copy of R. Brunette's Statement is attached as Exhibit M); E. Thibault Dep. at 208:4-14.

32. Cpl. Navari tried his best to get Wayne to drop the shovel and asked him to do so at least 6-7 times.  L. Brunette Statement Lines 173-176; E. Thibault Dep. at 208:4-14.

33. Mrs. Brunette believed Wayne probably would have hit Cpl. Navari with the shovel.  R. Brunette Statement Lines 103-05; R. Brunette Dep. at 29, 30:20-24, 36:4-14.

34. Wayne raised the shovel like a spear and quickly "charged" and "lunged" at Cpl. Navari while making "swinging," "jabbing," and "jousting" motions with the shovel.  R. Brunette Statement Lines 103-05; R. Brunette Dep. at 29, 30:20-24; Initial On-Scene Interview

Downs
Rachlin
Martin PLLC

6

with Mary Little Lines 152-55 (a copy of the Initial On-Scene Interview is attached as Exhibit N); Deposition of Mary Little, 4/5/16 (hereinafter M. Little Dep.) at 18:19-25 (copies of the relevant pages of M. Little Dep. are attached as Exhibit O); E. Thibault Dep. at 208.

35. Despite Cpl. Navari's efforts to create distance between himself and Wayne, it appeared to Cpl. Navari that Wayne was closing in on him faster than Cpl. Navari could back up. B. Navari Dep. at 118, 119:22-23, 120:14-15.

36. Wayne tried to attack Cpl. Navari with the shovel. Initial On-Scene Record (M. Little) Line 175; R. Brunette Dep. at 36:4-14.

37. Cpl. Navari was extremely fearful of being seriously injured or killed by Wayne. B. Navari Dep. at 126:2-4; Navari Affidavit ¶18.

38. Cpl. Navari placed his finger on the trigger of the gun and recalled thinking he would have to shoot if Wayne continued to advance. B. Navari Dep. at 120:23-24.

39. Almost as soon as Wayne started advancing on Cpl. Navari, Cpl. Thibault moved forward, drawing his firearm, to provide assistance. Thibault Affidavit ¶¶13-14.

40. Cpl. Thibault told Wayne multiple times to drop the shovel. E. Thibault Dep. at 208:23-24.

41. At the time Cpl. Thibault and Cpl. Navari were telling Wayne to drop the shovel, the blade of Wayne's shovel was in close proximity to Cpl. Navari's face. E. Thibault Dep. at 208:18.

42. All witnesses describe that Wayne advanced to within striking distance of the officers. Initial On-Scene Interview (M. Little) Lines 222-23; M. Little Statement Lines 177-80; L. Brunette Dep. 31, 33; R. Brunette Dep. 36:4-14; Deposition of Raymond Little, Jr., 4/5/16 (hereinafter R. Little Dep.) at 24:10-14 (copies of the relevant pages of R. Little Dep. are

Downs
Rachlin
Martin PLLC

attached as Exhibit P); Raymond Little, Jr. Sworn Statement Lines 30-31 (a copy of R. Little Statement is attached as Exhibit Q); J2 Sworn Statement Lines 60-62 (a copy of J2 Sworn Statement is attached as Exhibit R); J1 Sworn Statement Lines 102-04 (a copy of J1 Statement is attached as Exhibit S; Marcus Medlar Sworn Statement Lines 38-39 (a copy of M. Medlar Statement is attached as Exhibit X); Kelley Medlar Statement Lines 78-80,127-129 ( Medlar's Statement is attached as Exhibit T); Affidavit of Kelley Medlar ¶8 (a copy of Medlar Affidavit is attached as Exhibit U); E. Thibault Dep. 208; L. Brunette Statement Lines 166-171.

43. When Wayne was in striking distance of Cpl. Navari, he suddenly redirected his attention and momentum to charge Cpl. Thibault. E. Thibault Dep. 208:18-23.

44. Cpl. Thibault was fearful Wayne would strike him or Cpl. Navari with the shovel causing serious injury or death. E. Thibault Dep. at 220:13-19, 224:9-12.

45. Many witnesses thought it was reasonable for the officers to feel threatened and concerned with their physical safety. Initial On-Scene Interview (M. Little) Lines 222-223; M. Little Statement Lines 177-80; L. Brunette Dep. at 31, 33; R. Brunette Dep. at 36:4-14; Medlar Affidavit ¶¶ 7-10; K. Medlar Statement Lines 78-80,127-129.

46. In the immediate aftermath, none of the witnesses thought Cpl. Thibault acted unreasonably in shooting Wayne. L. Brunette Statement Line 265; Initial On-Scene Interview (M. Little) Lines 222-23; M. Little Statement Lines 177-80; L. Brunette Dep. at 31, 33; R. Brunette Dep. at 36:4-14.

