**UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT**

| | |
|---|---|
| ESTATE OF WAYNE BRUNETTE by<br>BARBARA BRUNETTE, as Personal<br>Representative and Administratrix of the<br>ESTATE OF WAYNE BRUNETTE, and<br>BARBARA BRUNETTE, Individually,<br><br>        Plaintiffs,<br><br>    v.<br><br>CITY OF BURLINGTON, VERMONT; CITY<br>OF BURLINGTON POLICE DEPARTMENT,<br>CHIEF MICHAEL SCHIRLING, in his<br>Individual and Official Capacities; CPL.<br>ETHAN THIBEAULT; in his Individual and<br>Official Capacities; CPL. BRENT NAVARI, in<br>his Individual and Official Capacities.<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No. 2:15-cv-61<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DEFENDANTS' RESPONSE TO PLAINTIFFS'/NON-MOVING PARTIES' STATEMENT OF UNDISPUTED MATERIAL FACTS

The City of Burlington, Chief Michael Schirling, Cpl. Ethan Thibault, and Cpl. Brent

Navari (the "Defendants"), submit the following Response to Plaintiffs' Statement of Undisputed

Material Facts (Doc. 92-2).

### Introduction

It is well established that not all factual disputes are material for the purpose of deciding a

motion for summary judgment.  See Post v. Killington, Ltd., 2010 WL 3323659, at *6 (D. Vt.

May 17, 2010), aff'd, 424 F. App'x 27 (2d Cir. 2011).  Thus, even where there are disputed facts,

summary judgment must still be granted where there is "an absence of evidence to support an

*essential element* of the non-moving party's claim." Id. (emphasis added); Brayshaw v. City of

Downs
Rachlin
Martin PLLC

Burlington, 2015 WL 1523019, *6 (D. Vt. April 3, 2015) (listing factual disputes that were immaterial to determining motion for summary judgment on qualified immunity).  This standard is critical to qualified immunity, which importantly protects "all but the plainly incompetent or those who knowingly violate the law."  White v. Pauly, 137 S.Ct. 548 (2017).

Although many of the statements set forth in Plaintiffs' Statement of Undisputed Material ("PSUMF") are disputed, these disputes are not material and thus do not preclude summary judgment for Defendants.  For example, many of Plaintiffs' statements impermissibly seek to judge the officers' conduct with "the 20/20 vision of hindsight," instead of from the perspective of a reasonable officer on the scene.  See Graham v. Connor, 490 U.S. 386, 396, 109 S. Ct. 1865, 1872 (1989) (emphasis added) (overruled on other grounds) (barring review of qualified immunity with "the 20/20 vision of hindsight.").  As this Court recognized:

> 'we are not concerned with the correctness of the defendants' conduct, but rather the 'objective reasonableness' of their chosen course of action given the circumstances confronting them at the scene.' Lennon v. Miller, 66 F.3d 416, 421 (2d Cir.1995).  Thus, *the plaintiffs' disputed facts, which speculate on Woodward's subjective motivations and question whether the police officers could have handled an EDP like Mr. Woodward differently, are not material*; this issue is whether the defendants, given what they knew at the time of the incident, objectively acted reasonably, not whether, as a matter of factual hindsight, they could have made a better decision or ultimately made the correct decision.

Woodward v. Town of Battleboro, 2006 WL 36906, at *2 (D. Vt. Jan. 5, 2006) (emphasis added).  Thus, the following disputes, among others, are immaterial for the purpose of deciding Defendants' Motion: (1) application of DD13.03, which was not in effect until June 2014; (2) Wayne's actions between the time Mr. and Mrs. Brunette called BPD and the time the officers arrived on the scene; (3) the degree to which Cpl. Thibault and Cpl. Navari discussed the call

Downs
Rachlin
Martin PLLC

prior to responding to the scene; (4) the degree to which Cpl. Thibault's and Cpl. Navari's style of communication differed in light of unrefuted testimony by Chief Schirling that Cpl. Navari followed standard procedure in communicating with Wayne Brunette; (5) the precise locations of Cpl. Navari, Cpl. Thibault, and Wayne Brunette in light of undisputed testimony that Wayne Brunette aggressively advanced to within a few inches or feet of the officers while lunging, jabbing, poking, and swinging the shovel; (6) the extent to which Cpl. Thibault was advancing or backing up in response to Wayne Brunette's undisputed actions with the shovel; (7) the medical examiner's testimony concerning bullet trajectories and wound locations; (8) the Vermont State Police's on-site investigation following the incident; (9) unrelated Use of Force Reports filed by Cpl. Thibault and Cpl. Navari; and (10) Plaintiffs' expert witnesses' 20/20 hindsight opinions.

 

1.      Paragraph 1 of Plaintiffs' Statement is Undisputed.

2.      Paragraph 2 of Plaintiffs' Statement is Undisputed.

3.      Paragraph 3 of Plaintiffs' Statement is Undisputed.

4.      Paragraph 4 of Plaintiffs' Statement is Undisputed.

5.      Paragraph 5 of Plaintiffs' Statement is Undisputed.

**Burlington Police Department's Policies in Responding to Mental Health Events**

6.      Paragraph 6 of Plaintiffs' Statement is Disputed but immaterial.  Former Chief of Police Michael Schirling clarified in his Errata Sheet that DD.13.03 did not create any *substantial* changes to the Burlington Police Department's ("BPD") operating methodology. Errata Sheet, attached as **Exhibit A**.  Moreover, these were the principles and philosophy that BPD trained to and were aspirational in nature, rather than codified in a police directive along

Downs
Rachlin
Martin PLLC

the lines of DD13.03.  See Schirling Dep. 106-107, attached as **Exhibit B**.  Chief Schirling also testified that the "Street Outreach Interventionist" (DD.13.03.IV) was a new operating methodology, added in DD.13.03, for calls that do not involve a threat to safety or property. Schirling Dep. 103:14-17, 111:25-112:1.  Thus, although DD.13.03 substantially codified pre-existing BPD training and operation, there was no prior directive discussing, for example, "containment, coordination, and communication" with persons with disabilities, and no prior directive or methodology for delivering a street outreach interventionist to non-violent or non-threatening calls.  Id. at 106:13-17.  Instead, DD.13.03 was developed to "provide a response framework" and further improve upon BPD's extensive training and guidance to officers in responding to calls involving individuals with mental illness.  Id. at 106:25-107:3.

