U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2018 AUG 30 PM 4: 31

CLERK

BY_____ law
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

BARBARA BRUNETTE and )
ESTATE OF WAYNE BRUNETTE, )
)
    Plaintiffs, )
)
    v. )    Case No. 2:15-cv-00061
)
CITY OF BURLINGTON, VERMONT, )
CHIEF MICHAEL SCHIRLING, )
CORPORAL ETHAN THIBAULT, )
and CORPORAL BRENT NAVARI in their )
individual capacities, )
)
    Defendants. )

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(Doc. 95)

This case arises out of an incident on November 6, 2013, during which two

Burlington Police Department ("BPD") officers, Corporal Ethan Thibault and Corporal

Brent Navari, responded to the residence of Wayne Brunette and his family based on a

report that Wayne Brunette was experiencing a mental health episode. After Wayne

Brunette approached Corporal Navari with a shovel, Corporal Thibault shot him four

times, causing his death. Wayne Brunette's wife and surviving heir, Barbara Brunette,

brings this lawsuit individually and on behalf of the Estate of Wayne Brunette

(collectively, "Plaintiffs") asserting claims under 42 U.S.C. § 1983, Title II of the

Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131-34, state law claims of

assault, battery, negligence, intentional infliction of emotional distress, and damages

under Vermont's wrongful death and survival statutes, 14 V.S.A. §§ 1451-55, 1491-92,

respectively.

Pending before the court is a motion for summary judgment filed by Defendants

City of Burlington, Vermont (the "City"), former BPD Chief Michael Schirling,

Corporal Thibault, and Corporal Navari (collectively, "Defendants"). On March 6, 2018, the court heard oral argument. In the course of the hearing, the court granted Defendants leave to file a response to Plaintiffs' statement of undisputed material facts and denied Defendants' motion to strike as moot. On March 22, 2018, Defendants filed their response to Plaintiffs' statement of undisputed material facts. After Defendants filed a notice of supplemental authority, to which Plaintiffs responded, the court took the pending motion for summary judgment under advisement on April 12, 2018.

Plaintiffs are represented by Richard R. Goldsborough, Esq., Steven A. Adler, Esq., and Jennifer E. Agnew, Esq. Tristram J. Coffin, Esq. and Jennifer E. McDonald, Esq. represent Defendants.

## I.     Procedural History.

On July 27, 2015, Plaintiffs filed their First Amended Complaint, alleging nine causes of action. Counts I and II alleged claims pursuant to 42 U.S.C. § 1983 that Corporal Thibault violated Chapter 1, Article 11 of the Vermont Constitution and the Fourth Amendment of the United States Constitution through the use of excessive force. Count III asserted a claim under Section 1983 that the City and former Chief Schirling failed to train, supervise, and institute policies regarding individuals with mental health issues. Count IV alleged that Defendants violated Title II of the ADA.

In Counts V through IX, Plaintiffs asserted state common law claims for assault and battery against Corporal Thibault (Count V); negligence against Corporal Thibault and Corporal Navari (Count VI); negligent training, hiring, and retention against BPD, former Chief Schirling, and the City (Count VI); loss of consortium against Defendants (Count VII); intentional infliction of emotional distress against Corporal Thibault and Corporal Navari (Count VIII); and a statutory wrongful death and survival action against Defendants (Count IX).

On September 4, 2015, the court granted in part and denied in part Defendants' motion to dismiss the First Amended Complaint. The court dismissed: (1) all claims against the individual defendants in their official capacity; (2) all claims against BPD; (3) all claims against the individual defendants in their individual and official capacities

2

under the ADA; and (4) Plaintiffs' loss of consortium claim set forth in Count VII. The court declined to rule on the issue of qualified immunity, determining that this issue was "best decided on a motion for summary judgment when the facts are more fully developed[.]" (Doc. 33 at 9) (internal quotation marks omitted) (citing *Walker v. Schult*, 717 F.3d 119, 130 (2d Cir. 2013)).

## II.    The Undisputed Facts.

### A.    The Events of November 6, 2013.

On November 6, 2013, at approximately 3:30 p.m., Lawrence Brunette and his wife, Ruthine Brunette, observed their adult son, Wayne Brunette, cutting down a portion of an apple tree with a reciprocating saw in the front yard of their home at 85 Randy Lane, Burlington, Vermont. Wayne Brunette had a history of mental illness, including diagnoses of paranoid schizophrenia and delusional disorder, grandiose type. After he was arrested in 2001, Wayne Brunette spent an unidentified amount of time at Vermont State Hospital due to his mental health. As of November 6, 2013, however, he had not sought treatment for his mental health in almost ten years.

While watching his son cut down the apple tree, Lawrence Brunette believed that Wayne Brunette was out of his mind and "out of control[]" (Doc. 99-5 at 3), although he testified that he "wasn't afraid for [his] life or [his] wife's [life][.]" (Doc. 99-5 at 4.) Lawrence Brunette told his son that he was not allowed to cut down the tree and unplugged the saw. Wayne Brunette then entered the house and went upstairs to have a soda.

At approximately 3:30 p.m., Ruthine Brunette telephoned Wayne Brunette's wife, who was at work, and advised her of what had taken place. Barbara Brunette responded that her husband "ha[d] been acting terribl[y][,]" (Doc. 95-2 at 4), and "if they needed help, . . . call the police" because "[t]he police were there to help." (Doc. 99-6 at 5.) At 4:18 p.m., Ruthine Brunette called BPD's non-emergency number and requested assistance.

> Mrs. Brunette: [T]his is Mrs. Brunette on 85 Randy Lane. I've got a problem here with my son that's upstairs. He's gone berserk, I think, and I

mean I've got to do something. He's cut my apple tree down out front just now. He's violent and he's just mean. We live downstairs. Him and his wife live upstairs over us. And now he says he owns this whole house and this whole property and everything, which he doesn't. And he's really bad.

Dispatcher: Ok, what is he doing right now m'am?

Mrs. Brunette: Right now I chased him upstairs. He's upstairs in the apartment right now[.]

Dispatcher: Does he have mental health issues?

Mrs. Brunette: Yes he does[.]

Dispatcher: Keep your door locked and I'll send somebody over there.

(Doc. 95-1 at 2-3, ¶ 6.)

At 4:19 p.m., Corporal Thibault and Corporal Navari received a radio call from dispatch while they were parked in separate police cruisers in a parking lot at Ethan Allen Homestead Park. The dispatch call directed the officers to respond to a mental health issue at 85 Randy Lane, informing them that: "(a) the caller lives downstairs and owns the property; (b) the caller's son lives upstairs; (c) the caller's son has been threatening, out-of-control, and destroying property; (d) the caller's son is now in the apartment upstairs; and (e) the caller is downstairs and was advised to stay inside with the door locked." (Doc. 95-1 at 3, ¶ 8.)

Because he was assigned to the New North End, the area in which the incident took place, Corporal Thibault was the primary officer to respond to the call. After receiving it, Corporal Navari testified that he "said something to [Corporal Thibault] probably to the effect of, [s]hit, can't even talk for four or five minutes, and then [Corporal Thibault] said, [y]up." (Doc. 99-11 at 4.) Corporal Navari further recalled that Corporal Thibault stated that he would "talk to the Complain[ant] and you can do what you do best and talk to the other person, [the] other party." *Id.* When asked in his deposition if that was the extent of the plan, Corporal Navari responded "[p]retty much, if that was a plan." *Id.* at 5. Similarly, Corporal Thibault acknowledged that "[t]here was no specific -- like an operational plan." (Doc. 99-7 at 22.) He recalled that:

4

> There was nothing formalized. I guess I would describe it as [Corporal Navari] and I had been on calls together for years. I knew his style. He knew mine. We heard the call. I was comfortable going there with him. I think he was comfortable going there with me. There's plans that are already laid into a dispatch that kind of go unspoken. For example, [the primary officer is] . . . the person whose radio number is called first.

*Id.*

Corporal Thibault estimated that he had responded to twenty or thirty "mental health calls" with Corporal Navari, but that he had also responded to "hundreds of calls" with Corporal Navari that had a "mental health component to it." (Doc. 95-9 at 13, 14.) Prior to this call, neither officer had previously responded to a call or complaint from 85 Randy Lane, and neither officer was familiar with Wayne Brunette. BPD had not interacted with Wayne Brunette since 2003.

On the day of the incident, Corporal Thibault was equipped with a pistol, a baton, pepper spray, a flashlight, and two sets of handcuffs. Neither Corporal Thibault nor Corporal Navari had been issued a Taser. Although BPD had Tasers at the time, it had not fully deployed them "primarily due to cost[.]" (Doc. 116-2 at 3.)

As the officers approached 85 Randy Lane in their cruisers, they did not activate their lights and sirens.[1] Corporal Thibault arrived at the property first. He described the scene as "calm," although he noticed the "destroyed trees" on the front lawn. (Doc. 99-7 at 32.) Ruthine and Lawrence Brunette came out of the house to speak with him. Corporal Thibault described their demeanor as "remotely calm[.]" *Id.* Corporal Navari arrived moments later and approached the house by way of the driveway.

Corporal Thibault asked Lawrence Brunette if his son was under the care of a particular doctor; if he was on any medications; if he was seeing anyone from the

---

[1] Plaintiffs contend that there is a disputed fact as to whether the officers turned on the lights and sirens to their police cruisers when arriving at the scene. Both Corporal Thibault and Corporal Navari testified that they did not do so, which is corroborated by the sworn statement of Mary Little, the Brunettes' neighbor. Her husband, Ray Little, stated in his initial interview that he observed the lights on for at least one police cruiser, however, in his deposition, he admitted that he "really [did not] know" because "now that [he] [had] thought about it for a few years, [he] [did not] remember seeing [the police car lights]." (Doc. 99-8 at 5.)

5

Howard Center for Human Services (the "Howard Center"); and if Wayne Brunette had any weapons or firearms. Lawrence Brunette responded that his son was not on any medications and was not receiving any medical care.

Shortly after his arrival at 85 Randy Lane, Corporal Navari observed an individual, who he later determined was Wayne Brunette, standing just inside the open garage. Wayne Brunette then disappeared from view and reappeared on the landing above the garage on the upper floor of the house. Corporal Navari asked Wayne Brunette to come down from the landing to talk to him. Wayne Brunette slammed the metal screen door on the landing, but did not appear to go inside.

Corporal Thibault did not know in advance that Corporal Navari planned to call out to Wayne Brunette and ask him to come downstairs. If he had known that Corporal Navari intended to interact with Wayne Brunette in this manner, he would have asked Corporal Navari to "hold off." (Doc. 99-7 at 34.) Corporal Thibault, however, did not "think [it was] inappropriate[]" for Corporal Navari to ask Wayne Brunette to come down because the decision to engage him was "a matter of style." *Id.* While Corporal Thibault stated that it would have "been [his] style to leave [Wayne Brunette] up there[,]" he noted that Corporal Navari had "always been very successful at talking to people[,]" and that "maybe [Corporal Navari was] overly confident, because there is a chance every once in a while things don't go well." *Id.* at 37-38.

After Wayne Brunette left the landing, he reappeared in the garage, holding a shovel. The shovel was a four-foot, ten-inch long garden spade with a wooden handle and a pointed metal head. Plaintiffs concede that the shovel could be used as a dangerous weapon and was capable of inflicting serious bodily injury or death. Corporal Navari immediately felt threatened by the manner in which Wayne Brunette was holding the shovel and asked him to put it down twice.[2]

When Wayne Brunette exited the garage, Corporal Thibault was standing by the house's front steps, speaking with Ruthine and Lawrence Brunette. Observing the

---

[2] Plaintiffs dispute that Corporal Navari asked Wayne Brunette to put the shovel down twice but provide no evidence to the contrary.

incident at 86 Randy Lane from across the street, Mary Little described Corporal Navari's position at the time as in front of the sidewalk and "further up the grass area[,]" closer to the garage. (Doc. 99-10 at 9.)

Although the record is unclear with regard to how Wayne Brunette exited the garage, at some point, he began to quickly advance towards Corporal Navari, who began to back up the driveway towards the sidewalk and the street. As he was retreating, Corporal Navari drew his firearm and yelled "drop it[]" at least six or seven times. (Doc. 95-11 at 21.) Wayne Brunette pointed the head of the shovel at Corporal Navari and "charged" (Doc. 95-7 at 4) and "lunged" (Doc. 95-15 at 6) at him while making "swinging[,]" (Doc. 95-21 at 3) "poking[,]"and "jousting" (Doc. 108 at 3) motions with the shovel.[3]

Despite "backing up as fast as [he]" could, Corporal Navari recalled Wayne Brunette "gaining on [him]." (Doc. 95-11 at 21-22.) Using a tree on the grassy median between the sidewalk and street "to create some type of distance[,]" he placed his finger on the trigger of his gun. *Id.* at 21. Corporal Navari described the tree as "small[,]" but sufficient to "create something between" them, so that Wayne Brunette "would have to come on one side or the other[.]" (Doc. 99-11 at 7.) He determined that if Wayne Brunette "comes [around] one side of the tree or the other" he was "going to be the one shooting." (Doc. 95-11 at 21.) When the shooting occurred, Corporal Navari recalled Wayne Brunette standing on the sidewalk, while he stood just off the curb on the street.

Almost as soon as Wayne Brunette began advancing on Corporal Navari, Corporal Thibault ran from his position at the front steps, around a felled tree limb, down the walkway, and towards the sidewalk. He drew his firearm to provide assistance and told Wayne Brunette multiple times to drop the shovel out of fear that Wayne Brunette would strike him or Corporal Navari.

Although the parties dispute whether Wayne Brunette redirected his attention to Corporal Thibault and advanced towards him, it is undisputed that Corporal Thibault

---

[3] Plaintiffs dispute that Wayne Brunette handled the shovel in this way but provide no evidence to the contrary.

fired two shots that struck Wayne Brunette. Seconds later, he fired two more shots in quick succession that also struck him. Wayne Brunette fell to the ground with his feet lying on the sidewalk near the driveway and with the handle of the shovel by his head. When he fell, he was alive and moving. Corporal Thibault tried to calm him, but neither officer administered first aid.[4] At 4:26 p.m., Corporal Thibault radioed that shots had been fired and requested an ambulance. The duration of the incident, beginning with the radio dispatch call and ending with Corporal Thibault radioing that shots had been fired, was just over seven minutes.

According to Corporal Navari, Wayne Brunette advanced to within eight to ten feet of him.[5] Based on Corporal Navari's estimate and because Wayne Brunette pointed the four-foot, ten-inch shovel at Corporal Navari, Plaintiffs' expert, Ken Katsaris, opined that the tip of the shovel was "maybe four to . . . six feet[]" from the officer. (Doc. 95-13 at 12.)

Several of the eyewitnesses similarly reported that Wayne Brunette advanced to within several feet of Corporal Navari. Ruthine Brunette testified that the sidewalk divided Wayne Brunette from Corporal Navari. She did not "know if [Wayne Brunette] would have hit [Corporal Navari] [with the shovel][,]" but "[h]e probably would have." (Doc. 95-2 at 7.) Lawrence Brunette estimated that, at some point, the blade of Wayne Brunette's shovel was approximately a foot-and-a-half away from Corporal Navari. Agreeing that it was reasonable for the officers to defend themselves, Lawrence Brunette further opined that "[t]hey could have done what they did; whatever they had to do. He is a big man, with a spade like that, coming at you, or poking at you, or whatever. One swipe, it could have been bad news." (Doc. 95-5 at 6.)

---

[4] Defendants point out that there is no medical testimony as to what, if any, first aid should have been rendered by the officers or what training should have been provided. BPD Directive DD05 on the Use of Force requires officers to provide "appropriate first aid until the arrival of rescue personnel." (Doc. 99-26 at 8.)

[5] Plaintiffs dispute Corporal Navari's estimate based on a scaled map of 85 Randy Lane which purportedly demonstrates that the distance between the sidewalk and the street is greater than ten feet. Because the image provided is unclear, the court cannot determine the map's scale and therefore cannot determine whether the map is consistent with Corporal Navari's testimony.

Mary Little stated that Wayne Brunette was close enough to Corporal Navari that he "could have hit [him] with the shovel, if he really wanted to." (Doc. 108-12 at 6.) She expressed "surprise[]" that Wayne Brunette "didn't hit the cop. It was that close." (Doc. 95-15 at 8.) Ray Little testified that Wayne Brunette was approximately two feet from Corporal Navari when Corporal Thibault fired his weapon. The Littles' children, J1 and J2, also witnessed the incident. J1 estimated that the end of the shovel was "[p]robably like half a foot, 12 inches[]" from Corporal Navari. (Doc. 95-20 at 5.) J2 indicated that if Wayne Brunette "had gotten a couple inches more of reach then" he could have "hit [Corporal Navari] in the face." (Doc. 95-19 at 4.)

