UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| ESTATE OF WAYNE BRUNETTE by BARBARA BRUNETTE, as Personal Representative and Administratrix of the ESTATE OF WAYNE BRUNETTE, and BARBARA BRUNETTE, Individually, <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF BURLINGTON, VERMONT; CITY OF BURLINGTON POLICE DEPARTMENT, CHIEF MICHAEL SCHIRLING, in his Individual and Official Capacities; CPL. ETHAN THIBAULT; in his Individual and Official Capacities; CPL. BRENT NAVARI, in his Individual and Official Capacities. <br><br> Defendants. | Case No. 2:15-cv-61 |

**DEFENDANTS' REPLY IN SUPPORT OF
RENEWED MOTION FOR SUMMARY JUDGMENT
ON STATE LAW CLAIM
AGAINST FORMER CHIEF SCHIRLING**

Defendants submit the following Reply Memorandum in Support of Summary Judgment on the remaining claim against former Chief Michael Schirling under Vermont law.

Memorandum of Law

**I. The Vermont Supreme Court Has Unequivocally Held That Police Directives Do Not Create A Legal Duty To Third Parties Under Vermont Common Law.[1]**

Plaintiffs rely on this Court's decision in MacLeod v. Town of Brattleboro, 2012 WL 5949787 (D. Vt. Nov. 28, 2012)[2] in support of their argument that Chief Schirling owed a legal duty to third parties under Vermont common law pursuant to BPD Department Directives. See

---

[1] DD 13.3 was not in effect at the time of the shooting in November 2013. See Doc. 123 at 65.
[2] Affirmed by MacLeod v. Town of Brattleboro, 548 F. App'x 6 (2d Cir. 2013). The state law claims were not addressed in the appeal.

Downs
Rachlin
Martin PLLC

Pls' Opp. at 4-5. When it was decided in 2012, MacLeod predicted that the Vermont Supreme Court would depart from its holding in Kane v. Lamothe, 2007 VT 91, that police procedures and polices "lack[] the authority of a statute or regulation" for the purpose of imposing a legal duty of care. MacLeod, 2012 WL 5949787, at *10 n.7.
Id.

However, the Vermont Supreme Court subsequently revisited this issue in Baptie v. Bruno, 2013 VT 117, and rejected the argument plaintiffs assert here that internal policies and procedures impose on officers a duty to third parties.[3] In Baptie, the Vermont Supreme Court reaffirmed Kane, concluding that "internal policies and manuals not adopted as formalized rules are 'not legal requirements for which individuals may hold the State liable,' and do not create a duty to third parties." Id. (quoting Kane, 2007 at ¶11).

BPD's Department Directives are analogous to the internal Vermont state police operations procedures at issue in Kane.[4] Neither the BPD Department Directives nor the Vermont State police operations procedures had been adopted as a rule under the Vermont Administrative Procedures Act, 3 V.S.A. §§836-44. For that reason, "[p]olice guidelines and procedures set forth in manuals do not have the same authority as statutes and ordinances. Though such manuals may direct or recommend the manner in which Department employees perform statutorily prescribed duties and may define an employee's duty to his or her employer, they do not create a duty to third parties." Kane, 2007 VT at ¶ 11.

---

[3] The Baptie Court also rejected the plaintiffs' analogy between Kane and Kennery. The basis for finding a legal duty in Kennery (a case involving ministerial police actions) was not internal policies and procedures but Section 324A, Negligent Undertaking. The Vermont Supreme Court had "formally adopted" Section 324A almost fifteen years earlier in Derosia v. Liberty Mutual Insurance Co., 155 Vt. 178, 182–83, 583 A.2d 881, 883 (1990). Thus, the Kane/Baptie line of decisions is not inconsistent with Kennery, because Kennery identified a legal duty based on a previously adopted Restatement section, not internal policies and procedures.
[4] The Vermont State Police Rules & Regulations, Operational Policies & Procedures.