47. Fearful Wayne would strike him or Cpl. Navari with the shovel causing serious injury or death, Cpl. Thibault fired two shots. E. Thibault Dep. at 220:13-19, 224:9-12.

48. Cpl. Navari believed that he and Cpl. Thibault were in imminent danger of serious injury or death from Wayne at the time Cpl. Thibault fired the shots. Navari Affidavit ¶¶ 16, 18.

49. Wayne continued to advance after the first two consecutive shots. E. Thibault Dep. at 210:8-12; R. Little Dep. at 40:5-15; M. Little Dep. at 29:25-30:3; M. Little Statement Line 14.

50. Because Wayne continued to advance following the first two consecutive shots, Cpl. Thibault continued to believe that he and Cpl. Navari remained in imminent danger of serious injury or death from Wayne. Thibault Affidavit ¶¶20-22.

51. Cpl. Thibault made a split-second decision and fired two more shots in quick succession when Wayne continued to advance following the first two shots. E. Thibault Dep. at 210:8-12; Thibault Affidavit ¶22.

52. At the time of the shooting, Wayne was in dangerously close proximity to Cpl. Thibault and Cpl. Navari. Navari Dep. at 125:13-23, 136:25-137:5; R. Little Dep. at 25:21-26:1; Navari Affidavit ¶¶18-19; Thibault Affidavit ¶¶18-21.

53. Wayne was well within 15 feet of Cpl. Thibault when the first two shots were fired. R. Little Dep. at 25:21-26:1; R. Little Statement Lines 71-79; B. Navari Dep. at 125:13-23, 135:17-23, 136:25-137:5.

54. Wayne was well within four (4) feet of Cpl. Navari at the time of the shooting. R. Little Statement Lines 71-79; K. Katsaris Dep. at 72:12-16.

55. Police officers, including Cpl. Thibault and Cpl. Navari, are commonly trained in the 21-foot principle. This principle informs well-trained police that a person wielding a short-handled bladed weapon such as a knife within a 21-foot zone of an officer can attack and fatally wound an officer before most officers can defend themselves. Accordingly, officers are taught that they can be in danger from bladed weapons even outside of the 21-foot zone. Wright Affidavit ¶7; K. Katsaris Dep. at 38:20-24.

56. The "21-foot doctrine" is widely accepted as a standard training policy for officers throughout the country. Katsaris Dep. 38:20-24.

57. An average assailant can cover 21 feet in "two seconds give or take." K. Katsaris Dep. at 36:13-15.

58. Wayne could have struck either Cpl. Thibault or Cpl. Navari in .75-1.5 seconds—well before either officer could react. K. Katsaris Dep. at 6, 38-39, 41.

59. Wayne fell to the ground, but was still moving after the second two shots were fired. Cpl. Thibault tried to calm him until the ambulance arrived. E. Thibault Dep. 298:19-299:25.

60. At 4:26:39 p.m., Cpl. Thibault radioed that shots had been fired, and requested an ambulance. Exhibit 2 to Wright Affidavit.

61. The period of time from when Wayne first charged out of the garage to the time of the fourth shot, was a matter of mere seconds. E. Thibault Dep. at 210:16-21; M. Little Dep. at 50:24-51:2, 55:18-23; L. Brunette Dep. at 37:23-38:1; L. Brunette Statement Line 141.

62. The entire incident, from the radio dispatch call to the officers at Ethan Allen Park to the time Cpl. Thibault radioed that shots had been fired, was just over seven (7) minutes.

63. This was the first officer-involved shooting or use of deadly force in Burlington since 1997. Schirling Affidavit ¶19.

64. Neither Cpl. Thibault nor Cpl. Navari had ever previously fired their gun in the line of duty. E. Thibault Dep. at 117:2-7; see Schirling Affidavit ¶19.

65. The Burlington Police Department and the Vermont State Police investigated the shooting. The investigation included tape-recorded statements from ten persons who witnessed

the shooting at close proximity, including Cpl. Thibault and Cpl. Navari.  Wright Affidavit ¶¶13-14.

66. The witnesses included: (1) Lawrence Brunette; (2) Ruthine "Dolly" Brunette; (3) Mary Little; (4) Raymond Little, Jr.; (5) The Little's 13-year old granddaughter "J1"; (6) The Little's 16-year old grandson "J2" ; (7) Kelly Medlar; (8) Marcus Medlar; (9) Cpl. Thibault; and (10) Cpl. Navari.  Wright Affidavit ¶¶13-14.