While many of the principles and methodology incorporated in DD.13.03 were the subject of ongoing training efforts, that Directive simply did not exist at the time of the shooting. BPD did, however, have a directive in place entitled "Interacting with Persons with Disabilities," DD13.02.  This directive is attached as **Exhibit C**.  Directive 13.02 codified BPD's policy to provide police services in an equal and impartial manner.  It directed that "[s]uccessful police contact with citizens is characterized by effective communication…. Officers shall strive to communicate effectively and accurately….[and] take steps to protect persons with disabilities from inequitable treatment based on their disability and to avoid furthering any injury or disability based on the police contact where such accomodation can occur without jeopardizing the safety of all persons involved in the event."  DD13.02.I.A-C.  Plaintiffs have not pointed to any violation of the directive that was in place at the time of the shooting.

Downs
Rachlin
Martin PLLC

7.      Paragraph 7 of Plaintiffs' Statement is Disputed in part but immaterial.  <u>See</u> Response to Paragraph 6, above.

8.      Paragraph 8 of Plaintiffs' Statement is Disputed in part but immaterial.  <u>See</u> Response to Paragraph 6, above.  Further responding, although Chief Schirling testified that the concepts of containment, coordination, communication, and time were part of long-standing day-to-day response methodology and officer training, there was no prior Directive defining these terms in the context of interacting with persons with disabilities.  Schirling Dep. 106:2-16. Instead, officers were trained to effectively communicate with persons with disabilities and diminished capacities by "[empathiz[ing], stay[ing] on their level.  Ensur[ing] that when [the officer is] talking, the [person with a disability] can understand what is going on….  [T]he core component [of communication] is simply empathy with anyone that you are taklin gto; treating them with dignity and respect."  <u>Id.</u> at 168:12-19.  "Communication" was understood as "everything [officers] do, whether it is talking with the victim, survivors or witnesses, or talking with people who are in crisis, or suspects in events."  <u>Id.</u> at 107:22-108:1.   Finally, although there was no directive defining the terms "containment," "coordination," and "communication," with the level of detail set forth in Directive 13.03, BPD's then-guiding directive on "Interacting with Persons with Disabilities," Directive 13.02, directed that successful contact with persons with disabilities is "characterized by effective communication [and] [o]fficers encountering a person with disability that affects the individual's ability to communicate must take additional steps to ensure that the communication is effective and that the individual has meaningful access to critical services." DD13.02.I.A.  It further directed that "Officers shall strive to communicate effectively and accurately….."  DD13.02.I.B.  In any event, as Chief Schirling testified, Cpl.

Downs
Rachlin
Martin PLLC

Navari and Cpl. Thibault complied with DD13.03 in their response to 85 Randy Lane, and the terms containment, coordination and communication are defined in that directive generally enough that it cannot be said that the officers did not comply with the directive.

9.      Paragraph 9 of Plaintiffs' Statement is Disputed in part and immaterial.  Directive 13.03, Section I, contains a more complete and detailed statement of the policy behind the Directive.  See Response to Nos. 6-8, above.

10.     Paragraph 10 of Plaintiffs' Statement is Disputed in part but immaterial. Directive 13.03, Section I and IV, contains a more complete and detailed statement of the policy behind the Directive and the operating guidelines for employing a street outreach interventionist in responding to non-violent, non-threatening, and non-destructive calls involving mental health needs.

11.     Paragraph 11 of Plaintiffs' Statement is Disputed in part but immaterial. Directive 13.03, Section I and IV, contains a more complete and detailed statement of the policy behind the Directive and the operating guidelines for employing a street outreach interventionist in responding to non-violent, non-threatening, and non-destructive calls involving mental health needs.

12.     Paragraph 12 of Plaintiffs' Statement is Disputed but immaterial.  Wayne did not qualify as a "person with a mental illness" as that term is defined by DD13.03 given that DD13.03 was not in effect at the time of the incident.  Plaintiffs' statement is further disputed (a) to the extent it suggests that Wayne was not a "Dangerous Person With a Mental Illness" as that term is defined by Directive 13.3.II.E and (b) to the extent that it suggests that Wayne was a "Qualified Individual" within the meaning of Section 1132 of the ADA.  When adopted in June

Downs
Rachlin
Martin PLLC

2014, DD13.03 defined "Dangerous Person With a Mental Illness" to "mean[] the person is one who presents a substantial risk of serious harm to self or another person or persons within the near future as manifested by evidence of recent acts or threats of violence or by placing others in reasonable fear of such harm." DD13.03.II.E.

13.     Paragraph 13 of Plaintiffs' Statement is Disputed but immaterial.  <u>See</u> Response to No. 8, above.

14.     Paragraph 14 of Plaintiffs' Statement is Disputed in part but immaterial.  It is disputed to the extent it (a) mischaracterizes BPD policy and training *as of November 6, 2013*; (b) fails to state the complete Containment procedure set forth in Directive 13.03.III.A; and (c) fails to state guidance in Directive 13.03 acknowledging that "for most calls [officers] are operating with incomplete and sometimes inaccurate information [and] [i]f at any time, circumstances or information change…" **responding officers have "latitude to make alterations to the [response methodology** and] guidelines above."  Directive 13.03.IV (emphasis added).  Chief Schirling testified that the term "Containment" "means you are going to the scene of anything, and you are containing the crisis…. You want to contain what is happening.  It applies to literally everything we respond to."  Schirling Dep. 107:8-15.

15.     Paragraph 15 of Plaintiffs' Statement is Disputed in part but immaterial.  It is disputed to the extent it (a) mischaracterizes BPD policy and training *as of November 6, 2013*; (b) fails to state the complete Containment procedure set forth in Directive 13.3.III.B; and (c) fails to state guidance in Directive 13.3 acknowledging that "for most calls [officers] are operating with incomplete and sometimes inaccurate information [and] [i]f at any time, circumstances or information change…" **responding officers have "latitude to make**

**alterations to the [response methodology** and] guidelines above."  Directive 13.03.IV (emphasis added).  For example, Chief Schirling testified that Cpl. Thibault's coordination of the situation on November 6, 2013 was consistent with "standard procedure, where one officer is talking with the complainant and victim, and the other gets the other side of the story from the other party.  So [Cpl. Thibault and Cpl. Navari] were coordinating, but didn't require active coordination.  It was the norm for 37,000 responses a year."  Schirling Dep. 165:17-166:1.  It is notable that BPD's method of responding had successfully avoided any officer involved shooting for over 15 years and some 500,000 calls, including thousands of mental health calls.  The reasonableness of the City's program to accommodate persons with disabilities needs to be judged against this broader perspective, rather than compliance with a lawyer's interpretation of a directive that did not exist at the time of the shooting.