Witnessing the incident from 71 Randy Lane, Kelly Medlar stated that after Wayne Brunette was shot, he "drop[ped] to a knee on the sidewalk." (Doc. 95-21 at 7.) She averred that Corporal Navari had retreated from the sidewalk onto the grassy median and ultimately ended up on the street. At their closest point, she believed Wayne Brunette "was within one or two feet of [Corporal Navari]." (Doc. 95-22 at 3.) Her father, Marcus Medlar, believed that Wayne Brunette "damn near got [Corporal Navari][]" and was within "the vicinity of about 3 feet" of the officer. (Doc. 95-25 at 3.)

## B. Post-Incident Autopsy and Investigation.

Wayne Brunette was alive when he was transported to the emergency room at the University of Vermont Medical Center. At 5:05 p.m., Dr. Ken Sartorelli, M.D. pronounced him deceased. The cause of death was identified as gunshot wounds to the torso with the manner of death characterized as homicide.

Chief Medical Examiner Steven L. Shapiro, M.D. and Deputy Chief Medical Examiner Elizabeth A. Bundock, M.D., Ph.D. provided a report based on an autopsy performed by Dr. Bundock on November 7, 2013. Dr. Bundock pointed out that she received Wayne Brunette's body unclad and that she did not examine his clothing, as she typically would in the case of a gunshot victim. She concluded that Wayne Brunette died from gunshot wounds to his torso. Her autopsy report notes that his blood alcohol concentration was 0.081 and that his blood was positive for cannabinoids, although neither was a cause of death.

Dr. Bundock could not determine the sequence in which Bullets A, C, D, and E entered Wayne Brunette's body. Bullet A entered the upper left abdomen and moved slightly upward to the right side of his body, puncturing Mr. Brunette's liver and stomach. This trajectory indicated that the left side of the body was facing the shooter more than the right side. Dr. Bundock opined that Bullet A would cause bleeding, pain, and "[i]n and of itself, . . . could lead to death, if untreated[,]" but that Wayne Brunette "would not have been made immobile or die immediately from this wound." (Doc. 99-19 at 12.)

Bullet C entered Wayne Brunette's left side near his hip and traveled to the right, moving from the back of his body towards the front, again indicating that his left side was facing Corporal Thibault. Bullet C fractured Wayne Brunette's hip bone and pelvis and "[went] through the abdominal wall musculature and fat so it [did not] perforate any [vital] internal organs[.]" *Id.* at 18. Because Bullet C did not compromise the joint with the femur, it was "not likely to have had a huge effect on [Wayne Brunette's] mobility[,]" such that Dr. Bundock expected "that he could still reasonably walk" and "move his legs" after that injury. *Id.*

Bullet D entered and exited Wayne Brunette's upper arm first before re-entering his chest, close to the armpit. Dr. Bundock opined that this bullet would "have essentially torn up his bicep in the left arm[,]" making it "hard to hold something after that[.]" *Id.* at 19. Specifically, she stated that "[i]t would be hard to have your arm flexed up and bearing weight" after suffering the injury caused by Bullet D. *Id.* at 20. Although she agreed that Wayne Brunette would have lost control of flexing the musculature in his left arm, she testified that he could possibly hold the shovel after being shot by Bullet D, but it was unlikely that he could poke with the shovel or hold it over his head.

After entering Wayne Brunette's chest, Bullet D passed through his heart, diaphragm, and the left lobe of his liver, traveling from almost six inches to five-and-a-half inches downward. A "reasonably fair interpretation[]" of this trajectory is that, at some point, Wayne Brunette was at a lower level than Corporal Thibault. *Id.* at 26.

However, "[t]he most [Dr. Bundock] can say is that [Bullet D's trajectory] suggests that there was a position change between [Bullet D] and the other three fired[,]" supporting a conclusion that "somebody moved," although she cannot determine who. *Id.* at 23. Although Bullet D caused a fatal wound to the heart and lung, an individual could "continue to walk" and "cover large amounts of distance, even with a hole in their heart[.]" *Id.* at 28.

Bullet E entered the left side of Wayne Brunette's back below his shoulder blade and closer to the center of his body, "transect[ing] the spinal cord." *Id.* at 32. Bullet E rendered Mr. Brunette unable to move his legs, making it more likely that he would fall. Although the bullet entered through Wayne Brunette's back, Dr. Bundock testified that his "back was not predominantly facing the gun." (Doc. 116-9 at 14.) Instead, "[h]e was presenting more of his left torso[,]" resulting in an injury that was not "a directly front to back type [of] injury." *Id.*

Dr. Bundock observed that "[i]t is much more useful to take the [bullet] trajectories and use them to confirm or refute observations, than to take them and try to conjure up a scene." *Id.* at 11. She cannot conclude, to a reasonable degree of medical certainty, "how [Wayne Brunette and Corporal Thibault] are positioned, with respect to the surroundings." *Id.* After reviewing the bullet trajectories of Bullets A, B, and D, however, Dr. Bundock opined that they were not "consistent with [Wayne Brunette's] torso facing the gun." (Doc. 99-19 at 25.) Rather, they were consistent with Wayne Brunette's left side facing the shooter, who was potentially holding the firearm out to his side as he was shooting. Dr. Bundock concurred with Vermont State Police ("VSP") Detective Annis's conclusion that "the location of the entrance wounds in the left to right travel and all bullets could be a result of [Wayne Brunette] possibly advancing with his left foot forward and torso turned toward his right." (Doc. 116-9 at 19) (internal quotation marks omitted).

After the shooting, BPD and VSP investigated the scene and took tape-recorded statements from ten individuals who witnessed the shooting, including Corporal Thibault and Corporal Navari. At the time of the incident, BPD vehicles were not equipped with

cameras. VSP's Crime Scene Search Team recovered three of the four bullet casings ejected from Corporal Thibault's firearm. The fourth bullet casing was not found.[6]

## C. Corporal Thibault's and Corporal Navari's Training with BPD.

### 1. Use of Force Training.

The incident at 85 Randy Lane was the first officer-involved shooting or use of deadly force in Burlington, Vermont since 1997. Neither Corporal Thibault nor Corporal Navari had previously fired their weapons in the line of duty.

In 1998, Corporal Thibault graduated from the Vermont Police Academy. He was employed by BPD on a full-time basis from 2001-2016, aside from two deployments as part of the Vermont Army National Guard, one lasting approximately ninety days, the other spanning seven months, as well as a one-year military contract. He is no longer employed by BPD.

In 2003, Corporal Navari graduated from the Vermont Police Academy and joined BPD where he has been employed on a continuous, full-time basis. He was promoted to the rank of Corporal in 2009.

At the Vermont Police Academy, all BPD officers, including Corporal Thibault and Corporal Navari, receive annual use of force training during which they are trained in artificial decision points for applying force, as well as changing the manner of force. When the incident took place, BPD had a Department Directive Policy, entitled "DD05 Response to Resistance/Use of Force" (the "Directive"), which states in relevant part:

---

[6] Plaintiffs raise numerous issues with regard to the adequacy of BPD's and VSP's on-site investigations. Courts in the Second Circuit, however, have consistently noted that "a 'failure to investigate' is not independently cognizable as a stand-alone claim[.]" *McCaffrey v. City of New York*, 2013 WL 494025, at *5 (S.D.N.Y. Feb. 7, 2013); *see also Kucera v. Tkac*, 2014 WL 6463292, at *19 (D. Vt. Nov. 17, 2014) (observing that "some state supreme courts have declined to hold that police officers . . . [have] a duty to investigate beyond establishing probable cause prior to arrest.") (collecting cases) (internal quotation marks omitted); *Newton v. City of New York*, 566 F. Supp. 2d 256, 278 (S.D.N.Y. 2008) (noting "there is no constitutional right to an adequate investigation" and dismissing a claim that the defendants deliberately or recklessly failed "to conduct a constitutionally adequate investigation"). Plaintiffs do not contend that Defendants withheld or manipulated evidence from the scene.

Officers are agents of the state authorized to use various degrees of force to effect arrests or ensure the public safety. Officers employ objectively reasonable force necessary to accomplish a legal purpose. Officers should use only the force that is necessary and appropriate for compliance to control of a suspect and only until compliance or control has been achieved.

(Doc. 95-27 at 2.)

According to the Directive, "[a]n Officer may use lethal force to protect him/herself or another person from what the Officer reasonably believes to be an imminent threat of death or serious bodily injury." *Id.* at 3. "Imminent" is defined as "impending or about to happen." *Id.* The Directive further states that the officer "may continue [the] application [of lethal force] until the subject surrenders or no longer poses an imminent danger." *Id.* at 8. After using lethal force, an officer, if able, "shall immediately call for an ambulance and render appropriate first aid until the arrival of rescue personnel." *Id.* In determining the appropriate amount of force, an officer considers the absence of a safe alternative, including the availability of cover. "An Officer in a position of cover may gain additional time to assess the need to use lethal force without incurring significant risks." *Id.* at 10.

When the incident occurred, Corporal Thibault was a certified Use of Force instructor for BPD. He was also certified as an instructor in (a) "Rape Aggression Defense"/Self-Defense; (b) firearms; (c) control and restraint; and (d) Monadnock Defensive Tactic Systems ("MDTS"), which includes instruction on policy, case law, and de-escalation techniques. Both Corporal Thibault and Corporal Navari had received training in de-escalation techniques. Corporal Thibault instructed or received training on the use of force ten times between 2002 and the incident, while Corporal Navari was trained on the use of force six times between 2005 and the incident.

BPD requires officers to complete a "use of force" report whenever officers use force that exceeds the handcuffing of a compliant individual. Prior to the incident, Corporal Thibault accumulated fifty-nine use of force reports over ten years of BPD

employment. Corporal Navari had fourteen use of force reports during this same time period.[7]

Plaintiffs submitted a list of Corporal Thibault's fifty-nine use of force reports as well as nine use of force report summaries written by Corporal Thibault that describe the incidents in question. There is no evidence before the court with regard to the precise nature of the other fifty use of force incidents.[8] For each of the reports before the court, a BPD supervisor checked a box indicating that he or she had "reviewed this incident" and "concluded that [Corporal Thibault's] actions were in compliance with [BPD's] Use of Force Policy." (Doc. 99-34 at 2.) The BPD supervisors who checked the boxes do not include former Chief Schirling. In the excerpts of his deposition provided to the court, former Chief Schirling was not asked if he reviewed any of the fifty-nine use of force reports for Corporal Thibault. Because of the important role they play in determining supervisory liability, the court quotes the nine use of force reports submitted to the court verbatim.

On June 25, 2009:

**[A]t approx. 1600 hours, I was in City Hall park with Cpl. Glynn and Ofc. Longevin investigating a report of an intoxicated juvenile. While the other officers were investigating, I observed the Defendant lying down on a park bench facing the back rest. I approached the subject and said, "Sir, Sir[.]"[] The subject's eyes were closed and he did not respond. I announced again stating, "Sir, are you ok[]?"[] I stated this once more time while shaking his left shoulder.**

**At that time, the Defendant jumped and began yelling but I wasn't sure what he was saying. I immediately detected a strong odor of intoxicants. He began walking quickly from me, turning around, and pacing back and forth. I asked [him] if he was okay and requested him to come speak to me. He continued yelling something about sleep[.] I**

---

[7] Defendants argue that the Use of Force Reports between the two officers cannot be compared based on quantity alone because Corporal Thibault worked the downtown nightshift for several years which is a more dangerous shift and carries the potential for more Use of Force Reports than other districts.

[8] The list provided to the court includes a date, the "Verbal Command[,]" and what appears to be page numbers. Prior to the Brunette incident, it reflects one incident of a "pulled" weapon, one incident of a "pulled gun[,]" and two incidents of "drew firearm[.]" (Doc. 99-33 at 2-3.)

asked Cpl. Glynn if he knew the subject and he advised he knew him as [redacted.] I asked the Defendant[] to relax and to come speak with me. He had ignored me and walked to another park bench and began speaking with several other subjects. The Defendant was unbalanced and swayed while he was standing still. He continued to yell and raise his arms shaking them in exclamation.

I advised Ofc. Longevin that we would be taking the Defendant into protective custody. I then advised the Defendant that we would be placing him into protective custody. He then yelled something about jail. Ofc. Longevin then began to explain to hi[m] something about protective custody. I then advised the Defendant that he was now in protective custody. Ofc. Longevin ordered the Defendant to turn around twice. The Defendant ignored the officer and fumbled with a bag of cigarette tobacco. I then ordered the Defendant to drop the bag and to turn around and place his hands behind his back. The Defendant ignored my order. I then pointed a bottle of OC spray toward the Defendant and ordered him to turn around again. The Defendant yelled, "Go ahead and mace me." I ordered the Defendant to turn around one last time. The Defendant didn't move. I then sprayed the Defendant's face with OC. I then secured the Defendant right arm and placed it behind his back. Ofc. Longevin then took control of the Defendant's left arm and placed him in handcuffs.

Ofc. Longevin and I then began to escort the Defendant toward the intersection of College St. and St. Paul St. where Cpl. Glynn had parked our patrol vehicle. I stopped the Defendant in the northwest corner of the park where I search[ed] him for weapons. All throughout the process, and the process of escorting the Defendant, he yelled attracting the attention of multiple park patrons. The Defendant yelled things such as, "Fuck you, you fucking faggot, who fucking maced me, fuck you, I'll have your fucking job, call my fucking lawyer[.]"

After searching the Defendant, we began to escort him across the sidewalk to the patrol vehicle. Once stepping onto the concrete, the Defendant collapsed toward the ground. I told him to get up and I attempted to pull him upward. He then yelled, "my fucking knee, I have a bad knee." I allowed the Defendant to stay where he was and Cpl. Glynn contacted rescue at my request. The Defendant continued to yell, "Fuck you, fuck you, I'll have your job[.]"[] On two occasions, the Defendant began to kick but did not strike anyone. The Defendant also spat multiple time in between yelling. While on the ground, Cpl. Glynn poured water on the Defendant's face in an attempt to decontaminate him. Cpl. Glynn also read the Defendant the OC spray

administrative warning. Burlington Fire Dept. personnel responded to the scene. The Defendant continued to yell at rescue personnel demanding to know who the "tall blond faggot" was who "maced" him. After approximately five minutes of rescue personnel trying to reason with the Defendant, the Defendant compl[i]ed enough to be placed in an ambulance and transported to the emergency room.

At approximately 1800 hours, the Defendant was issued a citation for disorderly conduct by Ofc. Cousins.

*Id.* at 3-4.

On May 16, 2007:

I responded to the parking lot next to the Daily Planet to a report of an "aggressive acting" male subject who was intoxicated. I checked the parking lot and observed no one. I then checked the alley connecting the lot and College St. I heard a subject yelling/singing out loud but couldn't understand [him]. I then observed [the individual] walking west on college St. [He] struck 4-5 newspaper boxes as he walked by them[.] [He] also had a pint bottle of Vodka protruding from a jacket pocket. I asked [him] to stop and asked him what he was doing. His speech was slurred but he insisted, again and again, that he had been doing nothing wrong.

[The individual's] speech was slurred and he swayed while standing. I advised [him] that I would be placing him into protective custody. I asked [him] to remove his backpack which he began to do. When he held the pack by the strap with one hand he said, "No." I then ordered [him] to turn around and place his hands behind his back[.] [He] refused and continued to hold the pack by one of its straps. I ordered him to turn around once more but he continued to passively resist. At that time I sprayed [his] face with OC spray which was not completely effective because the delivery failed due to lack of pressure. I was able to handcuff [the individual] in a standing position. He was transported to ACT 1 by Ofc. Erwin.

*Id.* at 8.

On May 8, 2007:

I responded to Battery Park to assist Ofc. Clements with an open container violation. In the center of the park, I observed [the individual] sitting on a bench with an open container of Steel Reserve. Ofc. Clements spoke with [the individual] who[se] speech was very slurred. Ofc. Clements ordered [the individual] to stand, turn around and place his hands behind his back. [The individual] initially

acquiesced but after ordered again, he st[ood] up. I instructed [the individual] to turn around and place his hands behind his back once more but he quickly stepped forward, toward me, with his arms extended. To defend myself, I sprayed [the individual's] face with OC spray and ordered him not to resist and to comply with our orders. Ofc. Clements and I were then able to handcuff [the individual] from a standing position without further incident. Ofc. Clements transported [the individual] to ACT 1 and then to corrections.

*Id.* at 6.

On October 16, 2006:

[A]t approx., 1515 hours, Officer Clements and I observed the Defendant sleeping on a bench swing in Battery Park. Upon approaching the Defendant, I observed an open can of Bud Light under the swing and a shopping cart filled with multiple empty alcohol cans.

Upon waking the Defendant, he spoke with slurred speech and denied owning any of the alcohol. The Defendant was very intoxicated and appeared to have urinated in his pants. The Defendant was issued a municipal ticket for an open container violation. After issuing the ticket I asked the Defendant to stand up. I had determined that he would be taken into protective custody.