Downs
Rachlin
Martin PLLC

Plaintiffs' state law claims come before this Court pursuant to its supplemental jurisdiction under 28 U.S.C. § 1367(a). Accordingly, the Court is "bound to apply state substantive law to the state claim" against former Chief Schirling. Promisel v. First Am. Artificial Flowers, Inc., 943 F.2d 251, 257 (2d Cir. 1991). As such, the Vermont Supreme Court's decisions in Baptie and Kane provide binding authority that BPD's Department Directives do not create a legal duty to third parties for the purpose of asserting a state common law claim against former Chief Schirling.

## II. Vermont Statutory Law Does Not Impose A Duty On The Chief Of Police To Third Parties.

"The State's law enforcement duties are provided for by statute." Kane, 2007 VT at ¶ 9. As the Vermont Supreme Court has recognized:

> the statutes create no special relationship between crime victims and law enforcement personnel: The officer's duty is owed to the community as a whole. It obviously encompasses the protection of crime victims, but it is shaped primarily by the need to investigate and prosecute crimes. Cf. Corbin v. Buchanan, 163 Vt. 141, 144, 657 A.2d 170, 172 (1994) (noting 'the absence in Vermont of any general inference of a private action based on government regulations whose clear purpose is the general welfare'). <u>The statutes do not set forth any mandatory acts, much less mandatory acts for the protection of a particular class of persons.</u>

Id. (emphasis added); see 20 V.S.A. §1914 (Powers and Immunities); 24A V.S.A. §184 (Powers and Duties). Accordingly, as this Court previously recognized, Vermont statutes do not create a special duty to Mr. Brunette, "beyond duties owed to the public at large." Order at 64 (Doc. 123).

## III. The ADA Does Not Give Rise To An Individual Duty Under Either Federal Or State Common Law.

In the absence of a duty under Vermont statutory or common law, Plaintiffs argue that a
Downs
Rachlin
Martin PLLC

duty arises under Title II of the Americans with Disabilities Act ("ADA").

It is well settled that the ADA does not "provide for actions against individual supervisors." Darcy v. Lippman, 356 F. App'x 434, 437 (2d Cir. 2009); Garcia v. S.U.N.Y. Health Sciences Ctr. of Brooklyn, 280 F.3d 98, 107 (2d Cir. 2001); Alsbrook v. City of Maumelle, 184 F.3d 999, 1005 (8th Cir. 1999). In dismissing actions against individual supervisors, Courts point to the statutory language of Title II and Congressional intent. Specifically, Title II of the ADA forbids discrimination by a "public entity." 42 U.S.C. § 12132. The term "public entity" is defined as "(A) any State or local government; (B) any department, agency, special purpose district, or other instrumentality of a State or States or local government; and (C) the National Railroad Passenger Corporation, and any commuter authority…." 42 U.S.C.A. § 12131. Thus, the statute imposes a duty and liability on the "entity" alone, not any individual employee or supervisor of the entity. Id. If Congress had intended that the ADA create individual liability, it would have included the term "individual" or supervisor employee in the definition of "public entity" or "employer" in Title II. Because it did not do so, the Second Circuit and other Circuits to consider the issue have rejected claims against individual supervisors under Title II of the ADA. See e.g., Darcy, 356 F. App'x at 437 ("[T]he ADA and ADEA, like Title VII, do not provide for actions against individual supervisors….").

The Vermont Supreme Court has never considered the issue of whether Title II of the ADA creates liability under Vermont common law negligence for individual supervisors. Defendants are also not aware of any jurisdiction recognizing individual supervisor liability under common law negligence based on the ADA, and Plaintiffs have not cited to any such case in their briefing. There is nothing in the statutory language to suggest that the Vermont Supreme

Court would recognize a duty of the individual supervisor under Title II such that the individual supervisor could be sued in negligence in Vermont.