67. The Littles witnessed the incident from the front bay window inside their home at 86 Randy Lane, Burlington, Vermont, located across the street from 85 Randy Lane.  M. Little Dep. at 4:14-15; 15:16-20

68. Mr. and Mrs. Brunette witnessed the incident from on or near the front walk-way and front steps, respectively, outside their home at 85 Randy Lane.  L. Brunette Dep. at 42-43.

69. Mr. Brunette was closer to the officers and Wayne than any other eye-witness.  L. Brunette Dep. at 43.

70. Kelly Medlar and Marcus Medlar witnessed the incident from 71 Randy Lane, which is located on the same side of the street and about fifty (50) feet from 85 Randy Lane. K. Medlar Affidavit ¶2.

71. Barbara Brunette, Wayne's wife, was not at Randy Lane during the relevant time period and did not witness the incident.  B. Davison Dep. at 111:13-112:5.

72. Chief Schirling had no personal involvement with the dispatch call or response to 85 Randy Lane until after the shots were fired and Cpl. Thibault notified BPD of the incident.  Schirling Affidavit ¶2.

73.     Shell casings for three of the four bullets fired were recovered from the crime scene. Affidavit of Det. Sargent Darren Annis at ¶¶5-6. A copy of Det. Annis Affidavit is attached as Exhibit V.

74.     At the time of the incident, BPD cruisers were not equipped with cameras. E. Thibault Dep. 166:22-25-167:1-2.

75.     At the time of the incident, neither Cpl. Thibault nor Cpl. Navari were equipped with tasers. B. Navari Dep. 177:19-178:2.

76.     The Vermont State Police measured the distance from the shell casings to the shovel lying on the ground, rather than the distance to where Wayne fell on the ground when he was shot. Det. Annis Affidavit ¶6.

77.     The distances of the shell casings to the shovel as measured by the Vermont State Police were 18'7", 22'6" and 28'2". Det. Annis Affidavit ¶6.

78.     Because shell casings eject backwards, the distance from the shovel to where Cpl. Thibault was standing when he fired the shots was significantly closer than the distance of the shell casings to the shovel as measured by the Vermont State Police. Det. Annis Affidavit ¶¶6-7; K. Katsaris Dep. at 140:1-8.

79.     Wayne Brunette was not well known to BPD as an individual suffering from mental illness. Prior to November 6, 2013, BPD had not interacted with Wayne since 2003. See M. Schirling Dep. at 176-77.

80.     Cpl. Navari graduated from the Vermont Police Academy in 2003. B. Navari Dep. at 3:21-4:12. In 2009, he was promoted to the rank of Corporal. B. Navari Dep. at 6:4-8.

81.     Cpl. Navari has been employed by the Burlington Police Department on a continuous, full-time basis since that 2003. B. Navari Dep. at 5:18-21.

82. Cpl. Thibault graduated from the Vermont Police Academy in 1998. Thibault Affidavit ¶1.

83. Aside from two military deployments, active duty in 2001 following September 11, 2001, and a one-year military contract in Central Asia from 2008-2008, Cpl. Thibault was employed by the Burlington Police Department on a full-time basis from 2001 to 2016. E. Thibault Dep. at 135-36.

84. All Burlington Police Department officers, including Cpl. Thibault and Cpl. Navari, receive annual Use of Force training beginning at the Vermont Police Academy. Deposition of Michael Schirling, 4/1/16 (hereinafter "M. Schirling Dep.") at 46:23-47:7 (copies of the relevant pages of M. Schirling Dep. are attached as Exhibit W).

85. Officers are trained in various "Use of Force" scenarios with artificial decision points for (a) applying force; (b) not applying force; and (c) changing the manner of force. Schirling Dep. at 48:8-14.

86. Cpl. Thibault was a certified Use-Of-Force instructor for BPD at the time of the incident in this case. E. Thibault Dep. at 109:5-6.

87. At the time of the incident, BPD also had in place a Department Directive Policy for use of force entitled "DD05 Response to Resistance/Use of Force." This policy provides in part as follows:

> Officers are agents of the state authorized to use various degrees of force to effect arrests or ensure the public safety. Officers employ objectively reasonable force necessary to accomplish a legal purpose. Officers should use only the force that is necessary and appropriate for compliance to control of a suspect and only until compliance or control has been achieved.

Exhibit 1 to Wright Affidavit.

Downs
Rachlin
Martin PLLC

88. At the time of the incident in this case, Cpl. Thibault was also certified as an instructor in (a) "Rape Aggression Defense"/Self-Defense; (b) firearms; (c) control and restraint; and (d) Monadnock Defensive Tactic Systems ("MDTS"), which includes de-escalation techniques. E. Thibault Dep. at 122:13-123:25; 129:25-130:3.