16.     Paragraph 16 of Plaintiffs' Statement is Disputed in part but immaterial.  <u>See</u> Response to No. 15, above.

17.     Paragraph 17 of Plaintiffs' Statement is Disputed in part but immaterial.  It is disputed to the extent it (a) mischaracterizes BPD policy; and (b) mischaracterizes Chief Schirling's testimony.  Chief Schirling testified that officers do not always have an opportunity to "elongate the encounter."  This testimony is consistent with the acknowledgement in Directive 13.03.IV that "for most calls [officers] are operating with incomplete and sometimes inaccurate information [and] [i]f at any time, circumstances or information change…" **responding officers have "latitude to make alterations to the [response methodology** and] guidelines above." (emphasis added).  Chief Schirling further testified that Cpl. Thibault and Cpl. Navari did not

have an opportunity to use time to their advantage on November 6, 2013, because "they were advanced on with a weapon…"  Schirling Dep. 166:2-7.

### Burlington Police Department's Policies on Use of Force

18.     Paragraph 18 of Plaintiffs' Statement is Disputed in part but immaterial.  It is undisputed that Directive 05 was in effect on November 6, 2013.  It is further undisputed that Directive 05 set forth BPD policy concerning use of force.  It is disputed to the extent it suggests that Directive 05 was not complied with or that it supplants clearly established law and existing Supreme Court and Second Circuit precedent.  It is further disputed to the extent Plaintiffs' reference to Chief Schirling's deposition testimony lacks context regarding Cpl. Thibault's decision to fire four shots.  While generally each use of force is evaluated for reasonableness, it is impossible in this case to distinguish between the first and second rounds of two successive sets of shots.  First, the period of time from when Wayne first charged out of the garage to the time of the fourth shot, was a matter of mere seconds.  Def. SUMF ¶¶51, 61.  Second, Mary Little and Ray Little testified at deposition that Wayne continued to advance following the first two successive shots.  R. Little Dep. 40:5-15 (attached as **Exhibit D**), M. Little. Dep. 29:25-30:3 (attached as **Exhibit E**), M. Little Statement Line 14.  Third, the incident occurred so quickly that Mrs. Brunette did not perceive any interruption in the sequence of the shots fired.  R. Brunette Dep. 38:24-39:9, attached as **Exhibit F**.  Fourth, United States Supreme Court precedent authorizes police officers to fire multiple rounds at a suspect "until the threat has ended."  Plumhoff v. Rickard, 572 U.S. __, 134 S. Ct. 2012, 2022 (2014); See City and County of San Francisco v. Sheehan, 192 L. Ed. 2d 856, 868, 135 S. Ct. 1765 (2015) ("Nothing in the Fourth Amendment barred [the officers] from protecting themselves, even though it meant firing

Downs
Rachlin
Martin PLLC

multiple rounds.").  Finally, Defendants' expert witness, Jack Ryan, testified that "most officers are trained to double tab" when shooting.  J. Ryan Dep. 74:6-7, attached as **Exhibit G**.

19.     Paragraph 19 of Plaintiffs' Statement is undisputed.

20.     Paragraph 20 of Plaintiffs' Statement is undisputed.

## The Events at 85 Randy Lane

21.     Paragraph 21 of Plaintiffs' Statement is Undisputed.  There are, however, audio recordings of the immediate aftermath on-scene interviews of seven bystander witnesses.

22.     Paragraph 22 of Plaintiffs' Statement is Disputed in part but immaterial.  It is undisputed that on November 6, 2013, Cpl. Thibault was equipped with his firearm, a baton, pepper spray, a knife, and handcuffs.  It is also undisputed that neither Cpl. Thibault nor Cpl. Navari were equipped with Tasers.  Def. SUMF ¶75.  This paragraph is disputed to the extent it suggests that either Cpl. Thibault and Cpl. Navari could or should have been equipped with Tasers.  Chief Schirling testified that Tasers had not been fully deployed at BPD in November 2016.  Taser deployment was a "multi-year implementation project, primarily due to cost" which was around $1,300 per Taser unit.  As of November 6, 2013, neither Cpl. Thibault nor Cpl. Navari had been issued a Taser.  Schirling Dep. 39-40.  For this reason, Plaintiffs' expert W. Ken Katsaris did not render an opinion about Tasers because "I don't believe that you can expect somebody to have something that doesn't have something…. [I]t is not an alternative that they had available…."  W. Ken Katsaris Dep. 137:17-23, attached as **Exhibit H**.

23.     Paragraph 23 of Plaintiffs' Statement is Undisputed.

24.     Paragraph 24 of Plaintiffs' Statement is Disputed in part but immaterial.  Defendants do not know if Wayne went upstairs to "have a coke."  At the time of his death,

Wayne had a blood alcohol concentration of 0.081, which is beyond the level for driving impairment.  Wayne also tested positive for marijuana.  Final Autopsy Report at 1; Bundock Dep. 102:20-23, attached as **Exhibit I**.  Undisputed that Mr. and Mrs. Brunette called Barbara Brunette before calling the police.  Mr. Brunette testified that "we did ask [Barbara] what we should do, because he was – he was out of control."  L. Brunette Dep. 23:3-8, attached as **Exhibit J**.  Barbara told Mrs. Brunette "[Wayne] has been acting terrible…I want you to call the police."  R. Brunette Dep. 16:2-5.

25.     Paragraph 25 of Plaintiffs' Statement is Undisputed as to the statement that Mrs. Brunette called the police at about 4:19 p.m.  Defendants do not know the exact time of Mrs. Brunette's phone call to Barbara Brunette and there is no evidence in the record to establish this.

26.     Paragraph 26 of Plaintiffs' Statement is Disputed but immaterial.  Cpl. Thibault and Cpl. Navari have responded to hundreds of similar calls and many together during their years as BPD officers.  Def. SUMF ¶10.  First, it was not necessary that the officers expressly designate a lead officer.  Cpl. Thibault was assigned to the New North End, A-Area, and was thus automatically the primary officer on the Randy Lane call.  Def. SUMF ¶9, E. Thibault Dep. 138-139.  Cpl. Navari understood this: "I knew he was primary and he was going to be talking to the Complainants [sic], and then I would talk to any witnesses or anybody else that was involved."  B. Navari Dep. 112:14-18, attached as **Exhibit K**.  Additionally, both Cpl. Thibault and Cpl. Navari testified that they discussed the call before responding to the scene.  E. Thibault Dep. 141:23, attached as **Exhibit L**.  Although Cpl. Thibault does not recall exactly what was discussed, Cpl. Navari recalls Cpl. Thibault telling Cpl. Navari to "do what you do best and talk to that guy [Wayne], and I'll talk to the Complaintants [sic]…."  B. Navari Dep. 113:6-11.