The Defendant did not stand up. I then ordered the Defendant, at least three to four times, to stand up and place his hands behind his back. The Defendant laughed until the fourth or fifth order was given. He then began to stand but placed his right hand inside a jacket after he had also been ordered to keep his hands visible. Once the Defendant stood, he would not place his hands behind his back, although he had been ordered a number of times to do so. At that time I sprayed the Defendant's face with O.C. spray to allow Officer Clements and [me] to safely handcuff the Defendant. Officer Clements then took control of one of the Defendant's arms to attempt to handcuff him. The Defendant continued to resist by not placing his other arm behind his back. Officer Clements was then forced to perform an arm bar takedown. Once the Defendant was on the ground he tucked his free arm under his body forcing Officer Clements to pry his arm from under him to safely handcuff him. After I had "pepper" sprayed the Defendant I gave multiple orders (at least 10 to 15) for him to "stop resisting[.]"[] The Defendant did not comply with these orders.

*Id.* at 10.

On July 12, 2006:

17

1.    On 7-12-06 at approx. 1055 Hours Ofc. Clements and I were patrolling the Church Street Marketplace. We were walking southbound and nearing the intersection of College St. when I observed two males sitting on a rock. The Defendant was speaking loudly with another male discussing our bulletproof vests. I heard the Defendant say, "Those fucking vests must be fucking hot[.]"[] I then heard him say, "Look at that one, he thinks he's fucking cool." The Defendant was speaking loudly enough for me to hear him clearly over 15 feet away. The Defendant was also sitting approx. 3 feet away from a youth lemonade stand.

2.    At that time I walked over to the Defendant and asked him if he was okay. The Defendant immediately grew angry and advised he was fine. I advised the Defendant that he got my attention by swearing loudly and speaking about me and my police equipment. The Defendant stated, "I'm fucking talking A to B." I again asked the Defendant if he was okay but he yelled louder that, "It was fucking between A and B[.]"[] The Defendant then pointed at me and yelled "keep walking[.]" I advised the Defendant that I would not be taking orders from him and requested he calm down.

3.    The Defendant then stood up and raised his hands in the air and shook them. In one hand he held a Power Aid bottle and the other hand was held in a fist. The Defendant's body convulsed and shook as he tensed his muscles. He yelled, "Fine, fuck you." And turned quickly to walk north on Church St. At this point pedestrian traffic along with workers on Church St. had stopped what they were doing and looked on as a result of the Defendant's loud and profane outbursts.

4.    At that time I requested the Defendant to stop but the Defendant kept walking northbound, yelling "fuck you[.]"[] I continued to follow the Defendant and continued to request him to stop. The Defendant continued to yell, "fuck you" causing other pedestrians to clear a way as not to be near the disturbance. I advised the Defendant that he had better not run and advised I would pepper spray him if he didn't stop. The Defendant then turned toward me and "squared off" as he bladed his stance and held his fists up in a fighting stance. I ordered the Defendant to turn around and place his hands behind his back and informed him he was under arrest for disorderly conduct. The Defendant did not turn around although Ofc. Clements and I continued to order him to turn around.

5.    Due to Defendant's actions and his refusal to comply I sprayed the Defendant with OC spray. As I sprayed the Defendant he turned

his head, avoiding most of the spray and then turned around and placed his hands behind his back. I moved forward to compliantly handcuff the Defendant with the assistance of Ofc. Clements. I was able to secure both handcuffs but the Defendant continued to yell. The Defendant's face grew very red and he spit every time he yelled. The Defendant also tensed up his entire body as we attempted to maintain control of him. Although Officer Clements and I ordered the Defendant to stop resisting and to calm down, the Defendant continued to resist and scream. The Defendant's actions forced Ofc. Clements and I to place the Defendant on the ground to maintain control of him. While on the ground the Defendant continued to struggle and yell until an officer with a patrol vehicle responded to transport the Defendant to police headquarters.

6. The Defendant's criminal record indicated that he had failed to appear at a court proceeding.

*Id.* at 12-13.

On July 7, 2006:

[A]t approx. 110 hours, Officer Clements and I went to the residence o[f an individual] to arrest her for a disorderly conduct violation in accordance with a rule 3 failure to appear exception. Upon knocking on her door[, she] answered and opened the door. I advised her that I had some paperwork for her and offered to show her the affidavit of probable cause for her arrest. [She] asked [if] she was being arrested and I advised her [that] she was. [She] then began to turn away from Ofc. Clements and I and state, "I need my shoes and vitamins[.]" I advised [her] that she was "under arrest" and told her we needed to be with her if she wanted to retrieve items.

Ofc. Clements and I escorted her to a table where she took some vitamins. She then began to order me to sit down. I again advised her that she was in my custody and was under arrest. [She] stood up and went to a dark area in her kitchen yelling at Ofc. Clements about him being a homosexual. Due to concerns of sharp objects in the kitchen I illuminated the area with my flashlight and advised her of my safety concerns and again advised her that we needed to go. [She] came out of the kitchen yelling about being a pacifist and calling Ofc. Clements a homosexual. [She] then stepped toward Ofc. Clement and stuck her arm out, index finger extended, pointing at Ofc. Clements face, approx. 6'' from his face.

At that [t]ime I sprayed [her] with O.C. spray. She ran from Ofc. Clements and I toward the west end of her apartment. There, both

**Ofc. Clements and I secured her arm[s], I [secured] the left arm, and placed her in rear wristlock and handcuffed her.**

*Id.* at 15.

On August 25, 2005:

**While assisting Officer Dier while dealing with a juvenile arrest in holding cell 1, I observed the male juvenile kick Officer Dier's leg. The male had earlier advised me that when he was out of handcuffs he was going to "knock me out[.]"[] The subject also advised he had planned on punching Officer Frisbie and others.**

**Immediately upon observing the subject kick Officer Dier, [I] took control of the subject's head to cover his eyes and distract him from assaulting either Dier or I again. Upon bringing the subject to his left side on the bench in the cell, I sprayed the subject with OC. Either immediately before or after spraying the subject, I struck the subject's left thigh with my right hand. I struck the subject's leg with minimum strength, approximately 10-15%. I utilized the distractionary strike to allow me time to maneuver [as] I was in fear the subject was beginning to prepare to strike with his leg again.**

*Id.* at 22.

On April 21, 2005:

**On 4-21-05 at approximately 1710 I was standing near the Burlington Town Center when I observed [an individual] exit the mall and yell, very loudly, "Fuck America[.]"[] [He] yelled this three times, attracting my attention and the attention of numerous people on the Street. Church St. has a high volume of pedestrian traffic at that time of day. I confronted [him] and told him that he was not permitted to yell obscenities and cause a public inconvenience. [He] advised [that] he understood. Approximately five minutes later, I observed [him] walk by me yelling, "I ain't breaking the law as far as you['re] concerned." [He] continued to yell including obscenities as before. At that time I addressed [him] and advised I wouldn't warn him again.**

**[The individual] then left the area. At approximately 1725 hours, I received a report that [he had] been walking down Cherry St near the bus stop yelling at people. I met with the witness, [P.B.] who runs a business on the Marketplace. [P.B.] advised he had seen [the individual] flailing his arms and acting violently. [P.B.] advised [that the individual] was acting in such a way that he wouldn't have felt safe confronting him. [P.B.] provided me with a sworn written statement. [P.B.] advised that he observed [him] walk onto Church St shouting,**

"I'm a live wire, get used to it." [P.B.] advised [that the individual] yelled this several times. [P.B.] advised [that he] stopped several times and taunted individuals [by] repeating his above quote. [P.B.] advised [that he] raised his arms, acted very agitated and loudly confronted several males on both Church and Cherry St.

At approximately 1805 hours, officer Michael Morris advised me that he had located [the individual] on Peru St. I responded to the area to arrest [him. His] criminal record check revealed that [he] had failed to appear [for] court proceedings. I observed [him] walking south on Johnson St and observed Officer Morris walking behind him. I drove along side [him] and told him to stop, which he did not. I exited my patrol vehicle and told [him] he was under arrest. [He] shook his head. I told [him] to turn around and place his hands behind his back. [He] then turned around and ran north on Johnson St. Officer Morris and I were able to catch up to [him.] I observe that [he] had stopped in front of Officer Morris. At that time I sprayed him with O.C. to [e]ffect the arrest. I handcuffed [him] using a rear wristlock handcuffing technique.

Officer Morris advised he had initially located [the individual] near Grant St. and Elmwood Ave. Morris advised [that he y]elled obscenities toward him and refused to stop at his request. Officer Morris detailed his encounter in his report.

*Id.* at 17.

October 30, 2003:

[A]t approx. 1400 hours, Officer Merchand and I were dispatched to Fletcher Allen Health Care, 111 Colchester Ave. in Burlington, to a report of a disorderly male subject. I was advised the subject had recently been fired and was getting out of control in the McLure lobby.

Upon arrival, I met with a hospital security guard. The guard advised the subject had left the building and was in the parking garage. The guard advised me [that] the Defendant had entered the hospital and yelled at his former manager. The Guard advised the Defendant was upset about the loss of his job. The guard went on to advise that the Defendant punched and dented a metal trashcan outside the main lobby.

The security guard advised hospital staff requested the Defendant be served with notice against trespass. The guard advised the Defendant would be coming out of the parking garage momentarily. Officer Merchand and I waited near the garage exit with the guard. The guard pointed to a silver Ford Taurus and advised it was the

Defendant. I approached the vehicle and while doing so, the Defendant rolled up his window. I ordered the Defendant to stop but he did not. I repeated this order several times without success. The Defendant finally stopped at a stop sign. At that time I ordered the Defendant to roll down his window. The Defendant refused. I ordered the Defendant several more times and advised the window would be broken if necessary. The Defendant's mother approached the vehicle screaming something about her window.

I was able to open the driver's door and ordered the Defendant to exit his vehicle. The Defendant stated, "Fuck you." I ordered the Defendant to exit his vehicle a minimum of four times. Each time the Defendant stated, "Fuck you." After being unsuccessful with verbal commands I sprayed the Defendant with oleoresin capsicum, pepper spray. This gave me a brief opportunity to reach into the vehicle, turn of[f] the ignition and remove the keys. The Defendant began to yell. The Defendant yelled, "I'm going to fucking kill you, you fuck, I'll kill you." I continued to order the subject out of the vehicle but he did not acknowledge my commands.

The Defendant was a large male, weighing at least 300 lbs. Officer Merchand and I attempted to extract the Defendant by using control and restraint techniques. I was able to place the Defendant's left arm in a front wrist lock. Due to the subject's size and strength, this was very difficult. When I was controlling the Defendant's left arm, the Defendant swung toward my head with his right hand. I pulled my head back and discovered the Defendant had a cigarette in his fist. The Defendant reached in the direction of my face with the cigarette and then struggled in the direction of my right arm. The Defendant was looking at my arm and pointing the burning end of the cigarette toward it. To protect my face, eyes, and arms from the Defendant's fist and cigarette, I struck the Defendant in the face with my free right hand. I struck the Defendant's left check using a front strike. I delivered the strike using approx. 25% striking force.

The Defendant continued to resist in spite of the use of pepper spray, wrist locks, a strike to the face, and continued orders to stop resisting. The Defendant was eventually extracted after I resorted to pulling him out by pulling on his clothing. When the Defendant was out of his vehicle he continued to scream threats and resist. The Defendant yelled, "I'm going to punch you in the face you fucker." And again yelled, "I'll kill you." I used my [Mon]adnock expandable baton to execute an arm bar on his left arm. Due to the Defendant's short meaty arms, the arm bar attempts were unsuccessful. It took the assistance of two other security guards along with Officer Merchand

**and I to handcuff the Defendant. I was finally able to ground cuff the Defendant by effecting an arm bar on his left arm. Due to the Defendant's short arms and large body, two sets of handcuffs were needed to properly secure his arms. After handcuffing the Defendant he continued to struggle. I advised the Defendant the fight was over and to relax. I advised the Defendant he w[ould] receive treatment as soon as he was no longer a threat to us. I advised the Defendant we would take care of him if he calmed down. After advising him these things, he began to calm down and allowed hospital staff to escort him for treatment.**

*Id.* at 19-20.

Prior to November 6, 2013, Corporal Thibault was sued for a civil rights violation based on excessive force, although the matter was dismissed for failure to timely serve the complaint.[9] Corporal Thibault testified that he "was cleared by [a BPD] internal investigator[]" for the alleged conduct. (Doc. 116-12 at 27.)

## 2. Mental Health Incident Training.

According to BPD records, Corporal Thibault received a total of 6.65 hours of mental health training from 2002 to 2013. Corporal Navari received a total of 6.75 hours of mental health training from 2005 to 2013.

Evaluating BPD's training and protocols for dealing with mentally disabled individuals, Plaintiffs' expert witness, Ken Katsaris, described BPD as a "progressive agency[.]" (Doc. 95-13 at 18.) All BPD officers received training in mental health issues that relate to law enforcement, and BPD has taken steps to address the increasing number of encounters with the mentally ill, including: (a) co-founding the Street Outreach Program with the Howard Center and other partners which enables a Howard Center mental health worker to work with law enforcement officers assigned to the Church Street Marketplace when engaging with individuals with mental health issues; (b) expanding the Street Outreach Program in 2009 from the Church Street Marketplace to the entire City; (c) partnering with other social service agencies in order to address the impact of mental illness on community welfare and public safety; (d) involvement,

---

[9] A copy of the civil rights complaint was not provided to the court.

through former Chief Schirling, in the Vermont Chapter of the National Association of the Mentally Ill; (e) providing four-and-a-half hours of mental health training as mandated by the State of Vermont Act 80 through a program entitled "Interacting with People Experiencing a Mental Health Crisis" (Doc. 95-10 at 6, ¶ 11); and (f) conducting mental health training in 2010 for all sworn officers, including Corporal Thibault and Corporal Navari, led by the Howard Center's Director.

On March 15, 2013, BPD adopted and promulgated Directive DD13.02 ("DD13.02") entitled "Interacting with Persons with Disabilities" which states:

> It is the policy of this department to provide police services in an equal and impartial manner. This policy includes providing police services to those who have disabilities that officers either observe or become aware of based upon the circumstances presented or information obtained.

(Doc. 95-30 at 2.)

DD13.02 further provides that:

> Successful police contact with citizens is characterized by effective communication[.] . . . Officers shall strive to communicate effectively and accurately . . . [and] take steps to protect persons with disabilities from inequitable treatment based on their disability and to avoid furthering any injury or disability based on the police contact where such accommodation can occur without jeopardizing the safety of all persons involved in the event.

*Id.*

At the time of the incident, BPD's practice was to dispatch trained police officers to respond to 911 calls concerning a mental health incident. Once the situation is assessed and the scene is secured, if appropriate and feasible, the officers may request the services of a mental health professional.

On April 1, 2014, BPD adopted Directive DD13.3 ("DD13.3"), entitled "Interacting with Persons of Diminished Capacity" which became effective on June 25, 2014. Because BPD adopted DD13.3 after the incident occurred, the parties dispute its relevance.[10]

---

[10] Fed. R. Evid. 407 provides that "[w]hen measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to

24

DD13.3 outlines the "day-to-day response methodology" for mental health calls, directing BPD officers to follow procedures for "containment, coordination, communication[,] and time[.]" (Doc. 99-24 at 4.) Containment requires officers to "devise a plan that separates the subject from other civilians" and to "respect the comfort zone of the subject in order to reduce any unnecessary agitation." (Doc. 99-23 at 3.) Officers "should . . . not compress [the comfort zone] unless necessary." *Id.* While officers should use all available tactics to de-escalate the situation where possible, "if an officer is faced with a dynamic and violent situation that poses a threat to the officer or other persons present, then officers should utilize tactics outlined in [another policy] to control the subject." *Id.* Former Chief Schirling testified that "[c]ontainment means you are going to the scene of anything, and you are containing the crisis. . . . You want to contain what is happening. It applies to literally everything that we respond to." (Doc. 116-2 at 7.)

Coordination involves establishing a perimeter "to ensure that outside persons[,]" including family members, do not become involved. (Doc. 99-23 at 3.) "Communication with the person of diminished capacity should be planned and controlled[.]" *Id.* at 4. "Time is the concept of elongating the encounter, rather than hastening it." *Id.* Former Chief Schirling testified that "time is the principle that we don't rush" and that an officer should "[s]low things down." (Doc. 99-24 at 5.)

Despite its adoption after the incident took place, former Chief Schirling testified that the officers "were trained to do everything that is in [DD13.3]." *Id.* at 6. He explained that DD13.3 "consolidate[d] information from a variety of other directives and our ongoing training into one place, for easy reference[]" and that it did not create "any [substantial] changes to the operating methodology" of how officers responded to mental

prove: negligence[] [and] culpable conduct[.]" The court "may admit this evidence for another purpose, such as impeachment or--if disputed--proving ownership, control, or the feasibility of precautionary measures." *Id.* Because former Chief Schirling testified that DD13.3 memorialized BPD's policies at the time of the incident it is relevant.

health calls. *Id.* at 3.[11] DD13.3 "codif[ied] the way things were trained and operationalized for the entire 25 years" he worked at BPD. *Id.* at 4. The only addition to the operating methodology was the use of a "street outreach interventionist as a first responder for certain types of events." *Id.* at 3.