Nor does the ADA create a "special relationship" between a chief of police and third parties for the purpose of a common law duty of care and a negligence cause of action. In Sabia v. State, the Vermont Supreme Court considered whether a governmental body (SRS) had "undertaken a duty of care toward specified persons above and beyond its duty to the public at large…." 164 Vt. 293, 299 (1995). In so doing, it looked at "whether a statute sets forth mandatory acts for the protection of a particular class of persons...." Id. The specific statute at issue directed SRS to undertake an investigation into reports of child abuse and provide assistance to the child and his family if the investigation produces evidence of abuse or neglect. Id. Based on this direction, the Court held that "it is beyond dispute that the relevant statutory provisions create a duty on the part of SRS to assist a particular class of persons to which plaintiffs belong and to prevent the type of harm suffered by plaintiffs." Id.

Unlike the claims against SRS in Sabia, Plaintiffs in this case seek to impose on an individual supervisor a duty to third parties based on a statutory directive to the *entity* or *employer*. The law in Vermont does not support that analysis. For the same reasons the ADA does not provide for a private right of action against individuals, it does not impose a legal duty on individuals under state law. Accordingly, any cause of action arising out of obligations under Title II of the ADA must be brought against the public entity, alone.

## IV. Plaintiffs Cannot Satisfy The Necessary Elements For The Negligent Supervision Claim.

Liability for negligent supervision "exists only if all the requirements of an action of tort for negligence exists." Haverly v. Kaytec, Inc., 169 Vt. 350, 357 (1999). Accordingly, the absence of a legal duty is fatal to Plaintiffs' state law claim against former Chief Schirling. Id.

In addition to duty, Plaintiffs must prove breach of duty; causation; and damage. Id.[5] Plaintiffs do not address any of these elements in their Opposition. As previously addressed, Plaintiffs' negligence claim against former Chief Schirling relies on the speculative theory that the shooting would not have occurred "but for" the failure to correct and properly train Cpl. Thibault's use of pepper spray and other applications of non-deadly force in arrest-type scenarios, or if Cpl. Thibault had on that basis been prevented from responding to the mental health call on November 6, 2013. Plaintiffs have never submitted any evidence of i) a legal nexus between the shooting by Cpl. Thibault and his prior authorized uses of non-deadly force; and ii) that another officer would not have acted in exactly the same manner as Cpl. Thibault. Accordingly, Plaintiffs' cannot establish causation as a matter of law.

Finally, even if a violation of the ADA could provide a basis for the "underlying wrongful act," required by Haverly, the supervisor's "breach" would be a failure to prevent the employee from causing an ADA violation—not the use of excessive force. Former Chief Schirling would still be entitled to qualified immunity, because Plaintiffs' have never identified clearly established law that would put former Chief Schirling on notice that he should preclude an officer, who had no record of denying accomodation to individuals with disabilities,

---

[5] And of course, they need to plead these items to provide notice of their claim, which they have not done.

Downs
Rachlin
Martin PLLC

from responding to calls involving mental health incidents. Nor is there any evidence of a pattern of use of force or ADA violations by the City.

**V. Plaintiffs' Opposition Does Not Address 24 V.S.A. §901a(b).**

Consistent with the principles of qualified immunity, 24 V.S.A. §901a(b) provides that the exclusive cause of action for an "act or omission of a municipal employee acting within the scope of employment...shall lie against the municipality…and no such action may be maintained against the municipal employee…."

Plaintiffs' Opposition does not address this statutory provision. Accordingly, the state law claim of negligent supervision against former Chief Schirling must be dismissed consistent with section 901a(b).

**VI. There Is No Applicable Law—U.S. Supreme Court, Second Circuit, Or Vermont Supreme Court—That Clearly Establishes Supervisor Liability For Retaining Cpl. Thibault Or Permitting Him To Attend To Mental Health Calls Where Firearm Use Of Force Might Be Required Based On Prior Authorized Pepper Spray Use Of Force Incidents.**

Plaintiffs' Opposition does not identify any Vermont Supreme Court, Second Circuit or U.S. Supreme Court case setting forth controlling clearly established law in existence at the time of the shooting on November 6, 2013 (or after) which would lead a reasonable chief to understand he or she was doing something contrary to law.[6] See Hoffer v. Ancel, 2004 VT 38, ¶ 12 ("[T]he clearly established right defendants are alleged to have violated must be 'specific to the circumstances.' Broad statements of rights are inadequate."). Instead, Plaintiffs cite two district court cases from January 2019 in an effort to shoehorn this case into the circumstances of Fiacco v. City of Rensselear, 783 F.2d 319, 331 (2d Cir. 1986). However, as in Fiacco, the