89. MDTS training includes instruction on policy, case law, and de-escalation techniques. E. Thibault Dep. at 131:19-22; B. Navari Dep. at 171:25.

90. As of the date of this incident, November 6, 2013, both Cpl. Thibault and Cpl. Navari had received extensive training in de-escalation techniques. B. Navari Dep. at 41:4-12, 18-21; Wright Affidavit ¶¶ 6, 7, 10, 12.

91. BPD is a "progressive agenc[y]" in terms of developing training and protocols for dealing with persons with mental disabilities. K. Katsaris Dep. at 152:21-22, 156:3-157:23; Schirling Affidavit ¶¶3, 4, 6, 7, 8, 9, 10, 11, 12, 13, 14, 20.

92. All BPD officers, including Cpl. Thibault and Cpl. Navari, were specifically trained in mental health issues that relate to law enforcement. B. Navari Dep. at 185:2-22; Wright Affidavit ¶¶2-5, 9, 11; Schirling Affidavit ¶¶ 10, 11, 12, 13, 14

93. BPD has taken a number of steps to address the increasing number of encounters with the mentally ill, including the following:

> a. BPD was one of the co-founders, along with Howard Center and other partners, of the Street Outreach Program. This program sought to have a mental health worker from the Howard Center available to interface with law enforcement officers working the Church Street marketplace to help deal with persons who presented with mental health issues. Schirling Affidavit ¶4.

    b. BPD has been active in partnering with other social service agencies aimed at addressing the impact of mental illness on community welfare and public safety.  Schirling Affidavit ¶¶3, 4.

    c. Chief Schirling has been involved with the Vermont Chapter of NAMI, the National Alliance on Mental Illness, participating in its fundraising walks, chairing its fundraising efforts and speaking at its annual convention in 2014.  Schirling Affidavit ¶14.

    d. In 2007, all sworn BPD officers received mental health training mandated by the State of Vermont Act 80.  This training, entitled Interacting with People Experiencing a Mental Health Crisis, was a four-and-a-half hour program mandated by state legislation.  It is the only training on mental health for law enforcement that is mandated by state law.   Schirling Affidavit ¶11 and Wright Aff.

    e. In 2009, BPD, at the direction of Chief Schirling, used federal grant money to expand the Street Outreach Program from the Church Street Marketplace to the entire city.  Schirling Affidavit ¶¶7-9.

    f. In 2010, BPD conducted a training for all sworn officers, including Cpl. Thibault and Cpl. Navari, over four (4), hour and a half long sessions.  This training was led by the Medical Director of the Howard Center and incorporated three other Howard Center mental health professionals into the teaching.  Schirling Affidavit ¶10.

94.     BPD adopted and promulgated Burlington Police Department Directive DD13.02 entitled "Interacting with Persons with Disabilities,"  effective March 15, 2013.  This policy

directs that "[i]t is the policy of this department to provide police services in an equal and impartial manner.  This policy includes providing police services to those who have disabilities that officers either observe or become aware of based upon the circumstances presented or information obtained."  See Burlington Police Department Directive DD13.02, Interacting With Persons With Disabilities, included as Attachment 4 to Wright Affidavit.

95. Upon receipt of a 911 call concerning a mental health incident, the City/BPD responds by dispatching trained police officers to respond to the call/complaint and assess the situation.  BPD officers are trained in dealing with mental health calls as the first line of response to such call.  Schirling Affidavit at ¶¶17-20.

96. Only after the officers have assessed the situation and secured the scene, and only if appropriate and feasible, are the services of a mental health professional requested.  Schirling Affidavit at ¶¶17-20.

97. BPD officers are trained to talk a person experiencing a mental health crisis and to encourage him or her to seek mental health treatment.

98. A crisis negotiation team was not warranted in this case, because (a) it did not involve a hostage situation; (b) it did not involve a barricaded subject; and (c) the situation evolved too rapidly to deploy this resource.  M. Schirling Dep. at 69-70.

September 29, 2017  DOWNS RACHLIN MARTIN PLLC

By /s/ Tristram J. Coffin
Tristram J. Coffin
Jennifer E. McDonald
199 Main Street, P.O. Box 190
Burlington, VT 05402-0190
Telephone:  802-863-2375
Fax:  802-862-7512

ATTORNEYS FOR DEFENDANTS CITY OF BURLINGTON, VERMONT; CITY OF BURLINGTON POLICE DEPARTMENT; CHIEF MICHAEL SCHIRLING, IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES; CPL. ETHAN THIBEAULT; IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES; CPL. BRENT NAVARI, IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES.

17808198.1