Downs
Rachlin
Martin PLLC

Moreover, Chief Schirling testified at his deposition that Cpl. Thibault's and Cpl. Navari's response to the scene was consistent with police training and policy: "[t]he norm for situations where there is a complaining party or a victim and a suspect is to engage them both, and separately.  **So [Cpl. Thibault and Cpl. Navari] were following standard procedure**, where one officer is talking with the complainant and victim, and the other gets the other side of the story from the other party.  So [Cpl. Thibault and Cpl. Navari] were coordinating, but didn't require active coordination.  It was the norm for 37,000 responses a year."  Schirling Dep. 165:17-166:1 (emphasis added).  Furthermore, neither DD13.02 or DD.13.03 (which was not in effect) direct that officers devise a formal "plan" before responding to a dispatch call involving a person with disabilities or diminished capacities.

27.     Paragraph 27 of Plaintiffs' Statement is Disputed but immaterial.  The deposition citations referenced by Plaintiff therein do not support the statement in that paragraph.

28.     Paragraph 28 of Plaintiffs' Statement is Disputed in part but immaterial.  It is undisputed that Cpl. Thibault testified that at the time he arrived, the scene appeared to be calm despite the initial call that Wayne had been threatening, out-of-control, and destroying property E. Thibault 187:9-19.  Disputed that there was no observable crime, given the report to police and the large, felled tree in the yard.  Chief Schirling testified that the information provided to dispatch by Mrs. Brunette, i.e. cutting down a tree and acting violent, is a crime of unlawful mischief.  Schirling Dep. 151:1-6.

29.     Paragraph 29 of Plaintiffs' Statement is Disputed but immaterial.  While it is undisputed that Wayne was in the upstairs apartment at the time of the radio dispatch call at 4:19:23 p.m., the officers did not know how long Wayne had been in his apartment.  See Def.

SUMF ¶¶7-8.  Indeed, Cpl. Navari recalls Wayne was in or near the garage when they arrived.

Further disputed that Cpl. Navari "ordered" Wayne down.  Consistent with his training, Cpl.

Navari used a soft-toned voice to request that Wayne come down from the landing to talk with

him.  Def. SUMF ¶ 21; Navari Dep. 106:11-12; L. Brunette Statement at Lines 343-344.  Cpl.

Navari made only one such request and thus did not repeatedly request or command Wayne to

come talk with him.

      30.      Paragraph 30 of Plaintiffs' Statement is Disputed in part but immaterial.  The

deposition citations referenced by Plaintiff therein do not support the statement in that paragraph

that there was a "typical way Thibault and Navari handled calls."  Undisputed that Cpl. Thibault

believed Cpl. Navari has "always been very successful at talking to people."  E. Thibault Dep.

206:22-24.  Disputed that Cpl. Thibault believed Cpl. Navari was "overly confident" in engaging

Wayne.  Plaintiffs have mischaracterized the deposition testimony.  Instead, Cpl. Thibault

testified that it was appropriate, given Cpl. Navari's style and success at talking with people, to

ask to speak with Wayne.  Id. at 206:10-15.  Cpl. Thibault merely suggested that despite Cpl.

Navari's success, skill, and confidence in speaking with people, there is still "a chance every

once in a while things don't go well."  Id. 206:22-207:1.  Cpl. Thibault never testified that it was

inappropriate for Cpl. Navari to speak with Wayne.  Id. 206.  In fact, he testified to the contrary.

Id.

      31.      Paragraph 31 of Plaintiffs' Statement is Disputed but immaterial.  When asked by

Plaintiff's counsel if it was inappropriate for Cpl. Navari to speak to Wayne, Cpl. Thibault

testified "I don't think it's inappropriate.  I think it's a matter of style."  Id. 206:15-20.  Although

Cpl. Thibault testified that Cpl. Thibault's style was different, and he would not have called to

Downs
Rachlin
Martin PLLC

him, Cpl. Thibault praised Cpl. Navari who he believed had "always been very successful at talking to people." Id. 206:22-24.  Furthermore, Chief Schirling testified that Cpl. Navari's communication to Wayne was consistent with police training and policy:  "[t]he norm for situations where there is a complaining party or a victim and a suspect is to engage them both, and separately.  **So [Cpl. Thibault and Cpl. Navari] were following standard procedure**, where one officer is talking with the complainant and victim, and the other gets the other side of the story from the other party.  So [Cpl. Thibault and Cpl. Navari] were coordinating, but didn't require active coordination.  It was the norm for 37,000 responses a year."  Schirling Dep. 165:17-166:1 (emphasis added).

32.     Paragraph 32 of Plaintiffs' Statement is Disputed but immaterial.  Plaintiffs grossly mischaracterize the deposition testimony of Cpl. Thibault.  Cpl. Thibault never testified that Cpl. Navari should not have communicated with Wayne.  Instead, Cpl. Thibault testified that Cpl. Navari's communication was appropriate for Cpl. Navari's style and skillset.  See Response to No. 31, above.  Furthermore, the testimony to which Plaintiffs refer the Court in paragraph 32 concerns a mere hypothetical by Cpl. Thibault.  In that section of testimony, Cpl. Thibault posited that if Wayne had been "outside sitting in a lawn chair," then Cpl. Thibault *might* have suggested that Cpl. Navari hold off speaking with Wayne.  It is undisputed that those were not the facts of this call.  Instead, Wayne was upstairs and the scene was not secure.  See Def. SUMF ¶96.

33.     Paragraph 33 of Plaintiffs' Statement is Disputed but immaterial.  Plaintiffs grossly mischaracterize the deposition testimony of Mary Little.  Mary Little did not testify that Cpl. Navari was at the end of the driveway, near the sidewalk, when Wayne emerged from the

garage.  Instead, Plaintiffs' counsel asked Mrs. Little if Cpl. Navari was standing where the driveway meets the sidewalk to which Mrs. Little testified: "No.  [Cpl. Navari] was up further up the grass area…. Like I said, right across from where the door of Wayne's car…."  M. Little Dep. 18:10-17.  Mrs. Little was then immediately asked if Cpl. Navari moved to the end of the driveway.  Id. at 18:18.  She responded affirmatively: "Yes.  **When Wayne lunged towards [Cpl. Navari] with the pointed shovel, then Navari just started backing up towards the sidewalk**.... At that point Navari was where the N [on Exhibit 25] was, at that point.  **Wayne had already started chasing him**."  Id. at 18:18-22 (emphasis added).  A copy of Exhibit 25 is attached as **Exhibit M**.