### D. Corporal Thibault's Post-Incident Conduct and Resignation from BPD.

After the incident, in September 2015, Corporal Thibault was arrested and charged with three counts of misdemeanor domestic assault based on allegations that he physically abused his then-girlfriend. Corporal Thibault disputes those allegations, which were dismissed with no finding of guilt. As a result of the investigation into the charges, he underwent a mental health evaluation and surrendered his personal firearms.

On August 14, 2016, Corporal Thibault resigned from BPD after being placed on administrative leave for what he described as a "jovial prank phone call" (Doc. 99-7 at 5) to a former BPD officer in the middle of the night, accusing him of "messing around" with the caller's wife. *Id.* at 7. Corporal Thibault testified that he could have remained with BPD after this incident, but decided to resign instead. Because these events post-date the incident, they have scant relevance to the court's determination of the contested issues. *See* Fed. R. Evid. 401-03.

## III. The Disputed Facts.

### A. The Period of Time in Which the Incident Occurred.

The parties dispute how much time elapsed between Wayne Brunette exiting the garage and Corporal Thibault firing the fourth shot. In his deposition, Corporal Thibault testified that the incident occurred in "maybe five[] . . . seconds." (Doc. 95-9 at 24.) Mary Little stated that the period of time from when Wayne Brunette started to move towards Officer Navari until the shots were fired "was very quick." (Doc. 95-16 at 8.) Likewise, Lawrence Brunette averred that the events "all happened so fast." (Doc. 95-3 at 6.) Ruthine Brunette did not perceive any interruption in the sequence of shots fired.

---

[11] The errata sheet to former Chief Schirling's deposition clarified that the word "substantial" should be added between "any" and "changes." (Doc. 116-1 at 2.)

26

Plaintiffs point out that the initial dispatch call occurred at 4:19 p.m. and Corporal Thibault radioed in that shots were fired at 4:26 p.m. Because Corporal Navari estimated that it took a "couple minutes" to travel to 85 Randy Lane and that a "minute to a minute and a half" elapsed while Corporal Thibault talked with Lawrence and Ruthine Brunette, Plaintiffs estimate that approximately three minutes remain for the officers' encounter with Wayne Brunette. (Doc. 99-11 at 3.)

## B. Corporal Navari's Initial Interaction with Wayne Brunette.

Plaintiffs dispute the manner in which Corporal Navari asked Wayne Brunette to come down from the landing. Corporal Navari averred that he used "a calm, soft-toned voice" in requesting that Wayne Brunette come down from the landing to talk to him. (Doc. 95-7 at 3, ¶ 7.) Corporal Thibault recalled him saying "come on out, I want to talk to you[.]" (Doc. 99-7 at 35.) Ruthine Brunette stated that Corporal Navari asked in a conversational tone. However, from inside his home across the street, Ray Little heard Corporal Navari say "[c]ome down here so we can discuss this[,]" and testified that Corporal Navari "shouted[]" loud enough that he could hear it. (Doc. 99-8 at 6.)

After asking Wayne Brunette to come down from the second floor, Corporal Navari recalled Wayne Brunette saying "[n]o." (Doc. 95-11 at 16.) Plaintiffs dispute that he responded in this way because no other witness at the scene recalled this response.

## C. The Manner in which Wayne Brunette Exited the Garage.

Corporal Navari testified that Wayne Brunette appeared in the garage "holding the shovel in an aggressive manner[]" and "staring through [him]." (Doc. 95-11 at 18.) Wayne Brunette then "started advancing [towards him] in a very fast manner[,]" not quite a sprint, but "faster than [he] could back up." *Id.* at 20. Corporal Thibault described him as "charging" and "barreling out of the [garage]" towards Corporal Navari. (Doc. 95-9 at 23.)

In contrast, Mary Little observed Wayne Brunette exit the garage, which had the Brunettes' car in it, at the pace of a "normal walk," that he "wasn't running[,]" and that he held the shovel upright with the blade pointed towards the sky. (Doc. 99-10 at 8.) She stated that Wayne Brunette initially walked toward his car, which was parked to his right

27

with its front end pointed towards the end of the driveway. He stopped near the driver's side door before lowering the shovel "with the pointy end pointing toward[] [Corporal] Navari" who was standing where the front lawn meets the driveway. *Id.* He then "lunged towards [Corporal Navari] with the pointed shovel" and "started chasing him . . . at a fast gait[,]" causing Corporal Navari to back up towards the sidewalk. *Id.* at 9-10.

Ray Little described Wayne Brunette as initially holding the shovel across his chest. Because a car was parked in the garage within a couple of feet of the garage wall, Wayne Brunette turned sideways in order to exit the garage and "[n]ot to threaten [Corporal] Navari[.]" (Doc. 99-8 at 8.) When he began advancing towards Corporal Navari, he was "walk[ing] briskly"; he did not "walk slow and he didn't run, but he was moving along[.]" *Id.* at 10. Mr. Little believed that Wayne Brunette was "[t]rying to get [Corporal Navari] off the lawn[.]" *Id.* at 19.

Ruthine Brunette recalled that the officers began "casually" walking towards Wayne Brunette. (Doc. 99-9 at 6.) Wayne Brunette then raised the shovel, but she could not "remember [the officers] backing off. All [she] [can] remember is that they came up to him, and that was it." *Id.* at 8.

As Wayne Brunette advanced towards him, Corporal Navari recalled that he responded to his second request to put the shovel down by saying, "[n]o, you're going to have to shoot me." (Doc. 95-11 at 19) (internal quotation marks omitted). Corporal Thibault, who was standing nearby, did not hear Wayne Brunette make this statement, but did hear him "yelling out, [n]o[]" after the officers ordered him to put down the shovel. (Doc. 99-7 at 45.)

## D. The Distance Between the Officers and Wayne Brunette Before and During the Shooting.

While Plaintiffs dispute the precise distance between Wayne Brunette and Corporal Navari during the incident, the officers and eyewitnesses reported Wayne Brunette was within several feet of Corporal Navari. Corporal Thibault described Wayne Brunette brandishing the blade of the shovel "within close proximity to [Corporal

Navari's] face[]" (Doc. 95-9 at 23), such that if he had "swung or jabbed or slashed within . . . six more inches, [Corporal Navari] would be severely injured for sure." (Doc. 99-7 at 39.) Plaintiffs question the reliability of Corporal Thibault's recollection because he admitted experiencing "tunnel vision fixed on [Wayne Brunette][,]" such that Corporal Navari was "now out of the picture somehow." *Id.* at 40-41.[12] He nevertheless testified that he "could see [Corporal Navari][]" even though "[h]e was blurry[,]" which is why he could not describe "exactly how [Corporal Navari] was standing or how he didn't get hit [by the shovel]." *Id.* at 41.

The parties dispute whether Wayne Brunette charged Corporal Thibault or whether Corporal Thibault moved towards Wayne Brunette as he shot. From the front steps of the Brunette residence, Corporal Thibault saw Wayne Brunette advancing towards Corporal Navari. He moved across the front yard, around a felled tree limb, and toward the sidewalk, ordering Wayne Brunette to drop the shovel. Corporal Thibault believed that he "needed to help [Corporal Navari][,]" because he "thought [Corporal Navari] was going to get killed." (Doc. 116-12 at 23.) He stated that he "moved towards [Wayne Brunette] with the . . . thought that [he] was going to have to shoot [Mr.] Brunette." *Id.* These thoughts "were going through [Corporal Thibault's] mind within . . . mere moments." *Id.* When Wayne Brunette was in "close proximity to [Corporal Navari's] face," Corporal Thibault recalled that he "unholster[ed] [his] firearm and start[ed] moving more towards [Corporal Navari] and Wayne Brunette, which is when [Mr.] Brunette redirected his momentum, turn[ed] left, and charg[ed] towards me[.]" (Doc. 95-9 at 23.)

Although Corporal Thibault testified in his deposition that he was backing up during this encounter, in his statement given to Detective Annis six days after the shooting, Corporal Thibault could not recall whether he was "moving backwards[]"

---

[12] Corporal Thibault described his "capsulized kind of tunnel vision, in a stressful, traumatic, horrible situation like [the shooting of Wayne Brunette], where things . . . do kind of slow down." (Doc. 116-12 at 17.) Defendants' expert, Jack Ryan, explained that, when firing a weapon, officers "are trained to double tap[,] . . . break tunnel vision, see if the threat still exist[s][,] and then double tap again." (Doc. 116-7 at 3.)

before he shot Wayne Brunette. (Doc. 99-20 at 4.) He fired the first two shots, paused for one second, then fired two more shots in rapid succession. After the first two shots, Wayne Brunette's "momentum didn't stop" and "he was still coming at [him]" (Doc. 95-9 at 24), prompting Corporal Thibault to make the "split-second decision" to fire "two more consecutive shots in quick succession[]" based on his belief that he and Corporal Navari were in "imminent danger of serious bodily injury or death[.]" (Doc. 95-8 at 4.) After the fourth shot, Wayne Brunette "finally stopped . . . and staggered backwards a little bit before kind of folding up and then falling . . . on his back." (Doc. 95-9 at 24.)

Corporal Navari testified that Wayne Brunette "heard [Corporal Thibault] start yelling at him[,]" turned, and began advancing towards Corporal Thibault. (Doc. 99-11 at 9.) With his weapon "still focused on [Wayne Brunette][,]" Corporal Navari watched Corporal Thibault backing up "as fast as he could[,]" "look[ing] scared[,]" and ordering Wayne Brunette repeatedly to "[d]rop it, drop it, drop it." (Doc. 116-11 at 12.) Corporal Navari then heard a "[p]op, pop," Wayne Brunette "paused for a second, and then he started to take another couple steps, and then [Corporal Thibault] [was] backing up still, pop, pop, and it was like a pause, and then [Wayne Brunette] fell to the ground . . . face down, like on his hands[.]" *Id.*

In contrast, Ray Little testified that Wayne Brunette was facing Corporal Navari when Corporal Thibault shot him and that after Corporal Thibault shot him, he turned towards Corporal Thibault, taking "about a half step" or moving "probably a foot" towards him. (Doc. 99-8 at 12-13.) Mr. Little recalled Corporal Thibault firing again, but he "didn't remember [Wayne Brunette] stopping with the second [bullet], either." *Id.* at 13. Mr. Little further stated that he "never saw [Corporal Thibault] back up[,]" but that the officer "advance[ed] in between shots." *Id.* at 17. He could not remember when Wayne Brunette fell to the ground.

Although Mary Little admitted that she did not see the first shot, she described Wayne Brunette stopping, and "look[ing] up" at Corporal Thibault before he shot him three more times. (Doc. 99-10 at 11.) She remembered Corporal Thibault "walking towards [Wayne Brunette] and [Corporal] Navari" before stopping and firing. *Id.* at 13.

After the first shot, Wayne Brunette "was still in the movement . . . when [Corporal] Thibault ended up shooting the last three shots." (Doc. 95-16 at 6-7.) Mrs. Little believed that Corporal Thibault "shot [three] or [four] times because [Wayne Brunette] just kept coming." (Doc. 95-12 at 6.)

There is a factual dispute as to the distance between Wayne Brunette and Corporal Thibault when the shooting occurred. Eyewitness testimony does not vary significantly, as both Corporal Navari and Ray Little estimated that fifteen feet separated the two, at most. Plaintiffs dispute these estimates by relying on investigators' measurement of the distances from the ejected bullet shell casings to the handle of the shovel. The recorded distances were eighteen feet, seven inches; twenty-two feet, six inches; and twenty-eight feet, two inches, respectively.

Plaintiffs' expert, Mr. Katsaris, opined that shell casings eject backwards, behind the position of the shooter, and that the ejected bullet casings from Corporal Thibault's weapon could travel forty to forty-eight inches behind his shooting position and six to eight inches to the right, at most. As a result, the distance from the shovel to where Corporal Thibault was standing when he fired the shots was closer than the investigators' measurements. Based on Mr. Katsaris's opinion, Plaintiffs estimate that Corporal Thibault could have been up to twenty-four feet away from Wayne Brunette when he fired at least one of his shots.

Defendants' expert, Jack Ryan, testified that it is not possible to determine the exact locations of Wayne Brunette and Corporal Thibault based on the locations of the shell casings because shell casing ejectment characteristics vary. Additionally, while Detective Annis noted that photographs from the scene depicted Wayne Brunette's body "as being closer to the shell casings than where the spade was lying[,]" he acknowledged that he could not determine how far a shell casing will travel after a weapon is fired. (Doc. 95-23 at 4.) Detective Annis further conceded that he and his investigators do not "think [they] know the exact position of everybody[]" when the shooting took place. (Doc. 99-18 at 3.) He could not identify on a map at which point Corporal Navari was

31

closest to Wayne Brunette and where Corporal Thibault was located when he fired at him.

## E. The "Twenty-One Foot Principle."

The parties dispute the relevance of the so-called "twenty-one foot principle" for the use of force. According to BPD Deputy Chief Jannine Wright, BPD officers are instructed that "an officer within [twenty-one] feet of a subject with a bladed weapon can be killed or seriously injured by that subject before he or she has time to perceive and defend against the threat." (Doc. 95-26 at 4, ¶ 7.) Deputy Chief Wright further explained:

> Biometric studies have shown that many officers do not even have the reaction time to reliably respond when the subject is even more than 21 feet away, so the zone of danger is commonly taught as being larger than 21 feet. The teaching typically assumes the reaction of an officer with a holstered weapon facing an individual with a short-handled knife. . . . The import of the doctrine and teaching to the doctrine is to impress upon the officers how reaction time and the speed with which a subject can really cover considerable ground can [a]ffect officer safety. [BPD] use of force instructors teach and have taught the principles of the 21 foot doctrine to [BPD] officers.

*Id.* at 4-5, ¶¶ 7-8. She believed that the "twenty-one foot principle" is taught in police trainings nationally.

Mr. Katsaris agreed that the "twenty-one foot principle" is accepted throughout the country to train officers on the speed of an average assailant. He estimated that the average assailant can cover twenty-one feet in "[t]wo seconds, give or take." (Doc. 95-13 at 5.) While Mr. Katsaris did not opine whether Wayne Brunette could have struck either officer before they could react based on the "twenty-one foot principle," he did testify that:

> [I]f there is a shovel being held and it is down low and it is kind of poking, that officer has made a decision -- because he has the capability of shooting himself. That has to be a decision made by the officer who is being threatened, because the other officer does not know what is going on between the two. There is a dynamic. The dynamic has to be assessed and you just can't shoot somebody because you have made an assessment when your partner or other officer is quite capable of making that decision.

32

(Doc. 99-31 at 3.)

In contrast, Defendants' expert, Mr. Ryan, disputed the relevance of the "twenty-one foot principle" stating that "there's no real science behind the 21-foot rule[]" and that the principle is "nonsense[,]" established only to demonstrate to officers that there is "a reactionary gap between the time the officer observes the threat until the time the officer can pull the trigger." (Doc. 99-21 at 3-4.)

### F.    Compliance with DD13.3.

Former Chief Schirling agreed that, on a mental health call, officers should be exercising the principles stated in DD13.3. He opined that, in this case, the officers followed "standard procedure" by having one officer "talk[] with the complainant and victim," while the other "gets the other side of the story from the other party." (Doc. 116-2 at 12.) With regard to time, he stated that the officers did not "have an opportunity to[]" prolong the encounter. *Id.* at 13.

In contrast to former Chief Schirling's opinions, Plaintiffs' expert, Mr. Katsaris, opines that Corporal Thibault's and Corporal Navari's "failures . . . are obvious just from an assessment of [BPD's] own procedures when encountering a person of diminished capacity, Directive DD13.3[]" because the officers did not follow the containment, coordination, communication, time, and intervention protocol. (Doc. 99-32 at 8.) For example, he notes that Corporal Navari did not contain the potential threat by respecting Wayne Brunette's "comfort zone[,]" but instead "compressed" the comfort zone by asking him to come down from the landing. *Id.* at 10 (internal quotation marks omitted). In turn, he opines that Corporal Navari violated the time factor because he abbreviated, rather than prolonged, the encounter. Mr. Katsaris concludes that the coordination factor was not followed because the officers did not establish a "command post[,] . . . which in [his] opinion would, at a minimum, have been at the street using the patrol vehicles as a place for a reactionary distance and cover for safety." *Id.* at 11. Finally, he found that the intervention procedures outlined in DD13.3 were "clearly violated" by both officers as they "did not control the situation and ensure that [Wayne Brunette] receive[d] the

33

most appropriate form of professional resources." *Id.* at 12 (internal quotation marks omitted).

Although summary judgment is generally inappropriate when there are disputed issues of fact, in this case, not all disputed facts are material to each issue raised in Defendants' motion for summary judgment. The court therefore may properly adjudicate issues where disputed facts do not alter the outcome. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").