---

[6] The fact that Plaintiffs have never plead a violation of clearly established law is further grounds for dismissal. See Hoffer v. Ancel, 2004 VT 38, ¶ 12.

claims against the chiefs of police in Montanez v. City of Syracuse, 2019 WL 315058 (N.D.N.Y. Jan. 23, 2019) and Sherrod v. Williams, 2019 WL 267175 (S.D. Ohio Jan. 15, 2019), are different in all material respects from the instant case. Neither district court case, or Fiacco, clearly establishes supervisor liability in an incident involving defensive use of firearms based on prior, self-reported incidents of authorized uses of non-deadly force involving pepper spray.[7]

The first case cited by Plaintiffs, Montanez v. City of Syracuse, 2019 WL 315058 (N.D.N.Y. Jan. 23, 2019), involved allegations that a patrol officer coerced a 911-caller to engage in sexual acts. Id. at *1. Unlike Cpl. Thibault, the patrol officer in Montanez had *four* other citizen complaints of the exact same nature, filed against him by women alleging coercive sexual conduct. Id. at *19. Although not analogous to the instant case, Montanez does involve similarities with Fiacco. As in Fiacco, the chief of police alone investigated one of the complaints, never interviewed the complainant and nonetheless deemed the complaint "unsubstantiated." Id. at *14 and 19. During the review process, the chief had told his deputies that he had made several attempts to reach the complainant, but that she had not returned his phone calls—representations that the chief subsequently admitted were untrue. Id. at *14. With respect to another complaint, the chief noted that the complainant's "description of events [w]as [] plausible, but nonetheless deemed the complaint 'unsubstantiated.'" Id. at *18. Based on this evidence, the District Court denied summary judgment, citing Fiacco for the proposition that the chief's "efforts to evaluate the claims were so superficial as to suggest that its official attitude was one of indifference to the truth of the claim…." Id. (quoting Fiacco, 783 F.2d at 328).

---

[7] On their own, Montanez and Sherrod are not controlling precedent for the purpose of the clearly established-prong of qualified immunity analysis. See Moore v. Vega, 371 F.3d 110, 114 (2d Cir. 2004) ("Only Supreme Court and Second Circuit precedent existing at the time of the alleged violation is relevant in deciding whether a right is clearly established."); Sabia v. Neville, 165 Vt. 515, 520 (1996) ("clearly established law" may include but is limited to "federal constitutional and statutory rights [and] Vermont statutes, regulations and common law.").

Downs
Rachlin
Martin PLLC

The facts against the chiefs in Fiacco and Montanez are different in all material respects from the instant case. Although there is no claim in this case that former Chief Schirling or the City did not comply with BPD procedure in investigating the two citizen complaints against Cpl. Thibault, the evidence is that the investigations complied with police procedure in all respects: (a) an investigation file was opened; (b) the investigation was assigned for review to a supervising officer; (c) the Citizen's Complaint file is part of Cpl. Thibault's personnel record at BPD; (d) the determination was based on a discussion with the complainant and review of sworn statements and use of force reports submitted by Cpl. Thibault and another officer who responded to the scene; and (e) former Chief Schirling reviewed the investigation and investigating officer's conclusions. See **Exhibit A** to Doc. 138.[8]

Plaintiffs also cite to the recent Ohio District Court case of Sherrod, which involved use of deadly force by an officer who had previously used deadly force in "the only other fatal shooting in the history of the Beavercreek Police Department." WL267175 at *20.

Sherrod differs in two other key respects from the instant case: qualified immunity was denied for the subordinate officer and the §1983 *Monell* claims against the City of Beavercreek survived summary judgment. Id. at *32. The citation to Fiacco is in reference to the "huge statistical disparity between [the subject officer] and the other officers[']" uses of force, which the Court in Sherrod held could form the basis for a finding that the City acted deliberately indifferent. Id. at *23-24. Notably, the subject officer was considered "aggressive" by the chief of police, and his uses of force were almost double the uses of force of the next closest officer. Id. at *19.