34.     Paragraph 34 of Plaintiffs' Statement is Disputed but immaterial.  Plaintiffs mischaracterize the scope of the tree limb and do not cite any testimony to support the statements in this paragraph.  Plaintiffs also do not indicate when in time they claim that "Wayne was on the opposite side of [the] tree limb from Thibault."  Cpl. Thibault testified that he was standing north of the walkway to the house, by the front steps, at a location marked by him as "T1" on Exhibit 78 at his deposition.  E. Thibault Dep. 172:1-9.  Perceiving that Cpl. Navari was "in grave trouble," Cpl. Thibault moved down the walkway, towards the sidewalk, along a dotted line depicted in Exhibit 78.  Id. at 222-224.  A copy of Exhibit 78 is attached as **Exhibit N**.

35.     Paragraph 35 of Plaintiffs' Statement is Disputed and immaterial.  Mrs. Little testified that Cpl. Navari was standing "right across from where the door of Wayne's car…."  M. Little Dep. 18:10-17.  Her testimony that Wayne exited the garage and walked towards his driver's side door necessarily implies that Wayne was moving closer to Cpl. Navari.  M. Little Dep. 17:10-11.  Moreover, although Cpl. Navari recalled that Wayne took one step in front the

Downs
Rachlin
Martin PLLC

garage (Navari Dep. 116:13-17), "stood there holding the shovel in an aggressive manner,"
(Navari Dep. 117:16-18), and began to advance on Cpl. Navari from this position (Navari Dep.
119:17-21); it is undisputed that Cpl. Navari and Wayne's interaction occurred in a matter of
seconds.  (Navari Dep. 117:25-118:1) ("I mean, this is all in a seconds."); Def. SUMF ¶61 (The
period of time from when Wayne first charged out of the garage to the time of the fourth shot,
was a matter of mere seconds.  E. Thibault Dep. 210:16-21; M. Little Dep. 50:24-51:2, 55:18-23;
L. Brunette Dep. 37:23-38:1; L. Brunette Statement Line 141).

     36.     Paragraph 36 of Plaintiffs' Statement is Disputed but immaterial.  Plaintiffs
misconstrue Cpl. Navari's testimony and the facts of the case.  It is undisputed that as Wayne
charged on Cpl. Navari, Cpl. Navari tried to create distance between himself and Wayne by
moving backwards and trying to get behind the tree.  Navari Dep. 120:7-16.  As Cpl. Navari
moved behind the tree, he repeatedly told Wayne to drop the shovel.  Id.  Cpl. Navari was
"backing up as fast as [he] could."  Id. at 120:25.  At this point, his finger was on the trigger and
Cpl. Navari thought he would have to shoot "if Wayne comes on one side of the tree or the
other…."  Id. at 120:22.  This movement happened in "like a millisecond."  Id. at 120:20.
Meanwhile, Cpl. Thibault had moved in to render assistance to Cpl. Navari.  Id. at 121:3-4.  At
that point, "something happened and Wayne caught [Cpl. Thibault's] words [to drop the shovel]
and he…turned and went towards Ethan….  [Cpl. Navari's] gun is still focused on Wayne…and
Ethan's backing up…[Ethan] just looked scared.  He [said] [d]rop it, drop it, drop it.  [Ethan
was] backing up as fast as he could.  And Wayne had started to going [sic] towards him[,]" when
Cpl. Thibault fired shots.  Navari Dep. 121:8-23.  Further disputed that Cpl. Navari testified he
was "in the street" when shots were fired.

Downs
Rachlin
Martin PLLC

37.     Paragraph 37 of Plaintiffs' Statement is Disputed in part but immaterial.  See Response to No. 34, above.  Further responding, Cpl. Thibault moved towards Cpl. Navari and Wayne because, according to Cpl. Thibault, "I thought Brent was going to get killed….  I wanted to be in a position where I could help Brent, and Brent wasn't in my, my danger area from discharging a firearm, nor other houses.  Again, those were all…thoughts that were going through my mind within mere, mere moments."  Thibault Dep. 247:7-18.

38.     Paragraph 38 of Plaintiffs' Statement is Disputed but immaterial.  Plaintiffs misconstrue Cpl. Thibault's testimony.  Cpl. Thibault testified: "my vision was very focused on Wayne, so at that point when I saw the actual jabbing and slashing motions, my tunnel vision fixed on Wayne.  I could see Brent.  He was blurry.  So that's why I can't describe…exactly how he was standing or how [Navari] didn't get it."  Thibault Dep. 221:1-7.  "Tunnel vision" is a physiological response experienced by police officers in threatening situations.  See id. at 209:3-4; Navari Dep. 150:4-5.  Police officers are trained to act even when experiencing tunnel vision. J. Ryan Dep. 74.

39.     Paragraph 39 of Plaintiffs' Statement is Disputed to the extent it suggests that Wayne no longer posed a threat to Cpl. Navari.  This dispute is immaterial.  All witnesses describe that Wayne advanced to a dangerously close position within striking distance of the officers.  Def. SUMF ¶42.  Many witnesses describe that the entire incident, between the time Wayne first charged out of the garage to the time of the fourth shot, happened in a matter of mere seconds.  Def. SUMF ¶61.

40.     Paragraph 40 of Plaintiffs' Statement is Disputed but immaterial.  All witnesses describe that Wayne advanced to a dangerously close position within striking distance of the

Downs
Rachlin
Martin PLLC

officers.  Def. SUMF ¶42.  Many witnesses describe that the entire incident, between the time

Wayne first charged out of the garage to the time of the fourth shot, happened in a matter of mere

seconds.  Def. SUMF ¶61.

41.     Paragraph 41 of Plaintiffs' Statement is Disputed but immaterial.  <u>See</u> Response

to No, 40, above.

42.     Paragraph 42 of Plaintiffs' Statement is Disputed but immaterial.  <u>See</u> Response

to Nos. 40-41, above.

43.     Paragraph 43 of Plaintiffs' Statement is Undisputed.  Wayne staggered backwards

after the fourth shot stopped him from continuing to advance.  Thibault Dep. 210:12-14.