## IV. Conclusions of Law.

### A. Whether Transcripts of VSP and BPD Interviews with Witnesses should be Struck from the Record.

Plaintiffs move to strike the transcripts of law enforcement interviews with Lawrence Brunette, Ruthine Brunette, Mary Little, Ray Little, the Littles' children, J1 and J2, Marcus Medlar, and Kelly Medlar because they lack an indicia of reliability.[13] Defendants contend that the audio recordings of the interviews and the transcripts of these recordings are "other materials" properly before the court.

A party asserting a fact on summary judgment can support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials[.]" Fed. R. Civ. P. 56(c)(1)(A). While the content of the evidence submitted to support or dispute a fact on summary judgment must be admissible, "the material may be presented in a form that would not, in itself, be admissible at trial." *Lee v. Offshore*

---

[13] Although Plaintiffs move to strike the transcripts of the interviews, they have not moved to strike the audio recordings of the interviews which Defendants also included as exhibits. Accordingly, even if the court granted Plaintiffs' motion to strike, the recorded statements would remain as part of the record.

*Logistical & Transp., L.L.C.*, 859 F.3d 353, 355 (5th Cir. 2017), *as revised* (July 5, 2017) (internal quotation marks omitted).[14]

To avoid the use of materials that lack authenticity or violate other evidentiary rules, Rule 56(c) allows the opposing party to "object that the material cited to support or dispute a fact . . . cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). "The objection functions much as an objection at trial, adjusted for the pretrial setting. The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated." *Id.*, advisory committee's note to 2010 amendment.

Although Plaintiffs characterize the interview transcripts as unreliable because they are unsworn, during the interviews, all of the witnesses except Lawrence Brunette, Ruthine Brunette, and Kelly Medlar attested to the veracity of their statements under the penalties of perjury. Mr. and Mrs. Brunette, however, provided affidavits stating that their interview responses were "true to the best of [their] ability at the time [they] made those statements[,]" (Doc. 95-29 at 4, 6), and under oath during their depositions, they adopted their interview responses as true. Similarly, Kelly Medlar provided an affidavit stating that her interview responses were truthful. For each law enforcement interview, Defendants filed affidavits from the BPD officers who conducted the interview which state that the recording accurately represents the interview and that the transcript accurately represents the recording. As each of these witnesses provided statements

---

[14] *See also Fraternal Order of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 238 (3d Cir. 2016) (holding that a "proponent need only 'explain the admissible form that is anticipated'") (quoting Fed. R. Civ. P. 56, advisory committee's note to 2010 amendment); *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 538 (4th Cir. 2015) (noting that a "court may consider . . . the content or substance of otherwise inadmissible materials where the party submitting the evidence show[s] that it will be possible to put the information . . . into an admissible form.") (alteration in original) (internal quotation marks omitted); *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293-94 (11th Cir. 2012) (determining that a district court may consider a statement "if the statement could be reduced to admissible evidence at trial or reduced to admissible form.") (internal quotation marks omitted); *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) ("At the summary judgment stage, [courts] do not focus on the admissibility of the evidence's form[,]" but "instead focus on the admissibility of its contents.").

35

based on their personal knowledge, the contents of their statements would generally be admissible at trial. *See* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."). The court therefore DENIES Plaintiffs' motion to strike the interview transcripts.

Plaintiffs also move to strike paragraphs eighteen and twenty of former Chief Schirling's affidavit on the grounds that they contain a description of events which he did not witness. Defendants do not oppose this request. The court therefore GRANTS Plaintiffs' motion to strike consideration of paragraphs eighteen and twenty of former Chief Schirling's affidavit.

## B. Standard of Review.

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' . . . if it 'might affect the outcome of the suit under the governing law.'" *Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31, 39 (2d Cir. 2015) (quoting *Anderson*, 477 U.S. at 248). "A dispute of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* at 39-40 (quoting *Anderson*, 477 U.S. at 248).

The court "constru[es] the evidence in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in his favor." *McElwee v. Cty. of Orange*, 700 F.3d 635, 640 (2d Cir. 2012). The moving party always "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).

"Once the moving party demonstrates that there are no genuine issues of material fact, the nonmoving party must come forth with evidence sufficient to allow a reasonable jury to find in [its] favor." *Spinelli v. City of New York*, 579 F.3d 160, 166 (2d Cir. 2009)

36

(internal quotation marks omitted). "Thus, a nonmoving party can defeat a summary judgment motion only by coming forward with evidence that would be sufficient, if all reasonable inferences were drawn in [its] favor, to establish the existence of [an] element at trial." *Id.* at 166-67 (internal quotation marks omitted). There is no genuine dispute where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## C. Whether Count II Gives Rise to a Section 1983 Excessive Force Claim Independent of Count I.

In Count I, Plaintiffs allege that Corporal Thibault violated the Fourth Amendment of the United States Constitution through the unreasonable use of force that was not justified by the threat Wayne Brunette posed to the officers. More specifically, in Count II, Plaintiffs allege that the second round of two shots fired by Corporal Thibault constitutes a separate claim for excessive force. Defendants seek dismissal of Count II, arguing that it does not give rise to an independent excessive force claim.

The amount of force used by an officer must be "reasonably related to the nature of the resistance and the force used, threatened or reasonably perceived to be threatened, against the officer." *Sullivan v. Gagnier*, 225 F.3d 161, 166 (2d Cir. 2000). "[F]orce justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated[.]" *Waterman v. Batton*, 393 F.3d 471, 481 (4th Cir. 2005).[15]

On the other hand, if the officer is "justified in firing at a suspect in order to end a severe threat to public safety," he or she "need not stop shooting until the threat has

---

[15] *See also Alicea v. Thomas*, 815 F.3d 283, 288 (7th Cir. 2016) (stating that use of force "is only reasonable when it is proportional to the threat posed. If an officer's threat perception changes, so too should her force calculus."); *Lamont v. New Jersey*, 637 F.3d 177, 184 (3d Cir. 2011) ("Even where an officer is initially justified in using force, he may not continue to use such force after it has become evident that the threat justifying the force has vanished."); *Lytle v. Bexar Cty., Tex.*, 560 F.3d 404, 413 (5th Cir. 2009) ("[A]n exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased").

ended." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2022 (2014); *see also City & Cty. of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765, 1775 (2015) ("Nothing in the Fourth Amendment barred [the officers] from protecting themselves, even though it meant firing multiple rounds."). The court must make "allowance[s] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 397 (1989).

In this case, Plaintiffs contend that the threat posed by Wayne Brunette diminished after the first two shots. The evidence, however, is to the contrary. For example, Ruthine Brunette did not perceive any interruption in the sequence of the shots fired. Other eyewitnesses recall Wayne Brunette continuing to move after Corporal Thibault fired the first shot. Mr. Little did not "remember [Wayne Brunette] stopping with the second [shot][,]" (Doc. 99-8 at 13), and Mrs. Little recalled Corporal Thibault shooting three or four times "because [Wayne Brunette] just kept coming[]" towards him. (Doc. 95-12 at 6.) The evidence therefore corroborates Corporal Thibault's contention that he "made a split-second decision" to fire "two more consecutive shots in quick succession." (Doc. 95-8 at 4, ¶ 22.)

While Plaintiffs point to the location of Wayne Brunette's injuries to argue that he posed no further threat to the officers after the first two shots, Dr. Bundock testified that she could not determine the order in which Wayne Brunette's injuries occurred. Plaintiffs therefore cannot establish a disputed issue of fact as to whether the alleged threat posed by Wayne Brunette had diminished after Corporal Thibault fired the first two shots.

Because Corporal Thibault "made a split-second judgment in responding to an imminent threat and fired a fusillade in an emergency situation[,]" the third and fourth shots "cannot be found unreasonable" for failure to "perfectly calibrate the amount of force required to protect [himself][]" and Corporal Navari. *Berube v. Conley*, 506 F.3d

79, 85 (1st Cir. 2007). Count II thus does not give rise to an independent Fourth Amendment violation and is, on that basis, DISMISSED.[16]

**D.     Whether Corporal Thibault is Entitled to Qualified Immunity for Plaintiffs' Section 1983 Excessive Force Claim (Count I).**

Defendants argue that Corporal Thibault is entitled to qualified immunity shielding him from Plaintiffs' allegations of excessive force under the Fourth Amendment because his use of force was objectively reasonable and did not violate a clearly established right. "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 664 (2012).

**1.     Whether Corporal Thibault's Use of Force Violated the Fourth Amendment.**

In order to determine whether Corporal Thibault's use of force violated the Fourth Amendment, the court considers whether the use of force was objectively reasonable, balancing the "nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (internal quotation marks omitted). This balancing "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396-97; *see also Salim v. Proulx*, 93 F.3d 86, 92 (2d Cir. 1996) ("The reasonableness inquiry depends only upon the officer's knowledge of circumstances immediately prior to and at the moment that he made the split-second decision to employ deadly force."). "Where the officer has probable cause to believe that the suspect poses a

---

[16] The successive shots remain part of the Fourth Amendment analysis for Count I.

threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). Because courts "have discretion to decide the order in which to engage these two prongs[,]" *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014), a court may proceed directly to the question of whether Corporal Thibault's actions violated clearly established law.

The court declines to proceed first with a Fourth Amendment analysis for two reasons. First, there are disputed issues of material fact regarding what transpired during the incident. And second, in the light most favorable to Plaintiffs, a rational jury could find that it was constitutionally unreasonable for Corporal Thibault to shoot a mentally-ill person within four minutes of receiving a mental health call. Conversely, a rational jury could also conclude that Corporal Thibault was entitled to use deadly force when he and Corporal Navari were faced with a threatening use of a pointed shovel which Plaintiffs concede could be used as a deadly weapon. *See Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (finding no "obvious" Fourth Amendment violation when an officer shot a plaintiff "who had just been seen hacking a tree with a large kitchen knife[,]" was acting "erratic[ally][,]" had "moved to within a few feet" of another individual, and did not comply with the officers' commands to drop the knife); *see also Blanford v. Sacramento Cty.*, 406 F.3d 1110, 1119 (9th Cir. 2005) (holding that police officers were entitled to qualified immunity for shooting a suspect who refused to let go of a sword despite being "told to stop and drop it" and "appeared to flaunt [their] commands by raising the sword and grunting").

### 2. Whether it was Clearly Established that Corporal Thibault's Use of Force was Unconstitutional.

Although the Fourth Amendment prong cannot be adjudicated, the second prong of the qualified immunity can. *See Lynch v. Ackley*, 811 F.3d 569, 576-77 (2d Cir. 2016) (noting that adjudication of the qualified immunity issue "does not need to await jury resolution of disputed factual issues" if even based on plaintiff's version of the disputed facts, there is no clearly established law prohibiting defendant's conduct). A clearly

established right is sufficiently clear when "every reasonable official would have understood that what he is doing violates that right." *Reichle*, 566 U.S. at 664 (internal quotation marks and alteration omitted). The Supreme Court has held that "'clearly established law' should not be defined 'at a high level of generality[,]'" but instead "must be 'particularized' to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam).

Supreme Court and Second Circuit authority "does not require a case directly on point for a right to be clearly established, [however] existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (internal quotation marks omitted) (citing *White*, 137 S. Ct. at 551); *see also Brown v. City of New York*, 862 F.3d 182, 190 (2d Cir. 2017) (stating that "[c]ontrolling authority serves to put officials on notice of what is unlawful"). Because the focus is on whether the officer had fair notice that his or her conduct was unlawful, "[o]nly Supreme Court and Second Circuit precedent existing at the time of the alleged violation is relevant in deciding whether a right is clearly established." *Moore v. Vega*, 371 F.3d 110, 114 (2d Cir. 2004). "When neither the Supreme Court nor [the Second Circuit] has recognized a right, the law of [other] circuits and the holdings of district courts cannot act to render that right clearly established within the Second Circuit." *Pabon v. Wright*, 459 F.3d 241, 255 (2d Cir. 2006).

"[S]pecificity is especially important in the Fourth Amendment context, where the [Supreme] Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (internal quotation marks omitted); *see also Sheehan*, 135 S. Ct. at 1776 ("Qualified immunity is no immunity at all if 'clearly established' law can simply be defined as the right to be free from unreasonable searches and seizures."). Use of excessive force is therefore an area of the law "'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Kisela*, 138 S. Ct. at 1153 (quoting

*Mullenix*, 136 S. Ct. at 309). A defendant police officer "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff*, 134 S. Ct. at 2023.

Arguably, the Supreme Court's most recent decisions have required an even closer match between the facts at issue and controlling precedent for the "clearly established" prong to apply. In *White v. Pauley*, the defendant officer "arrived late at an ongoing police action" and "witnessed shots being fired by one of several individuals in a house surrounded by other officers" before shooting and killing "an armed occupant of the house without first giving a warning." *White*, 137 S. Ct. at 549. The Court held that the defendant officer did not violate clearly established law, noting that the Tenth Circuit "failed to identify a case where an officer acting under similar circumstances as [the defendant officer] was held to have violated the Fourth Amendment." *Id.* at 552.

In *Kisela v. Hughes*, the defendant officer shot an individual who had been acting erratically, "was armed with a large knife[,]" was within "striking distance" of another individual, and had "ignored the officers' orders to drop the weapon[]" during a confrontation that "unfolded in less than a minute." *Kisela*, 138 S. Ct. at 1154. As an initial matter, the Court concluded that "[t]his [was] far from an obvious case in which any competent officer would have known" that the use of deadly force violated the Fourth Amendment. *Id.* at 1153. Because "not one of the decisions relied on by the [Ninth Circuit]" squarely governed the specific facts at issue, the Court held that the officer did not violate clearly established law. *Id.* at 1154.

In this case, the dispatch call directed Corporal Thibault and Corporal Navari to respond to a mental health issue based on a report that the caller's adult son had been threatening, out-of-control, and destroying property at 85 Randy Lane. Regardless of whether this report accurately reflected the threat posed, when Wayne Brunette emerged from a garage holding a four-foot, ten-inch long garden spade with a pointed metal head, he was armed with an object that was capable of inflicting serious bodily injury or death. Despite numerous requests, Mr. Brunette refused to put down the shovel and instead, at

some point, advanced towards Corporal Navari in an aggressive manner while swinging, jousting, and pointing the shovel in his direction. As Wayne Brunette moved toward Corporal Navari, Corporal Thibault drew his firearm while instructing Mr. Brunette multiple times to drop the shovel.

With regard to the shooting, there are two facts which must be construed in Plaintiffs' favor. In the light most favorable to Plaintiffs, ten feet separated Wayne Brunette from Corporal Navari with the tip of the shovel between four and six feet away. Wayne Brunette then turned away from Corporal Navari and took only a half-step towards Corporal Thibault before Corporal Thibault fired his weapon from a distance of up to twenty-four feet. The only controlling authority close to this fact pattern is *Thomas v. Roach*, 165 F.3d 137 (2d Cir. 1999) and *Cowan ex rel. Estate of Cooper v. Breen*, 352 F.3d 756 (2d Cir. 2003), neither of which "squarely governs" the facts at issue here. *Kisela*, 138 S. Ct. at 1153 (internal quotation marks omitted).

In *Thomas*, a team of eight officers responded to a call from a woman who reported that a man had threatened to set her house on fire. The woman identified Thomas, who was standing on the street, as the person who had issued this threat. The officers subsequently pursued him into an apartment building. Upon entering the building, the officers heard glass break on a floor above them. A third-floor tenant told the officers that a "crazy man" had broken her window, run through her apartment, and exited through the front door while carrying a knife. *Thomas*, 165 F.3d at 141 (internal quotation marks omitted). The officers pursued Thomas down a stairwell illuminated only by their flashlights, with Officer Roach taking the lead position. After reaching the second-floor landing and while approaching the steps leading to the first floor, Officer Roach encountered Thomas in the stairwell. Other officers behind Officer Roach fired two rounds of shots that hit Thomas. Hearing the shots and seeing Thomas recoil from the force of the bullets, Officer Roach fired three additional shots at him.

Thomas, who survived the shooting, brought suit against the officers pursuant to 42 U.S.C. § 1983, claiming that the shooting constituted unreasonable force in violation of the Fourth Amendment. Seeking qualified immunity, the officers argued that Thomas

posed a danger to Officer Roach because he held a knife in one hand and a rock in the other and tried to stab Officer Roach. Officer Roach claimed that the second round of shots was necessary because Thomas lunged forward after the first volley of shots and he feared that Thomas would stab him. He also cited a fear of being shot by the other officers, requiring him to shoot Thomas in order to push him away. In contrast, Thomas contended that he did not threaten the officers. He maintained that he was never on the second floor landing with Officer Roach and never lunged at the officers. Rather, he claimed the officers shot him from the second floor landing, while he was standing at the intermediate landing between the second and first floors. Although he previously admitted to carrying a knife in related state court proceedings, Thomas asserted in an affidavit that he did not have a knife while in the stairwell.

Because there were genuine issues of material fact regarding whether Thomas was in fact armed with a knife and whether he lunged at or otherwise threatened the officers, the Second Circuit reversed the trial court's grant of summary judgment. The court held that the plaintiff "alleged the violation of a clearly-established constitutional right when he alleged that the police used excessive force when arresting him[]" because the "Fourth Amendment protects against the use of excessive force by police officers in carrying out an arrest." *Id.* at 143 (citing U.S. CONST. amend. IV and *Graham*, 490 U.S. at 394-95).