---

[8] Additional detail is included in Defendants' principal memorandum (Doc. 138) at p. 9-14.

Downs
Rachlin
Martin PLLC

By contrast, the evidence in the instant case is that the number of uses of force by Cpl. Thibault was average for an officer who was assigned to the downtown district over a period of years. SUMF (127-1) at ¶ 18. Former Chief Schirling was not advised by either the Deputy Chief's or Cpl. Thibault's direct supervisors of any issues concerning Cpl. Thibault's uses of force. Id. at ¶¶ 24-25. Nor were any issues concerning Cpl. Thibault's use of force raised during his performance reviews, which occurred every four months and on an annual basis. Id. at ¶¶ 27-29. As such, former Chief Schirling had no reason be aware of any risk—let alone "a high degree of risk"—that improper application of deadly force would result from Cpl. Thibault's response to a non-emergency mental health call.

### VII. The Vermont Supreme Court's Decision In <u>Zullo</u> Does Not Overrule The Objective Good Faith Test And Does Not Change The Qualified Immunity Analysis.

Finally, Plaintiffs grossly misstate the Court's holding in <u>Zullo v. State</u>, 2019 VT 1. <u>Zullo</u> does not, in any way, provide that qualified immunity may be defeated by a factual assessment of the officer's subjective motivations. Rather, the language referenced by Plaintiffs pertains to an *element* of damages in constitutional tort claims against the State under Article 11's constraints against governmental search and seizures. <u>See</u> <u>id.</u> at ¶¶ 54-55. In particular, Plaintiffs refer to the third element, which requires that a plaintiff prove "the officer either knew or should have known that the officer was violating clearly established law or the officer acted in bad faith." Id. at ¶ 54. The Vermont Supreme Court explained that this element "includes a potential alternative showing of bad faith that in some instances would require the factfinder to make an objective assessment of the officer's subjective motivations." Id. at ¶ 55. In order to avoid any confusion, the Court clarified this element as follows:

> We emphasize, however, that the third element set forth above, although akin to qualified immunity in some respects, **is not an immunity from suit but rather an element that a plaintiff must prove to obtain damages** in a civil action directly under Article 11 for alleged constitutional violations.

Id. at ¶ 54 (emphasis added). Accordingly, Zullo does not in any way overrule Murray, or alter the objective good-faith test for qualified immunity from suit. See Murray, 155 Vt. at 630 ("Good faith exists where an official's acts did not violate clearly established rights of which the official reasonably should have known.").

Because the Vermont Supreme Court has never materially departed from Second Circuit or United States Supreme Court analysis with respect to qualified immunity in civil suit – and because it just makes sense -- it is reasonable to conclude that the Vermont Supreme Court would similarly condition supervisor liability on a violation by the subordinate officer of clearly established law. See Poe v. Leonard, 282 F.3d 123, 134 (2d Cir. 2002) ("a plaintiff "must show that *both* laws were clearly established to lay the predicate for demonstrating the [supervisor] lacked qualified immunity: the law violated by the [subordinate] and the supervisor liability doctrine under which [plaintiff] wishes to hold the [supervisor] liable.").

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court GRANT its Motion and dismiss all remaining state law claims against former Chief Schirling in Plaintiffs'

Amended Complaint.

March 22, 2019	DOWNS RACHLIN MARTIN PLLC

By /s/ Tristram J. Coffin
Tristram J. Coffin
Jennifer E. McDonald
199 Main Street
P.O. Box 190
Burlington, VT 05402-0190
Telephone: 802-863-2375
Fax: 802-862-7512

ATTORNEYS FOR DEFENDANTS CITY OF BURLINGTON, VERMONT; CHIEF MICHAEL SCHIRLING, IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES; CPL. ETHAN THIBAULT; IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES; CPL. BRENT NAVARI, IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES.

19111029.1