44.     Paragraph 44 of Plaintiffs' Statement is Disputed in part but immaterial.

Plaintiffs grossly misstate the distance of shell casing "4" by almost two feet.  The locations of

the shell casings on the lawn were marked by yellow markers "2," "3," and "4."  The distance

between shell casing "2" and the spade was 18'7".  The distance between shell casing "3" and

the spade was 22'6".  The distance between shell casing "4" and the spade was **28'2"**, not

**28'22"** as stated in Plaintiffs' Statement.  It is undisputed that shell casing "1" was never found.

It is also undisputed that the Vermont State Police measured the distance from the shell casings

to the shovel lying on the ground, rather than the distance from the shell casing to where Wayne

fell on the ground when he was shot.  Def. SUMF ¶76.  It is undisputed that the shovel handle

located in the yard was multiple feet south of where Wayne was lying, further away from the

shell casings then where Wayne fell.  D. Annis Dep. 153:22-154:3, attached as **Exhibit O**; <u>see</u>

Exhibit 9A to PSUMF.  It is undisputed that the shovel was approximately five feet long, which

could make up additional distance between the shell casings and the body.  Def. SUMF ¶24.

Downs
Rachlin
Martin PLLC

45.     Paragraph 45 of Plaintiffs' Statement is Disputed but immaterial. It is undisputed that Plaintiffs' expert, Ken Katsaris opined that shell casings can eject backward 40-48 inches and 6 to 8 inches to the right. Defendants' expert, Jack Ryan, testified that it is not possible to determine from the locations of the shell casings on the lawn exactly where Wayne or Cpl. Thibault were standing when shots were fired.  This is because shell casing ejectment characteristics vary from weapon to weapon, even weapons that are the same make and model. J. Ryan Dep. 81-82.  In any event, the exact distances of the shell casings are immaterial given the witness testimony that is consistent that Wayne advanced to a position dangerously close to the officers and within striking distance.  Def. SUMF ¶¶42-45.

46.     Paragraph 46 of Plaintiffs' Statement is Disputed in part but immaterial.  Cpl. Thibault immediately rendered verbal aid by contacting an ambulance, gathering information, and providing comfort to Wayne while maintaining a safe position.  Thibault Dep. 298:14-299:1. While it is undisputed that Cpl. Thibault did not render "hands-on first aid," DD05 requires only that officers render "appropriate first aid."  There is no medical testimony as to what, if any, first aid should have been rendered by the officers or what training should have been provided.  See Exhibit 20 to PSUMF.

## The Medical Examiner's Report

47.     Paragraph 47 of Plaintiffs' Statement is Undisputed.  There has been no expert testimony that would render this testimony relevant.  Further responding, Dr. Bundock testified as follows:

> Q:     There is a lot of discussion about trajectories and body
> positioning, and angles and so forth earlier in this deposition,
> correct?

Downs
Rachlin
Martin PLLC

A:      Yes.

Q:      Am I correct that when people are moving around in the real world, they don't often present themselves sort of in the stark frontal and posterior views that you have in these diagrams that you have written bullet trajectories, correct?

A:      Correct.

Q:      Am I also correct that movements of the body happening perhaps quickly…can change the ability to extrapolate from various trajectories you might note in the body, in significant ways?

A:      Yes.  Generally I would agree with that.

….

Q:      And people, as they walk, can ambulate and move, can result in different turnings and twistings and changes in angles of their body in relationship to another fixed point?

A:      Yes.

**Q:      So that…is part of the reason you are hesitant about drawing conclusions, based on the trajectories that you have noted, about the positioning of the body or positioning of the shooter?**

**A:      Yes.**

E. Bundock Dep. 104-105.

48.      Paragraph 48 of Plaintiffs' Statement is Undisputed.

49.      Paragraph 49 of Plaintiffs' Statement is Undisputed.  As to where Wayne and Cpl.

Thibault were standing when shots were fired, Dr. Bundock testified that she was *not* drawing

any conclusions or expressing any opinion "to a medical degree of certainty" as to the

positioning of Wayne and Cpl. Thibault based on the trajectories.  Bundock Dep. 105-106.

Downs
Rachlin
Martin PLLC

50.     Paragraph 50 of Plaintiffs' Statement is Disputed in part but immaterial.  Dr. Bundock testified that she could not draw conclusions about the positioning of Cpl. Thibault and Wayne, or their locations, based on the bullet trajectories.  E. Bundock Dep. 105:8-22.

51.     Paragraph 51 of Plaintiffs' Statement is Undisputed as it pertains to Dr. Bundock's medical examination.

52.     Paragraph 52 of Plaintiffs' Statement is Undisputed.

53.     Paragraph 53 of Plaintiffs' Statement is Undisputed, although incomplete and immaterial.  While bullet "A" could be potentially fatal "if untreated…[Wayne] would not have been made immobile or die immediately from this would."  Bundock Dep. 43:1-9.  Moreover, although Dr. Bundock testified that this shot would have caused some pain, she could not and would not venture a guess at how much.  Id. at 44:7-10.

54.     Paragraph 54 of Plaintiffs' Statement is Undisputed.  Dr. Bundock explained that "the location of the entrance wounds in left to right travel and all bullets could be a result of [Wayne] possibly **advancing with his left foot ward and torso turned toward the right**." Bundock. Dep. 108:13-23 (emphasis added).

55.     Paragraph 55 of Plaintiffs' Statement is Undisputed, although incomplete and immaterial.  Although Bullet "C" fractured the hip bone, it did not compromise the joint with the femur and did not compromise mobility.  Dr. Bundock "would expect that [Wayne] could still reasonably walk, move his legs, after that."  Bundock Dep. 51:4-22.

56.     Paragraph 56 of Plaintiffs' Statement is Disputed in that Plaintiffs have mischaracterized Dr. Bundock's testimony.  This dispute is immaterial.  Dr. Bundock did not testify that Wayne would have lost all control of the musculature of his arm.  Bundock Dep.

Downs
Rachlin
Martin PLLC

53:3-8. More specifically, Wayne would have lost the musculature for "flex[ing] up" the arm. Id. As Dr. Bundock explained more fully in pages 61-62 of her deposition, Wayne could have continued to advance while holding the shovel after being shot by bullet "D." Id. at 61-62.

57. Paragraph 57 of Plaintiffs' Statement is Disputed in that Plaintiffs have mischaracterized Dr. Bundock's testimony. This dispute is immaterial. With respect to bullet "D," Dr. Bundock testified that "[t]he most I can say is that it suggests that there was a position change between [bullet "D"] and the other three…. So somebody moved, **and I can't tell you who moved**." Bundock Dep. 56:3-13 (emphasis added). Dr. Bundock also cautioned Plaintiffs' counsel from reading too much into the trajectories. She told him "[i]t is much more useful to take the trajectories and use them to confirm or refute observations, than to take them and try to conjure up a scene." Id. at 57:22-25.