To the extent Plaintiffs rely on *Thomas v. Roach*, their reliance is misplaced because "general statements of the law are not inherently incapable of giving fair and clear warning to officers[] . . . [and] the general rules set forth in *Garner* and *Graham* do not by themselves create clearly established law outside an obvious case." *Kisela*, 138 S. Ct. at 1153 (internal quotation marks omitted). The *Thomas* court did not decide whether qualified immunity was available, it only held that a decision must await a determination of the facts. *Thomas* therefore does not "clearly establish[]" that Corporal Thibault's decision to use deadly force against Wayne Brunette was "in violation of the Fourth Amendment." *Brown*, 862 F.3d at 190 (internal quotation marks omitted).

*Cowan ex rel. Estate of Cooper v. Breen*, 352 F.3d 756 (2d Cir. 2003) does not mandate a different result. In *Cowan*, the Second Circuit held that the defendant officer

44

was not entitled to qualified immunity when an individual drove a vehicle "slowly" towards the officer who "was not in front of the vehicle but substantially off to its side when he fired the second, fatal shot; that [the officer] did not wave his hands at [the driver]; and that the vehicle made no sudden turns as it traveled along the roadway." *Id.* at 763. The officer did not fire "the second, fatal shot because he believed he was in danger[,]" but "because he was trained to always fire twice." *Id.* The plaintiff's expert opined that "proper police procedure when faced with an on-coming vehicle is to get out of the way rather than shoot[.]" *Id. Cowan* therefore does not "squarely govern[] the specific facts at issue." *Kisela*, 138 S. Ct. at 1153 (internal quotation marks omitted).

Construing the evidence in the light most favorable to Plaintiffs, the court finds that Corporal Thibault's use of deadly force "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White*, 137 S. Ct. at 551 (internal quotation marks omitted). There is no controlling precedent rendering it constitutionally unreasonable to shoot an individual physically threatening a fellow officer with a deadly weapon where the threat of serious bodily injury or death is both imminent and substantial. Qualified immunity therefore shields Corporal Thibault from liability on Plaintiffs' excessive force claim. This remains true even if a rational jury could find Corporal Thibault mishandled the tragic event and thereby caused Wayne Brunette's untimely death. Because the second prong of the qualified immunity analysis governs the outcome of Plaintiffs' excessive force claim against Corporal Thibault, the court must DISMISS Count I of the First Amended Complaint.

### E. Whether the City is Entitled to Judgment as a Matter of Law on Plaintiffs' *Monell* Claim under Section 1983 (Count III).

In Count III, Plaintiffs assert that the City failed to adequately train its officers to interact with mentally ill individuals and in the use of deadly force. Under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), a municipality can be held liable under Section 1983 for the unconstitutional actions of its employees if the deprivation of the plaintiff's rights is caused by a "governmental custom, policy, or usage of the municipality." *Jones v. Town of E. Haven*, 691 F.3d 72, 80 (2d Cir. 2012). "Absent such a custom, policy, or

45

usage, a municipality cannot be held liable on a *respondeat superior* basis for the tort of its employee." *Id.* The plaintiff therefore must "prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007) (internal quotation marks omitted).

Plaintiffs base their *Monell* claim on a failure to train which "may constitute an official policy or custom if the failure amounts to 'deliberate indifference' to the rights of those with whom the city employees interact." *Id.* To establish that a municipality acted with deliberate indifference in training its officers, a plaintiff must demonstrate: (1) "that a policymaker knows 'to a moral certainty' that her employees will confront a given situation[,]" because "a policymaker does not exhibit deliberate indifference by failing to train employees for rare or unforeseen events[]"; (2) "that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation[]"; and (3) "that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Walker v. City of New York*, 974 F.2d 293, 297-98 (2d Cir. 1992). "In addition, at the summary judgment stage, plaintiff must identify a specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation." *Jenkins v. City of New York*, 478 F.3d 76, 94 (2d Cir. 2007) (internal quotation marks omitted).

The Supreme Court has recognized that:

A pattern of similar constitutional violations by untrained employees is "ordinarily necessary" to demonstrate deliberate indifference for purposes of failure to train. . . . Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.

*Connick v. Thompson*, 563 U.S. 51, 62 (2011) (quoting *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 409 (1997)). "[W]hen city policymakers are on actual or constructive notice that a particular omission in their training program causes city

employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." *Id.* at 61; *see also Cash v. Cty. of Erie*, 654 F.3d 324, 334 (2d Cir. 2011) (stating that the plaintiff must demonstrate that the "policymaker's inaction was the result of 'conscious choice' and not 'mere negligence.'").

In a "narrow range of circumstances," however, "a pattern of similar violations might not be necessary to show deliberate indifference." *Connick*, 563 U.S. at 63 (internal quotation marks omitted). A municipality can be found to be deliberately indifferent based on a single constitutional violation only when "the unconstitutional consequences of failing to train [are] so patently obvious that a city could be liable under [Section] 1983 without proof of a pre-existing pattern of violations." *Id.* at 64; *see also City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 n.10 (1989) (stating that "the need to train officers in the constitutional limitations on the use of deadly force[] . . . can be said to be so obvious, that failure to do so could properly be characterized as deliberate indifference to constitutional rights.") (internal quotation marks and citation omitted).

Plaintiffs' own expert witness, Ken Katsaris, reviewed BPD's training with regard to interacting with individuals with mental health issues and opined that BPD had not "been deliberately indifferent to training [the] officers in mental health issues[.]" (Doc. 95-13 at 10.) Moreover, "there is no evidence of prior lawsuits or complaints" with regard to BPD's interactions with the mentally ill that would have put the City on notice of a deficiency in its training of officers. *Burwell v. Peyton*, 131 F. Supp. 3d 268, 303 (D. Vt. 2015), *on reconsideration in part*, 2015 WL 6874250 (D. Vt. Nov. 9, 2015), and *aff'd sub nom. Burwell v. Moody*, 670 F. App'x 734 (2d Cir. 2016).

Although Plaintiffs challenge whether BPD's mental health training was adequate "to accomplish its purpose of keeping mentally ill citizens safe during police encounters[]" (Doc. 99-3 at 34), based on how the officers responded to the scene, evidence arising solely from the incident in question cannot provide the basis for a claim of failure to train. *See Fiacco v. City of Rensselaer, N.Y.*, 783 F.2d 319, 328 (2d Cir. 1986) (noting that "the existence of a policy of nonsupervision amounting to deliberate

indifference to constitutional rights cannot be established by inference solely from evidence of the occurrence of the incident in question").[17]

Plaintiffs' *Monell* claim predicated on a failure to train officers in the use of force fares no better. At the time of the 2013 incident, no BPD officer had fired a firearm in the line of duty since 1997. BPD has a policy restricting the use of deadly force to those circumstances in which an officer reasonably believes that the use of force is necessary to protect the officer or others from an imminent threat of death or serious bodily injury. Both Corporal Thibault and Corporal Navari had received training on the use of force prior to the incident. Plaintiffs do not identify a "specific deficiency in the city's training program" or establish that the "deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation." *Jenkins*, 478 F.3d at 94 (internal quotation marks omitted).

Because "isolated acts of excessive force by non-policymaking municipal employees are generally not sufficient to demonstrate a municipal custom, policy, or usage that would justify municipal liability[,]" *Jones*, 691 F.3d at 81, the City is entitled to summary judgment on Plaintiffs' municipal liability claim. The court therefore DISMISSES Count III of the First Amended Complaint against the City.

F. **Whether Plaintiffs' Section 1983 Claim Against Former Chief Schirling for Supervisory Liability (Count III) Fails as a Matter of Law.**

In Count III, Plaintiffs assert a Section 1983 claim against former Chief Schirling based on his "supervisory responsibility" for the training, supervision, and control of Corporal Thibault. (Doc. 99-3 at 36.) Defendants argue that this claim must be dismissed because former Chief Schirling lacked the requisite personal involvement as he

_____

[17] *See also Mortimer v. City of New York*, 2018 WL 1605982, at *29 (S.D.N.Y. Mar. 29, 2018) ("Plaintiffs' failure to train allegations are circular—saying, in effect, that because Defendants violated Plaintiffs' constitutional rights, the City failed to train its employees properly."); *Burwell v. Peyton*, 131 F. Supp. 3d 268, 304 (D. Vt. 2015), *on reconsideration in part*, 2015 WL 6874250 (D. Vt. Nov. 9, 2015), and *aff'd sub nom. Burwell v. Moody*, 670 F. App'x 734 (2d Cir. 2016) ("[A] plaintiff cannot establish municipal liability solely by inference from evidence of the occurrence of the incident in question.") (internal quotation marks omitted).

was not present during the incident and had no knowledge of it until after it occurred. Defendants further note that Corporal Thibault and Corporal Navari had completed BPD's required training and that former Chief Schirling had "extensive involvement in improving BPD's interactions with individuals experiencing mental health issues[.]" (Doc. 95 at 34.)

"To establish the liability of a supervisory official under [Section] 1983, a plaintiff must show the defendant's personal involvement in the alleged constitutional violations." *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 667 (2009) ("In a § 1983 suit . . . the term 'supervisory liability' is a misnomer. Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct."). Prior to the Supreme Court's decision in *Ashcroft v. Iqbal*, the Second Circuit required a plaintiff to establish one or more of the following categories for supervisory liability under Section 1983:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [persons] by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995). A plaintiff must also demonstrate "an affirmative causal link between the supervisor's inaction and [his or] her injury." *Poe v. Leonard*, 282 F.3d 123, 140 (2d Cir. 2002).

"The Second Circuit has recognized that, in light of *Iqbal*, not all of the *Colon* factors may have survived, but it has yet to definitively identify which factors remain applicable." *Kucera v. Tkac*, 2013 WL 1414441, at \*4 (D. Vt. Apr. 8, 2013) (citing *Reynolds v. Barrett*, 685 F.3d 193, 205 n.14 (2d Cir. 2012)).[18] The "majority view" of

---

[18] *See also Shaw v. Prindle*, 661 F. App'x 16, 18 n.2 (2d Cir. 2016) (noting that *Iqbal* "may have heightened the requirements for showing a supervisor's personal involvement with respect to

49

district courts in the Second Circuit is that "the five *Colon* categories supporting personal liability of supervisors still apply as long as they are consistent with the requirements applicable to the particular constitutional provision alleged to have been violated." *Id.* at *5 (collecting cases) (internal quotation marks omitted).

In this case, Plaintiffs assert that there is sufficient evidence to satisfy the fourth and fifth *Colon* factors.[19] The fourth *Colon* factor requires a showing of gross negligence, which "denotes a higher degree of culpability than mere negligence." *Raspardo v. Carlone*, 770 F.3d 97, 116 (2d Cir. 2014). Gross negligence is the "kind of conduct where the defendant has reason to know of facts creating a high degree of risk of harm to another and deliberately acts or fails to act in conscious disregard or indifference to that risk." *Id.* (alteration and internal quotation marks omitted); *see also Poe*, 282 F.3d at 140 n.14 (equating "gross negligence with recklessness"). The gross negligence standard is satisfied "where the plaintiff establishes that the defendant-supervisor was aware of a subordinate's prior substantial misconduct but failed to take appropriate action to prevent future similar misconduct before the plaintiff was eventually injured." *Raspardo*, 770 F.3d at 117.

Although gross negligence and the fifth *Colon* factor, deliberate indifference, are often "used interchangeably, they represent different degrees of intentional conduct on a continuum." *Poe*, 282 F.3d at 140 n.14. While the former refers to "a heightened degree of negligence, the latter is a lesser form of intent[.]" *Id.* (internal quotation marks omitted). Under the fifth *Colon* factor, Plaintiffs must establish that former Chief Schirling was "deliberate[ly] indifferen[t] to the rights of others by his failure to act on information indicating that unconstitutional acts were occurring[.]" *Id.* at 140. They must demonstrate that he either "knew or should have known that there was a high degree of risk that [subordinates] would behave inappropriately . . . but either deliberately or recklessly disregarded that risk by failing to take action that a reasonable supervisor

---

certain constitutional violations[]" but declining to "reach *Iqbal*'s impact on *Colon* in this case"); *Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013) (same).

[19] It is undisputed that former Chief Schirling has no liability under the remaining *Colon* factors.

would find necessary to prevent such a risk[.]" *Id.* at 142. "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick*, 563 U.S. at 61 (alteration and internal quotation marks omitted).

Although neither party has briefed the issue, "[a] supervisor is protected by qualified immunity so long as reasonable officials could disagree about whether the supervisor's action was grossly negligent [or deliberately indifferent] in light of clearly established law." *Raspardo*, 770 F.3d at 116-17. In the Second Circuit, "[c]ase law clearly establishes that a supervisor may be liable for failing to screen or otherwise inquire about his subordinates or into their actions[]" regarding the use of force. *Poe*, 282 F.3d at 141 (footnote omitted); *see also Fiacco v. City of Rensselaer*, 783 F.2d 319, 331 (2d Cir. 1986), *cert. denied*, 480 U.S. 922 (1987) (finding sufficient evidence to support a jury's conclusion that a police chief was deliberately indifferent "to whether or not excessive force was used[]" based on the failure "to conduct a nonsuperficial investigation into civilian claims of excessive force").

Plaintiffs contend that former Chief Schirling was grossly negligent or deliberately indifferent because he was "well aware of [Corporal] Thibault's history of escalating force during civilian encounters and citizen complaints prior to [the incident in question]." (Doc. 99-3 at 37.) Before the incident, Corporal Thibault accumulated fifty-nine use of force reports, including multiple uses of physical restraints and pepper spray and one incident where the recipient of his use of force was hospitalized. By comparison, Corporal Navari had fourteen use of force reports during the same time period.[20]

Defendants do not dispute that former Chief Schirling had actual or constructive notice of Corporal Thibault's use of force reports. *See Poe*, 282 F.3d at 141 (holding that a supervisor must "have been on [actual or constructive] notice that his subordinate was

---

[20] While Plaintiffs also cite events involving Corporal Thibault that occurred after the incident on November 6, 2013 as relevant to "the credibility of [Chief] Schirling's assessment prior to November 2013 that [Corporal] Thibault was fit for active duty as a police officer[,]" they nonetheless concede that these events "could not have put Defendants on notice of his problems prior to [the incident in question][.]" (Doc. 99-3 at 38.)

prone to commit unconstitutional or unacceptable behavior."). Rather, they argue that the use of force reports do not indicate whether Corporal Thibault was effectively supervised because the quantity of reports vary based on the officer's patrol assignment and because Corporal Thibault's past uses of force did not involve the discharge of a firearm. They point out that former Chief Schirling has a demonstrated record of *not* being indifferent to mental health issues, and, to the contrary, was dedicated to mental health outreach. While this appears to be true, it asks the wrong question because the issue is not whether former Chief Schirling was generally well-trained and attentive to mental health issues, but whether he adequately supervised Corporal Thibault in allowing him to respond to non-emergency mental health calls when Corporal Thibault arguably had a history of using force against incapacitated individuals and escalating civilian encounters.

In determining whether to grant summary judgment, the court must "draw[] all reasonable inferences in [Plaintiffs'] favor[,]" *McElwee*, 700 F.3d at 640, and "may not make credibility determinations or weigh the evidence." *Proctor v. LeClaire*, 846 F.3d 597, 608 (2d Cir. 2017) (internal quotation marks omitted). It must be able to determine, as a matter of law, that no rational jury could find former Chief Schirling grossly negligent or deliberately indifferent in supervising Corporal Thibault by allowing him to remain on active patrol duty despite the accumulation of fifty-nine use of force reports and a civil rights claim based on excessive force.

The record before the court includes only nine of the fifty-nine use of force reports. These reports include only a checked box indicating that the incident was reviewed by a supervisor and complied with BPD's use of force policy. Former Chief Schirling is not one of the supervisors who checked the box. Defendants have produced no evidence with regard to whether former Chief Schirling further investigated these incidents or how he supervised Corporal Thibault, if at all, after they occurred. *See Fiacco*, 783 F.2d at 331 ("The jury was free to reason that the very failure of the City defendants[, including the police chief,] to conduct a nonsuperficial investigation into [at least seven] civilian claims of excessive force indicated that" the police chief was "indifferent to whether or not excessive force was used.").

52

There is also no evidence before the court regarding the precise nature of the civil rights claim against Corporal Thibault, nor whether former Chief Schirling supervised him differently because of it. For purposes of summary judgment, former Chief Schirling's "extensive involvement in improving BPD's interactions with individuals experiencing mental health issues[,]" (Doc. 95 at 34), is modifying evidence that cannot be weighed to diminish the probative force of the evidence Plaintiffs have proffered. *See Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 622 (2d Cir. 1999) ("Any weighing of the evidence is the prerogative of the finder of fact, not an exercise for the court on summary judgment."); *see also Proctor*, 846 F.3d at 608 (noting that "the drawing of legitimate inferences from the facts are jury functions, not those of a judge.") (internal quotation marks omitted).