58. Paragraph 58 of Plaintiffs' Statement is Disputed in part because Plaintiffs mischaracterize Dr. Bundock's testimony. This dispute is immaterial. Although bullet "D" caused fatal injuries to the heart and lung, Dr. Bundock testified that Wayne could have "continue[d] to walk…cover large amounts of distance, even with a hole in [his] heart, that is possible…." Bundock Dep. 61:6-16. Dr. Bundock also testified that it was possible Wayne could have continued to advance while holding the shovel after being shot by bullet "D." Id. at 61-62.

59. Paragraph 59 of Plaintiffs' Statement is Disputed in part because it mischaracterizes Dr. Bundock's testimony. This dispute is immaterial. Dr. Bundock concluded that "all the wounds are coming into the left side of [Wayne's] body." Bundock Dep. 47:1-12. However, Dr. Bundock cautioned Plaintiffs' counsel from drawing conclusions as to Wayne and

Downs
Rachlin
Martin PLLC

Cpl. Thibault's locations based on the trajectories: "I can't tell you how the shooter was standing….." Bundock Dep. 48-49. And, "[l]ike I said in the beginning, **I can't tell you how they are positioned, with respect to the surroundings**." Id. at 57:5-9 (emphasis added).

60.     Paragraph 60 of Plaintiffs' Statement is Undisputed, although incomplete and mischaracterized. Dr. Bundock opined that "the location of the entrance wounds in the left to right travel and all bullets could be a result of the deceased possibly **advancing with his left foot forward and torso turned toward his right**." Bundock Dep. 108:13-23 (emphasis added).

61.     Paragraph 61 of Plaintiffs' Statement is Disputed in part because it mischaracterizes Dr. Bundock's testimony. This dispute is immaterial. Although bullet "E" entered Wayne's back, Dr. Bundock testified that the bullet went primarily sideways left to right, that "his back **was not predominantly facing the gun. He was presenting more of his left torso**, because this went in his back, but then it went across his spine. It was not a directly front to back type injury. **He was not presenting his back to the gun when this was fired**…as I said before, his left torso was facing the gun." Bundock Dep. 68:4-15 (emphasis added).

62.     Paragraph 62 of Plaintiffs' Statement is Undisputed but immaterial. See Response to No. 61, above. Further responding, Dr. Bundock was clear in her testimony that she was *not* expressing any opinion "to a medical degree of certainty" as to the positioning of Wayne and Cpl. Thibault based on the trajectories. Bundock Dep. 57:5-9, 105:23-106:4.

### The Vermont State Police On-Site Investigation

63.     Paragraph 63 of Plaintiffs' Statement is Disputed to the extent that it seeks to establish reliability of Plaintiffs' expert's testimony and to the extent it suggests that the Vermont State Police's investigation of the incident did not follow proper procedure, which it did. This

dispute is immaterial.  There is no claim in the case based on the Vermont State Police's investigation.

64.     Paragraph 64 of Plaintiffs' Statement is Disputed but immaterial.  This is not a fact, it's an unsupported opinion by Plaintiffs' expert witness.  Plaintiffs have had full discovery to develop facts for the record.

65.     Paragraph 65 of Plaintiffs' Statement is Disputed but immaterial.  These are not facts, they are unsupported opinions by Plaintiffs' expert witness.  Plaintiffs have had full discovery to develop facts for the record.

     a.   Vermont State Police Trooper Darren Annis testified that BPD's immediate on-scene interviews with the bystander witnesses were not inconsistent with VSP or BPD procedure.  D. Annis Dep. 41-43.  VSP reviewed the bystander witness interviews performed by BPD immediately following the incident and concluded that the interviews were full and complete and did not require follow-up.  Id. 43:11-17; 45:3-4 ("We felt they did thorough interviews of the subject.").  Consistent with Trooper Annis, Defendants' expert witness Jack Ryan testified that "[m]ost big departments still investigate their own officer-involved shootings."  J. Ryan Dep. 91:17-92:2.  Furthermore, Mr. Katseris' opinion mischaracterizes the interviews by saying they relied on leading questions.  This was not the case, and Plaintiffs have now had a full opportunity to depose the bystander witnesses.

     b.   VSP interviewed Cpl. Thibault and Cpl. Navari.  D. Annis Dep. 37:2-6.

c.  In Jack Ryan's considerable experience, "[m]ost departments don't do walk-throughs…." J. Ryan Dep. 93:3-5.

d.  There is no procedure or protocol requiring VSP or BPD to use a metal detector to locate the fourth casing. Jack Ryan explained that he's seen both types of investigations, where metal detectors are and are not used. J. Ryan Dep. 90:5-24. It would not have been possible to determine from the location of the fourth shell casing on the lawn exactly where Wayne or Cpl. Thibault were standing when shots were fired. This is because shell casing ejectment characteristics vary from weapon to weapon, even weapons that are the same make and model. J. Ryan Dep. 81-82.

e.  Cpl. Thibault and Cpl. Navari were not left to "wander around the scene." BPD Sergeant Bradley A. Trombley put Cpl. Thibault in a patrol car and immediately assigned Cpl. Thayer to supervise him. B. Trombley Dep. 22:10-12, attached as **Exhibit P**. At no time were Cpl. Thibault or Cpl. Navari left alone in a vehicle together after the incident. Id. Mr. Ryan testified that so long as the officers were supervised, there was nothing wrong with using the same patrol car to transport them back to BPD. J. Ryan Dep. 136:15-19. Once back at BPD, the officers were immediately separated. B. Navari Dep. 29:19-21. Contrary to Plaintiffs' completely unsupported accusation, Cpl. Thibault and Cpl. Navari did not discuss the incident before making statements or at any time in the past four years with the exception of one, very brief exchange in the patrol car during which Cpl. Thibault asked Cpl. Navari if he was okay, to which Cpl. Navari responded "yeah

Downs
Rachlin
Martin PLLC

I guess so."  Nothing more.  B. Navari Dep. 28:15-29:5.  That was the only

conversation.  B. Navari Dep. 161:7-14.

66.     Paragraph 66 of Plaintiffs' Statement is Undisputed.

67.     Paragraph 67 of Plaintiffs' Statement is Undisputed.

68.     Paragraph 68 of Plaintiffs' Statement is Undisputed.  The testimony cited in

support of paragraph 68 pertains to whether Trooper Annis and the VSP identified "specifically"

or the "exact location[s]" of Wayne and Cpl. Thibault.  Trooper Annis testified that they

determined "the general area" where Cpl. Thibault was located when he fired the first shot.  D.