Because Defendants have not argued that former Chief Schirling is entitled to qualified immunity on Plaintiffs' supervisory liability claim, *see Coollick v. Hughes*, 699 F.3d 211, 219 (2d Cir. 2012) ("Qualified immunity is an affirmative defense that the defendants have the burden of raising . . . on a motion for summary judgment.") (internal quotation marks omitted),[21] the court cannot determine, based on the record before it, whether "reasonable officials could disagree" as to whether former Chief Schirling's supervision of Corporal Thibault was deliberately indifferent or grossly negligent "in light of clearly established law." *Raspardo*, 770 F.3d at 116-17.

The evidence is insufficient to determine whether Count III should be dismissed as a matter of law with regard to former Chief Schirling. The court therefore DENIES WITHOUT PREJUDICE Defendants' motion for summary judgment.

---

[21] *See Spencer v. City of New York*, 2011 WL 13130638, at *9 (S.D.N.Y. Mar. 15, 2011) ("The Individual Defendants do not argue that their actions were objectively reasonable, and the Court therefore does not address that prong of the qualified immunity inquiry."); *see also Baldwin v. Goddard Riverside Cmty. Ctr.*, 615 F. App'x 704, 705 n.1 (2d Cir. 2015) ("Because [the defendant] did not raise the issue as a defense to [the plaintiff's claim], [the court] do[es] not address" the issue).

53

### G. Whether the City is Entitled to Summary Judgment on Plaintiffs' ADA Claim (Count IV).

In Count IV, Plaintiffs allege that the City violated Wayne Brunette's rights under Title II of the ADA, 42 U.S.C. §§ 12131-34, by failing to provide Wayne Brunette with reasonable accommodations during the incident. To establish a violation of the ADA, Plaintiffs must demonstrate: (1) that Wayne Brunette "[was] a 'qualified individual' with a disability; (2) that he was excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by a public entity; and (3) that such exclusion or discrimination was due to his disability." *Hargrave v. Vermont*, 340 F.3d 27, 34-35 (2d Cir. 2003).

In the context of an encounter with law enforcement, courts have recognized ADA claims "where police wrongly arrest someone with a disability because they misperceive the effects of that disability as criminal activity[.]" *Sheehan v. City & Cty. of San Francisco*, 743 F.3d 1211, 1232 (9th Cir. 2014), *rev'd in part, cert. dismissed in part sub nom. Sheehan*, 135 S. Ct. 1765 (2015). They have also recognized ADA claims "where although police properly investigate and arrest a person with a disability for a crime unrelated to that disability, they fail to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees." *Id.*; *see also Sage v. City of Winooski through Police Dep't*, 2017 WL 1100882, at *3 (D. Vt. Mar. 22, 2017) (recognizing "wrongful arrest" and "failure to provide reasonable accommodations[]" claims under Title II of the ADA). Plaintiffs raise the second type of claim, asserting that BPD failed "to provide [Mr.] Brunette with reasonable accommodations to his known and qualifying disability in their interactions with [Mr.] Brunette on the day they shot and killed him." (Doc. 22 at 14, ¶ 102.) In asserting this claim, they must proffer sufficient evidence to establish certain threshold requirements.

#### 1. Whether Wayne Brunette was a Qualified Individual with a Disability.

Under the ADA, the term "qualified individual with a disability" means:

an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

42 U.S.C. § 12131(2). The regulations interpreting this provision provide that an "individual [who] poses a direct threat to the health or safety of others[]" is excluded from receiving Title II benefits. 28 C.F.R. § 35.139(a).

An individual poses a "direct threat" when he presents "a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures or by the provision of auxiliary aids or services." 42 U.S.C. § 12182(b)(3). In making this determination, a governmental actor conducts:

an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence, to ascertain: the nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures or the provision of auxiliary aids or services will mitigate the risk.

28 C.F.R. § 35.139(b). "The existence, or nonexistence, of a significant risk must be determined from the standpoint of the person who refuses the treatment or accommodation, and the risk assessment must be based on medical or other objective evidence." *Bragdon v. Abbott*, 524 U.S. 624, 649 (1998).

"The 'direct threat' doctrine operates as an affirmative defense to a disability discrimination claim under the ADA[.]" *Hulett v. City of Syracuse*, 253 F. Supp. 3d 462, 487 (N.D.N.Y. 2017). The party "asserting a direct threat as a basis for excluding an individual bears the heavy burden of demonstrating that the individual poses a significant risk to the health and safety of others." *Id.* (internal quotation marks omitted) (citing *Lockett v. Catalina Channel Express, Inc.*, 496 F.3d 1061, 1066 (9th Cir. 2007)); *see also Hargrave*, 340 F.3d at 35 (stating that the defendant has the "burden to establish that a plaintiff poses a 'direct threat' of harm to others").

At the time of the incident, Wayne Brunette had a history of mental illness, including diagnoses of paranoid schizophrenia and delusional disorder, grandiose type. Defendants contend that Wayne Brunette was nevertheless not a qualified individual under the ADA because he posed a direct threat to the health and safety of others. This approach, however, makes the determination based on hindsight. When the BPD officers arrived at 85 Randy Lane, they understood that Wayne Brunette had destroyed a tree and was out of control, but there was no indication that he was armed or that he had physically injured another person. When Lawrence and Ruthine Brunette exited their home, their son was upstairs, and the scene appeared calm. Because Plaintiffs have established that the officers were aware of Wayne Brunette's "mental health issues" before arriving at the scene and because Defendants have not established that he posed a direct threat to the health and safety of others at that time, a rational jury could find that Wayne Brunette was a qualified individual with a disability under the ADA.

## 2. Whether Plaintiffs' ADA Claim Fails Due to Exigent Circumstances.

Even if Wayne Brunette was a qualified individual with a disability, Defendants argue that Title II of the ADA does not apply due to the exigent circumstances. Citing *Hainze v. Richards*, 207 F.3d 795 (5th Cir. 2000), they note that the Fifth Circuit has held "that Title II does not apply to an officer's on-the-street responses to reported disturbances or other similar incidents, whether or not those calls involve subjects with mental disabilities, prior to the officer's securing the scene and ensuring that there is no threat to human life." *Id.* at 801.

"The Second Circuit has yet to address the question whether and to what extent Title II of the ADA applies during an on-the-street interaction leading to an arrest." *Williams v. City of New York*, 121 F. Supp. 3d 354, 365 n.12 (S.D.N.Y. 2015). It has, however, explained that "the ADA must be broadly construed to effectuate its purpose of providing a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." *Noel v. New York City Taxi & Limousine Comm'n*, 687 F.3d 63, 68 (2d Cir. 2012) (internal quotation marks omitted).

The Department of Justice's implementing regulations for the ADA make clear that[] . . . Title II of the ADA "applies to all services, programs, and activities provided or made available by public entities," 28 C.F.R. § 35.102(a), and requires public entities to make "reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability," unless the required modification would fundamentally alter the nature of the service, program, or activity, 28 C.F.R. § 35.130(b)(7).

*Williams*, 121 F. Supp. 3d at 365. The phrase "services, programs, or activities" is "a catch-all phrase that prohibits all discrimination by a public entity." *Noel*, 687 F.3d at 68 (internal quotation marks omitted).

Because the ADA is broadly construed, "[o]ther circuits have declined to adopt the Fifth Circuit's approach[]" and have concluded that interactions between law enforcement and disabled individuals are "services, programs, or activities" subject to the requirement of accommodation under Title II of the ADA. *Sheehan*, 743 F.3d at 1231.[22] This court therefore follows the majority approach and holds that Title II of the ADA applies to Corporal Thibault and Corporal Navari's encounter with Wayne Brunette notwithstanding the exigent circumstances that developed in the course of that encounter. *See Williams*, 121 F. Supp. 3d at 368 ("The only reasonable interpretation of Title II is that law enforcement officers who are acting in an investigative or custodial capacity are performing 'services, programs, or activities' within the scope of Title II.").

Exigent circumstances, however, must be considered in determining whether a reasonable accommodation is available. *See Sheehan*, 743 F.3d at 1232 (holding that "exigent circumstances" of the police encounter "and the already onerous tasks of police on the scene go more to the reasonableness of the requested ADA modification than whether the ADA applies in the first instance.") (internal quotation marks omitted) (citing

---

[22] *See also Waller ex rel. Estate of Hunt v. Danville, Va.*, 556 F.3d 171, 175 (4th Cir. 2009) (rejecting the Fifth Circuit approach in *Hainze* and holding that the ADA applied to police officers' encounter with a mentally-ill individual); *Bircoll v. Miami-Dade Cty.*, 480 F.3d 1072, 1085 (11th Cir. 2007) ("[T]he question is not so much one of the applicability of the ADA because Title II prohibits discrimination by a public entity by reason of Bircoll's disability."); *Gohier v. Enright*, 186 F.3d 1216, 1221 (10th Cir. 1999) ("[A] broad rule categorically excluding arrests from the scope of Title II[] . . . is not the law.").

*Bircoll v. Miami-Dade Cty.*, 480 F.3d 1072 (11th Cir. 2007)); *see also Waller ex rel. Estate of Hunt v. City of Danville, Va.*, 556 F.3d 171, 175 (4th Cir. 2009) (holding that "exigency is one circumstance that bears materially on the inquiry into reasonableness under the ADA."). "[T]he reasonableness of the accommodation required must be assessed in light of the totality of the circumstances of the particular case." *Williams*, 121 F. Supp. 3d at 365; *see also Bahl v. Cty. of Ramsey*, 695 F.3d 778, 784-85 (8th Cir. 2012) ("The reasonable modification inquiry is highly fact-specific and varies depending on the circumstances of each case, including the exigent circumstances presented by criminal activity and safety concerns.").

In determining whether the City reasonably accommodated Wayne Brunette's disability, "the plaintiff bears the initial burden of producing evidence of the existence of a reasonable accommodation." *Sheehan*, 743 F.3d at 1233. "A public entity may defeat a reasonable accommodation claim by showing 'that making the modifications would fundamentally alter the nature of the service, program, or activity.'" *Id.* (quoting 28 C.F.R. § 35.130(b)(7)). Plaintiffs contend that the City did not reasonably accommodate Wayne Brunette because the officers failed to follow the protocols outlined in DD13.3 by failing to respect Wayne Brunette's comfort zone, elongate the time of the encounter, create a safe perimeter, avoid unnecessary contact and agitation, and seek professional resources. They cite their expert witness's opinion as further support for the availability of a reasonable accommodation.[23]

Although Defendants point out that DD13.3 was adopted six months after the incident occurred, former Chief Schirling stated that the officers "were trained to do everything that is in this directive[.]" (Doc. 99-24 at 6.) He explained that DD13.3

---

[23] Mr. Katsaris opines that the officers did not remove the complainants from the immediate vicinity of the scene or properly coordinate their interaction because they failed to establish a "command post[,] as directed by DD13.3, which in [his] opinion would, at a minimum, have been at the street using the patrol vehicles as a place for a reactionary distance and cover for safety." (Doc. 99-32 at 11) (internal quotation marks omitted). He further opines that the officers "did not control the situation" in order to "ensure that [Wayne Brunette] receive[d] the most appropriate form of professional resources." *Id.* at 12 (internal quotation marks omitted).

58

"consolidate[d] information from a variety of other directives and our ongoing training into one place, for easy reference[]" and that it did not create "any [substantial] changes to the operating methodology" of how officers responded to mental health calls. *Id.* at 3. The directive "codif[ied] the way things were trained and operationalized for the entire 25 years" he worked at BPD. *Id.* at 4. Former Chief Schirling further agreed that officers should be exercising the principles outlined in DD13.3 when responding to a mental health call. DD13.3 is thus relevant in determining whether the officers reasonably accommodated Wayne Brunette's disability.

In the light most favorable to Plaintiffs, when the officers arrived at 85 Randy Lane, the scene was "calm." (Doc. 99-7 at 32.) Ruthine and Lawrence Brunette came out of their home physically separated from Wayne Brunette and appearing "remotely calm[.]" *Id.* The officers thus "had the time and the opportunity to assess the situation and potentially employ the accommodations identified by [Plaintiffs.]" *Vos v. City of Newport Beach*, 892 F.3d 1024, 1037 (9th Cir. 2018) (finding that the officers' "pre-shooting conduct" in responding to a call about a man behaving erratically arguably demonstrated that "further accommodation was possible[,]" including "de-escalation, communication, or [providing] specialized help.").

Although Corporal Thibault and Corporal Navari "were forced to make split-second decisions[]" once Wayne Brunette emerged from the garage with a shovel, these exigent circumstances arose after the officers initiated the encounter with Wayne Brunette and after they allegedly failed to follow the proper protocol. *Sheehan*, 743 F.3d at 1233. In addition, there are disputed issues of material fact as to whether Wayne Brunette emerged from the garage in a threatening manner. "A reasonable jury . . . could [therefore] find that the situation had been defused sufficiently[]" when the officers arrived at the scene, affording them "an opportunity to wait for backup and to employ less confrontational tactics, including the accommodations that [Plaintiffs] assert[] were necessary." *Id.* Because Plaintiffs have adduced sufficient evidence from which a rational jury could find that the officers failed to reasonably accommodate Wayne Brunette's mental illness and "because the reasonableness of an accommodation is

59

ordinarily a question of fact," *id.*, Defendants' motion for summary judgment on Plaintiffs' claim under Title II of the ADA is DENIED.

## H.     Whether Defendants are Entitled to Summary Judgment with Regard to Plaintiffs' State Law Claims.

In addition to claims under Section 1983, Plaintiffs assert state law claims of assault and battery against Corporal Thibault (Count V); negligence against all Defendants (Count VI); intentional infliction of emotional distress against Corporal Thibault and Corporal Navari (Count VIII); and a statutory wrongful death and survival action against all Defendants (Count IX). These state law claims are governed by Vermont's substantive law. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *see also Liberty Synergistics Inc. v. Microflo Ltd.*, 718 F.3d 138, 152 (2d Cir. 2013) (stating that "federal courts apply those state rules of decision that are substantive . . . and are consistent with federal law") (internal quotation marks omitted).

Defendants contend that Corporal Thibault, Corporal Navari, and former Chief Schirling are entitled to qualified immunity with regard to Plaintiffs' assault and battery and negligence claims, that the City is entitled to municipal liability on Plaintiffs' state law claims, and that Plaintiffs' intentional infliction of emotional distress claim fails as a matter of law.

### 1.     Whether Corporal Thibault and Corporal Navari are Entitled to Qualified Immunity under Vermont Law for Plaintiffs' Assault and Battery and Negligence Claims (Counts V and VI).

"[T]he substantive law of Vermont governs the applicability of qualified immunity to [Plaintiffs'] state law claims[]" against Corporal Thibault and Corporal Navari. *Napolitano v. Flynn*, 949 F.2d 617, 621 (2d Cir. 1991). Under Vermont law,

> once the issue [of qualified immunity is] raised, [the plaintiff] ha[s] the burden to rebut the qualified immunity defense "by establishing that the official's allegedly wrongful conduct violated clearly established law. We do not require that an official demonstrate that he did not violate clearly established federal rights; our precedent places that burden upon plaintiffs.

*Sprague v. Nally*, 2005 VT 85, ¶ 4 n.3, 178 Vt. 222, 225, 882 A.2d 1164, 1167 (internal quotation marks omitted) (quoting *Pierce v. Smith*, 117 F.3d 866, 871-72 (5th Cir. 1997)).

Qualified immunity "attaches to public officials who are (1) acting during the course of their employment and acting, or reasonably believing they are acting, within the scope of their authority; (2) acting in good faith; and (3) performing discretionary, as opposed to ministerial, acts." *Baptie v. Bruno*, 2013 VT 117, ¶ 11, 195 Vt. 308, 314, 88 A.3d 1212, 1216 (internal quotation marks omitted). The Vermont Supreme Court has noted that the "doctrine's purpose [is] to protect officials from exposure to personal tort liability that could (1) hamper their ability to effectively discharge their duties and (2) subject their discretionary determinations to review by a judicial system ill-suited to assess the full scope of factors involved in such determinations." *Nelson v. Town of St. Johnsbury Selectboard*, 2015 VT 5, ¶ 63, 198 Vt. 277, 303, 115 A.3d 423, 441 (internal quotation marks omitted).

There is no dispute that Corporal Thibault and Corporal Navari were acting during the course of their employment and performing discretionary, not ministerial, acts at the time of the incident. *See Amy's Enters. v. Sorrell*, 817 A.2d 612, 617 (Vt. 2002) ("This Court has previously held that decisions made in the course of investigations are discretionary."); *see also MacLeod v. Town of Brattleboro*, 2012 WL 5949787, at *12, *19 (D. Vt. Nov. 28, 2012), *aff'd*, 548 F. App'x 6 (2d Cir. 2013) (noting that, at the time of the plaintiff's arrest, the officer "was acting during the course of his employment when he tased Plaintiff[,]" and holding that he was "engaged in a discretionary not ministerial function."). They were also indisputably acting in good faith as that term is defined by the Vermont Supreme Court.[24]

---

[24] Plaintiffs proffer no evidence to the contrary. *See Brayshaw v. City of Burlington*, 2015 WL 1523019, at *14 (D. Vt. Apr. 3, 2015) (finding that the defendant officer was entitled to qualified immunity under Vermont law because the plaintiff "offers no evidence that [the officer] failed to act in good faith[.]").