Annis Dep. 96:7-18.

69.     Paragraph 69 of Plaintiffs' Statement is Undisputed.  While it is undisputed that

Trooper Annis did not do a scene walk-through, he testified at his deposition that he did not

recall whose decision that was.  Contrary to Plaintiffs' assertion, Trooper Annis never testified

that his superiors instructed him not to.  D. Annis Dep. 63.

70.     Paragraph 70 of Plaintiffs' Statement is undisputed .

**Defendant Thibault's History of Use of Force**

71.     Paragraph 71 of Plaintiffs' Statement is Undisputed.  Use of Force reports are

prepared anytime an event exceeds handcuffing of a subject.  E. Thibault Dep. 275:10-11.

72.     Paragraph 72 of Plaintiffs' Statement is Disputed but immaterial.  Plaintiffs have

identified nine (9) incidents over Cpl. Thibault's eighteen-year career, each of which were

contemporaneously reviewed by Cpl. Thibault's supervisors and determined to be in compliance

with BPD's Use of Force Policy.  Plaintiffs claim that these individuals were "not threatening

physical violence," is blatantly untrue and unsupported by the documents submitted by Plaintiffs

Downs
Rachlin
Martin PLLC

26

as Exhibit 26.  For example, the incident reported on 8/25/05 was a response to a subject who had kicked a fellow officer and appeared to be preparing to strike again.

73.     Paragraph 73 of Plaintiffs' Statement is Disputed it in part but immaterial.  The number of Use-Of-Force reports for Cpl. Thibault and Cpl. Navari cannot be compared on number alone.  As Cpl. Thibault explained during his deposition, he was assigned to work the nightshift in the downtown district for a couple of years, which is a more dangerous shift and carries the potential for more Use-Of-Force Reports than other districts.  See E. Thibault Dep. 276-77.

74.     Paragraph 74 of Plaintiffs' Statement is Undisputed, although incomplete.  With respect to the 2004 federal court filing, no determination of wrongdoing was ever made.  In fact, BPD performed an internal investigation of the alleged use of force and determined that it conformed to BPD's use of force policy.  E. Thibault Dep. 285:10-16.

75.     Paragraph 75 of Plaintiffs' Statement is Undisputed, although incomplete and immaterial.  Cpl. Thibault did not assault his then-girlfriend and disputed the allegations which were dismissed with no finding of guilt.  See E. Thibault Dep. 54:6-9.  The allegations concern events that occurred after the subject incident on November 6, 2013.

76.     Paragraph 76 of Plaintiffs' Statement is Undisputed, although incomplete and immaterial.  The allegations concern events that occurred after the subject incident on November 6, 2013.

77.     Paragraph 77 of Plaintiffs' Statement is Disputed but immaterial.  Cpl. Thibault testified that the gun was not loaded and he never threatened to shoot himself.  E. Thibault Dep.

59:24-60:6.  The allegations concern events that occurred after the subject incident on November 6, 2013.

78.     Paragraph 78 of Plaintiffs' Statement is Undisputed, although incomplete and immaterial.  During a break-up, Cpl. Thibault's then-girlfriend threatened to take Cpl. Thibault's duty weapon and kill herself.  In order to distance his then-girlfriend from the weapon, Cpl. Thibault slid it onto a carpeted floor on the other side of a table.  E. Thibault Dep. 62-63.  The allegations concern events that occurred after the subject incident on November 6, 2013.

79.     Paragraph 79 of Plaintiffs' Statement is Disputed in part but immaterial.  Cpl. Thibault telephoned his friend, a former officer, as a joke.  He did not disguise his voice and he did not threaten his friend.  Cpl. Thibault could have decided to stay with BPD, but instead made the decision to resign.  E. Thibault Dep. 24-25.  The allegations concern events that occurred after the subject incident on November 6, 2013.

### The Expert Opinion of W. Ken Katsaris

80.     Paragraph 80 of Plaintiffs' Statement is Disputed as it mischaracterizes his testimony.  It is also immaterial.  This is not a fact, it's an unsupported opinion by Plaintiffs' expert witness.  It is also  inconsistent with Mr. Katsaris' testimony that BPD is a "progressive agenc[y]" in terms of developing training and protocols for dealing with persons with mental disabilities.  Def. SUMF ¶91.  BPD had taken an unusual number of steps to address the increasing demands for dealing with encounters with the mentally ill.  These steps are discussed in Defendants Statement at ¶93.  Furthermore, all BPD officers, including Cpl. Thibault and Cpl. Navari, were specifically trained in mental health issues that relate to law enforcement.  Def. SUMF ¶92.

Downs
Rachlin
Martin PLLC

81. Paragraph 81 of Plaintiffs' Statement is Disputed, mischaracterizes the record, and is immaterial.  This is not a fact, it's an unsupported opinion by Plaintiffs' expert witness. See Response to Paragraph 26, above.

82. Paragraph 82 of Plaintiffs' Statement is disputed, mischaracterizes the record, and is immaterial.  This is not a fact, it's an unsupported opinion by Plaintiffs' expert witness.  Mr. and Mrs. Brunette are not parties to this action, and thus this opinion has no bearing on any of the claims in this case.

83. Paragraph 83 of Plaintiffs' Statement is Disputed but immaterial.  See Response to Paragraphs 21-46, above.

84. Paragraph 84 of Plaintiffs' Statement is Disputed but immaterial.  See Response to Paragraphs 21-46, above.

March 22, 2018.                               DOWNS RACHLIN MARTIN PLLC


By:   /s/ Tristram J. Coffin
      Tristram J. Coffin
      Jennifer E. McDonald
      199 Main Street
      P.O. Box 190
      Burlington, VT 05402-0190
      Telephone:  802-863-2375
      Fax:  802-862-7512


      ATTORNEYS FOR DEFENDANTS CITY
      OF BURLINGTON, VERMONT; CHIEF
      MICHAEL SCHIRLING, IN HIS
      INDIVIDUAL AND OFFICIAL
      CAPACITIES; CPL. ETHAN THIBEAULT;
      IN HIS INDIVIDUAL AND OFFICIAL
      CAPACITIES; CPL. BRENT NAVARI, IN
      HIS INDIVIDUAL AND OFFICIAL
      CAPACITIES.

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 22, 2018, I electronically filed a true copy of Defendants'

Response to Plaintiffs' Statement of Undisputed Material Facts with the Clerk of Court using the

CM/ECF system, which will send notification of such filing to all counsel of record.


By: <u>/s/ Jennifer McDonald</u>


18199763.1

Downs
Rachlin
Martin PLLC

31