61

In *Murray v. White*, the Vermont Supreme Court adopted the United States Supreme Court's conclusion that "good faith depends 'on the objective reasonableness of an official's conduct, as measured by reference to clearly established law[.]'" *Murray v. White*, 587 A.2d 975, 980 (Vt. 1991) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Good faith therefore "exists where an official's acts did not violate clearly established rights of which the official reasonably should have known." *Baptie*, 2013 VT 117, ¶ 11, 195 Vt. at 314, 88 A.3d at 1216 (internal quotation marks omitted).

> As such, a lack of good faith is not established by asserting that the right to be free from the torts alleged in plaintiff's complaint is clearly established. Rather, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. . . . [I]n the light of pre-existing law the unlawfulness must be apparent."

*Murray*, 587 A.2d at 980. Using this standard for good faith, for the same reasons it found qualified immunity available under federal law, the court finds state qualified immunity applicable as well.

Because "lower-level government employees are immune from tort liability when they perform discretionary acts in good faith during the course of their employment and within the scope of their authority[,]" Corporal Thibault and Corporal Navari are entitled to qualified immunity under Vermont law. *Hudson v. Town of E. Montpelier*, 638 A.2d 561, 563 (Vt. 1993). Accordingly, the court GRANTS summary judgment in favor of Corporal Thibault for Counts V and VI and in favor of Corporal Navari for Count VI.

## 2. Whether Former Chief Schirling is Entitled to Qualified Immunity under Vermont Law.

With regard to former Chief Schirling, there is similarly no dispute that his decision to allow Corporal Thibault to continue on active patrol duty was a discretionary act in the course of his employment as police chief. However, because the court cannot conclude, as a matter of law, that former Chief Schirling was not grossly negligent or deliberately indifferent to Corporal Thibault's prior uses of force in allowing him to respond to mental health calls, the court similarly cannot determine whether he violated "clearly established rights of which [he] reasonably should have known." *Baptie*, 2013

VT 117, ¶ 11, 195 Vt. at 314, 88 A.3d at 1216 (internal quotation marks omitted). Although unlike federal qualified immunity Defendants affirmatively raise this claim, the parties do not adequately brief it.[25] The court therefore declines to address it.[26]

### 3. Whether Plaintiffs' Negligence Claim Against Former Chief Schirling Fails as a Matter of Law.

Although the court cannot conclude that former Chief Schirling is entitled to qualified immunity under Vermont law, it must consider whether he is nonetheless entitled to judgment as a matter of law with regard to Plaintiffs' negligence claim. Defendants argue that former Chief Schirling did not owe Wayne Brunette a legal duty which is an essential element of a negligence claim. In response, Plaintiffs contend that the "same facts that preclude summary judgment in favor of . . . [former] Chief Schirling" on their supervisory liability claim preclude summary judgment on their negligence claim. (Doc. 99-3 at 49.)

Under Vermont law, a claim of negligence requires proof that the defendant owed the plaintiff a legal duty, that the defendant breached that duty, that the breach was the proximate cause of the injuries the plaintiff suffered, and that the plaintiff suffered actual loss or damage. *See Endres v. Endres*, 2008 VT 124, ¶ 11, 185 Vt. 63, 67, 968 A.2d 336,

---

[25] Defendants raise this argument in a single sentence, stating that "[t]here is also no allegation that Chief Schirling acted in violation of a clearly established statutory or constitutional right." (Doc. 95 at 44.) Plaintiffs, in contrast, contend that former Chief Schirling was grossly negligent or deliberately indifferent in supervising Corporal Thibault with regard to his alleged history of engaging in excessive force in violation of the Fourth Amendment and proffer evidence in support of that claim. As they have the burden to establish state qualified immunity, they, too, had an obligation to adequately brief it.

[26] *See Jackson on Behalf of Z.J. v. City of Middletown*, 2017 WL 2218304, at *4 (D. Conn. May 19, 2017) (declining to grant summary judgment on the basis of qualified immunity because the defendants did not "show what the relevant state of the law was at the time of the incident in question"); *Perkins v. Teele*, 2018 WL 3541864, at *4 (D. Conn. July 23, 2018) (declining to grant summary judgment based on a qualified immunity defense that was "inadequately briefed by the defendants"); *see also Jimmo v. Sebelius*, 2011 WL 5104355, at *22 (D. Vt. Oct. 25, 2011) (declining to address alleged grounds for dismissal due to "the complexity of the legal issues, the parties' cursory treatment of the issues, and the current stage of the litigation[.]") (internal quotation marks omitted) (citing *Ibarra v. City of Chicago*, 2011 WL 4583785, at *8 (N.D. Ill. Sept. 28, 2011)).

340. Duty "is central to a negligence claim, and its existence is primarily a question of law." *Id.* at ¶ 11, 185 Vt. at 68, 968 A.2d at 340.

A governmental actor owes a duty of care "toward specified persons above and beyond [his or her] duty to the public at large" based on the following considerations:

(1) whether a statute sets forth mandatory acts for the protection of a particular class of persons; (2) whether the government has knowledge that particular persons within that class are in danger; (3) whether those persons have relied on the government's representations or conduct; and (4) whether the government's failure to use due care would increase the risk of harm beyond what it was at the time the government acted or failed to act.

*Sabia v. State*, 669 A.2d 1187, 1191 (Vt. 1995).

Vermont law provides that the chief of police "shall be a police officer" and is "vested" with the "direction and control of the entire police force[.]" 24 V.S.A. § 1931(a), (b). This statute imposes duties "owed to the community as a whole." *Kane v. Lamothe*, 2007 VT 91, ¶ 9, 182 Vt. 241, 246, 936 A.2d 1303, 1308 (internal quotation marks omitted). In claiming that he negligently supervised Corporal Thibault with regard to the use of force, Plaintiffs cannot establish that former Chief Schirling owed Wayne Brunette a specific duty "beyond duties owed to the public at large[.]" *Burwell*, 131 F. Supp. 3d at 301-02.

Plaintiffs further claim that former Chief Schirling negligently allowed Corporal Thibault to continue on active patrol duty and respond to mental health calls, despite his use of force record. In this respect, a duty arises from Title II of the ADA, which requires reasonable accommodations for the mentally disabled. Moreover, before the incident occurred, BPD adopted and promulgated DD13.02 for interacting with persons with disabilities. *See MacLeod*, 2012 WL 5949787, at *10 (holding that a police department's use of force policy regarding the use of tasers "contains most, if not all, of the identified hallmarks of a governmental duty.").[27] DD13.02 is a policy specifically

---

[27] In *Kane v. Lamothe*, 2007 VT 91, 182 Vt. 241, 936 A.2d 1303, the Vermont Supreme Court noted that a police manual that had not been adopted as a rule pursuant to Vermont's Administrative Procedure Act "lacks the authority of a statute or regulation" and "[o]ur test of

64

directed to police encounters with the mentally ill, as opposed to the public at large. This policy sets forth procedures for an officer's use of force in a situation "involving a person with a known disability[]" and directs officers to "take steps to accommodate that disability where they are able to do so[.]" (Doc. 95-30 at 3.) Finally, although DD13.3 was not in existence at the time of the incident, former Chief Schirling has testified that it reflects BPD's policy prior to its adoption as well.

Title II of the ADA, DD13.02, and DD13.3 create a duty of care on behalf of former Chief Schirling in supervising Corporal Thibault's response to mental health calls. *See Sabia*, 669 A.2d at 1192 (citing statutory provisions requiring investigation of reports of child abuse, and finding "it is beyond dispute that the relevant statutory provisions create a duty on the part of SRS to assist a particular class of persons to which plaintiffs belong and to prevent the type of harm suffered by plaintiffs."). Plaintiffs must next proffer admissible evidence that former Chief Schirling breached that duty of care. For purposes of summary judgment, they have done so.

"[W]here there is no settled rule of diligence more specific than a general reasonableness standard, 'negligence is ordinarily a question for the jury.'" *Morway v. Trombly*, 789 A.2d 965, 971 (Vt. 2001) (quoting *Baisley v. Missisquoi Cemetery Ass'n*, 708 A.2d 924, 928 (Vt. 1998)). For the same reasons that the court cannot conclude whether former Chief Schirling was grossly negligent or deliberately indifferent in supervising Corporal Thibault, the court cannot determine, as a matter of law, whether former Chief Schirling breached his legal duty of care and whether that breach of duty

---

whether a specific duty exists asks 'whether a *statute* sets forth mandatory acts for the protection of a particular class of persons.' Generally, internal policies and manuals provide preferred standards but not legal requirements for which individuals may hold the State liable." *Id.* at ¶ 11, 182 Vt. at 247, 936 A.2d at 1309 (internal citation omitted). Without overruling *Kane*, the court in *Kennery v. State*, 2011 VT 121, 191 Vt. 44, 38 A.3d 35, relied upon "a common law duty of care under Restatement (Second) of Torts § 324A[,]" *id.*, at ¶ 11, 191 Vt. at 51, 38 A.3d at 39, and concluded that the first prong of the *Sabia* test was met. This prompts the court to conclude that a statute or regulation is not required, and an official governmental policy or common law duty will suffice.

was a proximate cause of Plaintiffs' injuries. Summary judgment in former Chief Schirling's favor with regard to Plaintiffs' negligence claim must therefore be DENIED.

### 4. Whether the City is Entitled to Municipal Immunity for Plaintiffs' Negligence Claim (Count VI).

In Count VI, Plaintiffs claim that the City negligently trained dispatch operators, failed to properly relay information from dispatch to the responding officers, and negligently sent officers with minimal and inadequate training to respond to the incident. In particular, Plaintiffs allege that the City negligently hired and retained Corporal Thibault.[28] Defendants contend that municipal immunity shields the City from liability.

The Vermont Supreme Court has held that "[m]unicipal immunity protects municipalities from tort liability in cases where the municipality fulfills a governmental rather than a proprietary function." *Sobel v. City of Rutland*, 2012 VT 84, ¶ 14, 192 Vt. 538, 543, 60 A.3d 625, 630 (internal quotation marks omitted). "The rationale for distinguishing between these two municipal functions is that municipalities perform governmental responsibilities for the general public as instrumentalities of the state, but they conduct proprietary activities only for the benefit of the municipality and its residents." *MacLeod*, 2012 WL 5949787, at *19 (internal quotation marks omitted) (citing *Hillerby v. Town of Colchester*, 706 A.2d 446, 447 (Vt. 1997)). "[P]olice work is a quintessential governmental function." *Decker v. Fish*, 126 F. Supp. 2d 342, 346 (D. Vt. 2000); *see also Franklin Cty. Sheriff's Office v. St. Albans City Police Dep't*, 2012 VT 62, ¶ 17, 192 Vt. 188, 196, 58 A.3d 207, 214 ("[T]he provision of police services . . . is a governmental function provided only by governmental entities for the benefit of the public."). Supervision of police officers thus falls squarely within this governmental function.

---

[28] Plaintiffs further contend that the City waived municipal liability pursuant to 29 V.S.A. § 1403 by purchasing liability insurance. Under this statute, however, waiver applies only "to the extent of the coverage of the policy[.]" *Id.* The City's insurance policy has a preservation of governmental immunity clause which states that the policy applies to "tort liability . . . not subject to any defense of governmental immunity[.]" (Doc. 108-18 at 4.) The City therefore has not waived municipal liability.

Because Plaintiffs' negligence claim arises from the City's provision of police services, a governmental function, the City is entitled to municipal liability. *See Sage*, 2017 WL 1100882, at \*5 (holding that "the City's hiring, training and supervision of Corporal Nokes was a purely government function, and it cannot be held liable for his allegedly-tortious actions."). The court therefore GRANTS Defendants' motion for summary judgment and DISMISSES Count VI against the City.

### 5. Whether Plaintiffs' Intentional Infliction of Emotional Distress Claim Against Corporal Thibault and Corporal Navari Fails as a Matter of Law (Count VIII).

Defendants do not argue that qualified immunity shields Corporal Thibault and Corporal Navari from Plaintiffs' intentional infliction of emotional distress claim. *See Brayshaw v. City of Burlington*, 2015 WL 1523019, at \*15 (D. Vt. Apr. 3, 2015) (finding that "[t]he very nature of [intentional infliction of emotional distress] renders a qualified immunity analysis unproductive[,]" because "it would be difficult to imagine a circumstance in which a police officer committed this tort and yet did so in the scope of his or her employment as a discretionary activity undertaken in good faith."). Assuming *arguendo* that qualified immunity under Vermont law is unavailable with regard to an intentional infliction of emotional distress claim, Corporal Thibault and Corporal Navari are nonetheless entitled to judgment as a matter of law for this claim.

To sustain a claim for intentional infliction of emotional distress, Plaintiffs must establish that Corporal Thibault and Corporal Navari engaged in "outrageous conduct, done intentionally or with reckless disregard of the probability of causing emotional distress, resulting in the suffering of extreme emotional distress, actually or proximately caused by the outrageous conduct." *Davis v. Am. Legion, Dep't of Vt.*, 2014 VT 134, ¶ 19, 198 Vt. 204, 212, 114 A.3d 99, 106 (internal quotation marks omitted). Plaintiffs "carry a heavy burden[]" in establishing this claim and "will not succeed unless [they] can show that [the officers'] actions were so outrageous in character and so extreme in degree as to go beyond all possible bounds of decent and tolerable conduct in a civilized community and be regarded as atrocious and utterly intolerable." *Id.* at ¶ 20, 198 Vt. at 212, 114 A.3d

at 106 (internal quotation marks omitted) (citing *Cate v. City of Burlington*, 2013 VT 64, ¶ 28, 194 Vt. 265, 277, 79 A.3d 854, 863). "The test is objective; the plaintiff must show that the harm resulting from the inflicted distress was so severe that no reasonable person could be expected to endure it." *Farnum v. Brattleboro Retreat, Inc.*, 671 A.2d 1249, 1256 (Vt. 1995). "[W]hether a jury could reasonably find that the conduct at issue meets this test[]" is a "threshold question" for "the court to determine[.]" *Dulude v. Fletcher Allen Health Care, Inc.*, 807 A.2d 390, 398 (Vt. 2002).

Regardless of the wisdom of the BPD officers' initial response to the dispatch call from 85 Randy Lane, there is no dispute that Corporal Thibault shot Wayne Brunette only after he began advancing towards Corporal Navari in a threatening manner with a weapon capable of inflicting serious bodily injury or death. The officers' interaction with Wayne Brunette by asking him to come down from the landing to talk was not so extreme or outrageous "as to go beyond all possible bounds of decent and tolerable conduct in a civilized community[.]" *Cate*, 2013 VT 64, ¶ 28, 194 Vt. at 277, 79 A.3d at 863 (internal quotation marks omitted). "No rational jury could reach a contrary conclusion." *Brayshaw*, 2015 WL 1523019, at *15 (citing *Commander Oil Corp. v. Advance Food Serv. Equip.*, 991 F.2d 49, 51 (2d Cir. 1993)). Because Corporal Thibault's and Corporal Navari's actions do not rise to the level of intentional infliction of emotional distress as a matter of law, the court GRANTS summary judgment in their favor and DISMISSES Count VIII.

### 6. Plaintiffs' Claim for Damages under Vermont's Wrongful Death and Survival Statutes (Count IX).

The parties agree that Vermont's wrongful death statute, 14 V.S.A. §§ 1491-92, and survival statute, 14 V.S.A. §§ 1451-55, do not create independent causes of action separate from the underlying torts. *See Trepanier v. Getting Organized, Inc.*, 583 A.2d 583, 590 (Vt. 1990) (noting that a wrongful death claim is "derivative in nature and must fail absent an independent underlying tort."). Because Plaintiffs' negligence claim against former Chief Schirling is not dismissed, the court DENIES summary judgment with

regard to Plaintiffs' claim for damages pursuant to Vermont's wrongful death and survival statutes.

## CONCLUSION

For the foregoing reasons, the court GRANTS IN PART AND DENIES IN PART Defendants' motion for summary judgment. (Doc. 95.) Summary judgment is GRANTED with regard to Counts I, II, V, and VIII. Summary judgment is GRANTED on Count III with regard to Plaintiffs' municipal liability claim against the City, but DENIED on Plaintiffs' supervisory liability claim against former Chief Schirling. Summary judgment is GRANTED on Count VI with regard to Corporal Thibault, Corporal Navari, and the City, but DENIED with regard to former Chief Schirling. Summary judgment is DENIED with regard to Counts IV and IX.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this $\underline{30^{TK}}$ day of August, 2018.

Christina Reiss, District Judge
United States District Court